1   LAWRENCE LESSIG
    JENNIFER STISA GRANICK (SBN 168423)
2   ANTHONY T. FALZONE (SBN 190845)
    anthony.falzone@stanford.edu
3   DAVID S. OLSON (SBN 231675)
    dolson@law.stanford.edu
4   STANFORD LAW SCHOOL CYBERLAW CLINIC
    CENTER FOR INTERNET AND SOCIETY
5   559 Nathan Abbott Way
    Stanford, California  94305-8610
6   Telephone:  (650) 724-0517
    Facsimile:   (650) 723-4426
7
    MARK A. LEMLEY (SBN 155830)
8   mlemley@kvn.com
    MATTHEW M. WERDEGAR (SBN 200470)
9   mwerdegar@kvn.com
    DOROTHY MCLAUGHLIN (SBN 229453)
10  BENEDICT Y. HUR (SBN 224018)
    KEKER & VAN NEST LLP
11  710 Sansome Street
    San Francisco, California  94111
12  Telephone: (415) 391-5400
    Facsimile: (415) 397-7188
13
    BERNARD A. BURK (SBN 118083)
14  bburk@howardrice.com
    ROBERT SPOO (admitted *pro hac vice*)
15  spoo@howardrice.com
    HOWARD RICE NEMEROVSKY CANADY
16      FALK & RABKIN LLP
    Three Embarcadero Center, 7th Floor
17  San Francisco, California  94111-4024
    Telephone:  (415) 434-1600
18  Facsimile:  (415) 217-5910

19  Attorneys for Plaintiff

                    UNITED STATES DISTRICT COURT

20                NORTHERN DISTRICT OF CALIFORNIA

21                      SAN JOSE DIVISION

22

23  CAROL LOEB SHLOSS,                          Case No. CV 06-3718 (JW) (HRL)

            Plaintiff,                          **AMENDED COMPLAINT FOR
24                                              DECLARATORY JUDGMENT AND
        vs.                                     INJUNCTIVE RELIEF**
25
    SEÁN SWEENEY, in his capacity as trustee of the   **DEMAND FOR JURY TRIAL**
26  Estate of James Joyce, and THE ESTATE OF
    JAMES JOYCE,
27
            Defendants.
28

Dockets.Justia.com

Plaintiff Professor Carol Loeb Shloss ("Shloss"), by and through her attorneys, brings this action and alleges against Defendants as follows:

## NATURE OF THE ACTION

1.    This is a civil action seeking declaratory judgment that Shloss's use of certain written works on her proposed website does not constitute infringement of any copyrights that Defendants are authorized to assert against Shloss.

2.    This case arises out of copyright litigation threats defendant Estate of James Joyce (the "Estate") made against Shloss through its trustee, defendant Seán Sweeney ("Sweeney"), and other agents of the Estate, such as Stephen James Joyce ("Stephen Joyce").

3.    Defendant's threats caused, and were intended to cause, Shloss and Farrar, Straus & Giroux ("the Publisher") to cut significant documentary support for Shloss's scholarly thesis from her book, *Lucia Joyce: To Dance in the Wake* (2003) (the "Book"). Such threats were successful.

4.    After the Book's publication in redacted form, Shloss prepared a website (the "Website") that hosts an electronic supplement to her Book (the "Electronic Supplement") in order to present necessary documentary support that serves, in connection with her critical and analytical commentary, to enrich the scholarly nature of her Book. Defendants once again threatened Shloss and demanded that the Website never be made public. Shloss now seeks a declaratory judgment that her uses of materials on the Website do not infringe any copyrights controlled or owned by the Estate.

## THE PARTIES

5.    Shloss is an Acting Professor of English at Stanford University, and a resident of Stanford, California. Shloss received a B.A. at Swarthmore College, an M.A. at Harvard University and her Ph.D. from Brandeis University. She has taught at Wesleyan University, the University of Pennsylvania and West Chester University of Pennsylvania. She has held fellowships from the National Endowment for the Humanities, the Rockefeller Foundation, and the Mellon Foundation. In 1994 she won the Fellowship for Creative Non-Fiction Writing from the Pew Fellowships in the Arts. Prior to coming to Stanford, she held research positions at the Center for the Humanities at Wesleyan University, the Bunting Institute of Radcliffe College at Harvard, the Center for Documentary Photography at Duke University, the Rockefeller Institute at Bellagio, Italy, the Alice Paul Research Center at the University

of Pennsylvania, the Center for the Cross Cultural Study of Women at Oxford University, and the Harry Ransom Humanities Research Center at the University of Texas at Austin.

6.    Until recently she served on the editorial boards of the *Joyce Studies Annual* and *College Literature*. She is the author of four books: *Flannery O'Connor's Dark Comedies*, *In Visible Light: Photography and the American Writer*, *Gentlemen Photographers*, and, most relevant to this litigation, *Lucia Joyce: To Dance in the Wake*, a book about Lucia Joyce and the creative impact of Lucia's relationship with her father, the Irish expatriate author James Joyce, on James Joyce's literary works. At Stanford, Shloss teaches courses on James Joyce, Virginia Woolf, Women Writers and the Modern Experimental Novel, Modern Irish Literature, Modernism and the Cinema, Novels into Film, and Jane Austen on Film.

7.    Defendant Estate is a foreign entity that, upon information and belief, is organized under the laws of Great Britain. The Estate purports to own and control the copyrights to the works of James Joyce.

8.    Defendant Sweeney is a natural person and, upon information and belief, the sole Trustee of the Estate. The Trustee resides and can be found in the State of New York.

## JURISDICTION AND VENUE

9.    This Court has original jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1338 because this case arises under the Copyright Act, 17 U.S.C. §§ 101 *et seq*. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201.

10.    A major source of the Estate's income comes from licensing rights to James Joyce's works in the United States.

11.    The Estate has licensed James Joyce's works on numerous occasions in the United States, including in California. The Estate has also sold millions of copies of James Joyce's works, including sales in California.

12.    For instance, the Estate negotiated a licensing arrangement with Jane M. Ford, a resident of California, to quote from James Joyce's works. During the exchange, the Estate called, faxed, and sent letters to Ford in California.

13.    On or about June 9, 2005, the Estate's lawyers wrote to Paul K. Saint-Amour, an English professor at Pomona College in Claremont, California and a resident of California, in his capacity as chairperson of a fact-finding panel appointed by the International James Joyce Foundation to research and report to other scholars on the Estate's licensing policies and practices. A copy of the letter was also sent by the Estate's lawyers to Shloss, who was also a member of the panel and a California resident.

14.    In the letter, the Estate's lawyers asserted that the fact-finding panel's "'investigation' and any conclusion that [it] may draw, appear to carry with them a significant risk of infringement of the legal rights of the trustees of the Estate and the immediate Joyce family and we fully reserve their legal rights in this matter."

15.    On August 8, 2002, Stephen Joyce wrote to Shloss at her Stanford University address, repeating his oft-mentioned opposition to her Book, restating his goal of protecting Joyce family privacy, and forbidding her to use various materials concerning Lucia Joyce, including her medical records and files, which, upon information and belief, Stephen Joyce does not physically or legally control.

16.    After it was informed of Shloss's proposed Website and Electronic Supplement to her Book, the Estate directed several letters to Shloss's counsel at the Stanford Law School Cyberlaw Clinic expressing its opposition to the Website and Electronic Supplement, rejecting Shloss's fair use arguments, and stating its preparedness to enforce its copyrights against her. Stephen Joyce also sent correspondence to the Provost of Stanford University, Shloss's employer, stating his opposition to the proposed Website and Electronic Supplement.

17.    The Website and Electronic Supplement, if made available to the public, would serve as a source of scholarly and educational benefits to persons throughout the United States, including residents of California.

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 1400(a) because Defendant Estate is an alien and thus is subject to personal jurisdiction in this Court, and therefore may be found in this judicial district, and because a substantial part of the harm threatened to Shloss occurred in this judicial district, where Shloss resides and works.

1

**INTRADISTRICT ASSIGNMENT**

2

19.    For purposes of Local Rule 3-2(c) this action may be assigned district-wide because this is

3

an intellectual property case sounding in copyright.

4

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

5

**THE LIFE AND WORKS OF JAMES AND LUCIA JOYCE**

6

20.    James Joyce was an Irish fiction writer and poet, widely considered to be one of the most

7

influential and innovative authors of the twentieth century. He is best known for his short story

8

collection *Dubliners* (1914), and his novels *A Portrait of the Artist as a Young Man* (1916), *Ulysses*

9

(1922), and *Finnegans Wake* (1939). In particular, *Ulysses* is considered by both the public generally

10

and by literary scholars as one of the most important works of the twentieth century.

11

21.    Lucia Joyce, daughter of James Joyce and Nora Barnacle, was born in Trieste, Italy, on

12

July 26, 1907.

13

22.    Lucia began taking dance lessons when she was fifteen, and this became her main interest

14

during her teens and twenties.

15

23.    She started to show signs of emotional distress in 1930. Carl Jung took her in as a patient in

16

1934. Many other doctors, all with varying diagnoses, worked with her in ensuing years.

17

24.    Against her will and the will of James Joyce, her mother, Nora, and brother, Giorgio,

18

committed Lucia to a mental hospital when Lucia was 25, beginning her sporadic confinement in

19

psychiatric institutions that would last until her death on December 12, 1982.

20

25.    In her will, Lucia Joyce appointed Peter Francis du Sautoy, Frederic Lionel Monro, and

21

Jane Hester Lidderdale to act as trustees of the trust created by her will. Upon information and belief,

22

under the terms of Lucia Joyce's will, these trustees retained all of her property rights, including

23

copyrights. Income generated from these rights was to be split between her brother Giorgio Joyce and

24

Lucia's relative, Nelly Joyce.

25

**HISTORY OF THE DESTRUCTION OF PAPERS RELATED TO LUCIA JOYCE**

26

26.    People have destroyed documents about Lucia Joyce for over sixty years, apparently due

27

largely to the stigma that previous generations attached to young women who had suffered emotional

28

trauma. As a result, little of the public record remains. This dearth of information characterized the

1  special circumstances in which Shloss worked, and it explains the special importance of even small

2  amounts of documentary evidence in this case. Because James Joyce wrote about Lucia in various

3  creative and imaginative ways in *Finnegans Wake*, this documentary evidence is of literary as well as

4  biographical importance. In the generation of those who knew James and Lucia Joyce personally, those

5  who destroyed or suppressed letters were Maria Jolas, Harriet Shaw Weaver, John Dulanty, Stuart

6  Gilbert, and the family of Charles Joyce. Upon information and belief, in 1988 Stephen Joyce

7  announced publicly that he had destroyed all of his letters from Lucia as well as correspondence to

8  Lucia from the famous Irish author, Samuel Beckett. Upon information and belief, in or around 1992

9  Stephen Joyce persuaded officials at the National Library of Ireland to allow him to remove Joyce

10 family papers, including papers pertaining to Lucia, from the Paul Léon Papers, an important collection

11 of Joyce materials that the National Library of Ireland was about to open to the public.

### SHLOSS'S FIFTEEN YEARS OF SCHOLARLY WORK ON THE BOOK

12

13    27.    Shloss began research on Lucia Joyce in 1988, when she traveled to Paris to consult

14 Lucia's dance archives at the Bibliothèque de l'Opéra and the Rondelle Collection of the Performing

15 Arts at the Bibliothèque de l'Arsenal.

16    28.    Because these two libraries provided interesting material about Lucia Joyce's dance career,

17 Shloss expanded her search for records of Lucia's Parisian dancing at the Henry W. and Albert A. Berg

18 Collection at the New York Public Library and the New York Library of the Performing Arts.

19    29.    During this time, Shloss began studying at the Institute for Psychoanalytic Psychotherapies

20 in Bryn Mawr, Pennsylvania, in order to understand the issues involved in diagnosing and treating

21 "schizophrenia" from an historical perspective.

22    30.    Shloss's early research was supported by West Chester University, which, between the

23 years of 1987 and 1995, provided her with nine research grants from the Office of the Dean of Arts and

24 Sciences in the form of Research and Publication Awards and Faculty Development Awards.

25    31.    In 1990, Shloss traveled to the McFarlin Library, Poetry and Rare Books Collection (Tulsa,

26 Oklahoma) to consult the Richard Ellmann Archives. (Ellmann is a major biographer of James Joyce.)

27    32.    In the spring of 1992, Shloss went to Zurich to expand her research on dance at the

28 Zentralbibliothek, the Hauptbibliothek, and the Kunstgewerbe Museum.

33.    While in Zurich, Shloss also consulted the C.G. Jung Archives at the E.T.H. Bibliothek (Eidgenössische Technische Hochschule) and spoke to Peter Jung, Carl Jung's grandson, about any documents concerning Jung's care of Lucia that might not be in the possession of public institutions.

34.    Shloss then went to Dublin when the papers of Paul Léon, a friend and assistant of Joyce, were opened to the public at the National Library of Ireland in the summer of 1992. Shloss's work in Ireland consisted both of reading the Paul Léon papers and of discerning which Lucia-related materials had been removed by Stephen Joyce from the archive before it opened.

35.    After constructing a list of the names of Lucia's doctors whose bills had not been removed from the financial section of the Paul Léon papers, in 1993 Shloss went to the National Library of the History of Medicine in Bethesda, Maryland. In Bethesda, she read, and when necessary, translated from French and German, copies of the medical writings of Lucia's doctors.

36.    In 1994, Shloss received the Award for Creative Non-Fiction Writing from the Pew Charitable Trusts in Philadelphia. This award allowed her to become a Visiting Scholar at the Alice Paul Center for the Study of Women at the University of Pennsylvania (Fall 1994), and a fellow at the Centre for Cross-Cultural Research on Women at Oxford University, England, in the Spring 1995.

37.    In the fall of 1994, Shloss traveled to Buffalo, New York, to consult the James Joyce papers in the Special Collections Department at the Lockwood Memorial Library at the University of Buffalo, New York.

38.    Shloss's research continued at Oxford in 1995. During this time she traveled frequently to London to consult the Harriet Shaw Weaver papers at the British Library and the Lucia Joyce papers at University College London.

39.    In 1996, Shloss returned to Tulsa to work once again with the Richard Ellmann papers. She also visited the Harry Ransom Humanities Research Center at the University of Texas, Austin, a repository for the Stuart Gilbert papers and for other of Lucia Joyce's papers.

40.    Soon thereafter Shloss received a Mellon Fellowship in Biography from the University of Texas, which allowed her to return for a full month to use their collections in 1998.

41.    In both 1997 and 1998, Shloss was invited to be a Visiting Scholar at Stanford University where she used the Lane Medical Library to further her research into the historical use of pharmacology and to complete the writing of the first draft of her Book.

42.    Thereafter, Shloss made trips to consult manuscripts at Princeton University, Cornell University, Southern Illinois University at Carbondale, the Archive of American Art at the Smithsonian Institution, Washington D.C., the San Francisco Library of the Performing Arts, and the Beinecke Rare Book and Manuscript Library at Yale University.

43.    In 2000, Shloss returned to Dublin for more work at the National Library of Ireland and to use archives at University College Dublin and Trinity College Dublin.

44.    In the spring of 2003, Shloss was named Richard Ellmann Visiting Professor at Northwestern University, where she completed the revisions and final copy-editing of her manuscript.

45.    Shloss's Book describes the extraordinary influence that James Joyce's daughter Lucia exercised on her father's emotions and work and challenges Lucia's conventional portrayal as a troublesome blight on the Joyce family.

46.    As the Publisher made clear in a description of the Book issued upon publication, there is an important connection between Shloss's archival research and the scholarly value of *Lucia Joyce: To Dance in the Wake*: "Though most of the documents about Lucia have been destroyed, Shloss has painstakingly reconstructed the poignant complexities of her life . . . ."

## DEFENDANTS' THREATS AGAINST SHLOSS AND THE PUBLISHER

47.    Upon information and belief, Defendants became aware of Shloss's scholarly research into Lucia Joyce around 1994. Although Defendants had not contacted Shloss or discussed her scholarly work on Lucia Joyce, they opposed her work.

48.    Upon information and belief, Defendants sought to interfere with Shloss's ability to engage in Lucia-related scholarly research at various institutions including the Special Collections Department at the Lockwood Memorial Library at the University of Buffalo, New York, notwithstanding that Defendants cannot claim any ownership rights in the physical documents relating to Lucia or James Joyce in various libraries' collections. These attempts at interference were chilling and made Shloss's scholarly work more difficult.

49.    In 1996, Shloss wrote to Stephen Joyce and asked for his help on her Book, inquiring if he had personal documents that he would allow her to see. In response to her letter, Stephen Joyce stated in a letter dated March 31, 1996, that his "response regarding working with you on a book about Lucia is straightforward and unequivocal: it is a definitive no." He then purported specifically to prohibit Shloss from using any letters or papers by or from Lucia Joyce, notwithstanding that, upon information and belief, he was not legally entitled under the circumstances to prevent Shloss from making use of Lucia's writings.

50.    Stephen Joyce wrote to Shloss again in a letter dated April 19, 1996, in which he set forth a catalog of complaints about Joyceans and said that "[o]n Lucia's dancing career we have nothing to say . . . ."

51.    Over the course of his communications with Shloss, the only item that Stephen Joyce granted her permission to use—for a fee—was James Joyce's published poem *A Flower Given to My Daughter*, but he later rescinded that permission, claiming that Shloss had tried to "bypass" him by directing communications to Estate Trustee Seán Sweeney and former Estate lawyer David Monro, instead of to him. Defendants also refused permission so long as Shloss intended to use certain other materials bearing on the life of Lucia Joyce, even though, upon information and belief, Defendants did not control the use of, or copyrights in, those works.

52.    Upon information and belief, Defendants took other steps directly or indirectly, without justification, to interfere with Shloss's Book project and her scholarly work on Lucia Joyce, or to make that work more difficult.

53.    Though Shloss was disturbed and frightened by Defendants' attempts to obstruct her scholarly work, she persisted in her publication plans. In August of 2002, as she neared completion of the Book, Stephen Joyce again wrote to Shloss at her Stanford University address to harangue against her Book. After reiterating that Defendants' position had not changed from its expression in previous letters, he then "add[ed] a few 'things' you are <u>not</u> authorized to do and/or use." (emphasis in original). First, Stephen Joyce purported to "forbid[]" the use of any of Lucia's medical files and records, even though, upon information and belief, Defendants have no physical or legal control over such records and cannot claim any copyright interest in them. Second, Stephen Joyce again purported to forbid Shloss

from using any materials created by Lucia, which, upon information and belief, he was not legally entitled to do under the circumstances. Finally, he threatened Shloss by referring to recent copyright litigation that the Estate had engaged in, stating that "[o]ver the past few years we have proven that we are willing to take any necessary action to back and enforce what we legitimately believe in."

54.   After learning that the Book was to be published by Farrar, Straus & Giroux, Defendants then switched their tactics and began threatening the Publisher. On or about November 4, 2002, Stephen Joyce called the Publisher to inform it that he had heard about the Book, that he was opposed to any publication, and that he had never lost a lawsuit.

55.   Later that day, November 4, Stephen Joyce sent a letter to Jonathon Galassi, President of Publisher Farrar, Straus & Giroux, to the same effect.

56.   The very next day, on November 5, 2002, Stephen Joyce again wrote to Mr. Galassi. In the letter, Stephen Joyce claimed that since March 31, 2002, he is the "sole beneficiary owner" of all of James Joyce's rights and that he runs the Estate jointly with the Trustee, Sweeney. He also claimed that he is the sole owner of the rights to Lucia Joyce's works. Stephen Joyce tried to undermine publication of the Book further by asserting that Shloss did not have permission to use letters written by Harriet Shaw Weaver, Paul Léon, and Maria Jolas, whose copyrights, upon information and belief, Defendants do not own or control.

57.   Leon Friedman, an attorney for the Publisher, wrote to Stephen Joyce on November 6, 2002, informing him that the Publisher considered Shloss's work to be protected by copyright's fair use doctrine.

58.   On November 21, 2002, Stephen Joyce wrote to Leon Friedman. In the letter, Stephen Joyce informed Friedman that he "should be aware of the fact that over the past decade the Estate's 'record', in legal terms, is crystal clear and we have proven on a number of occasions that we are prepared to put our money where our mouth is." Stephen Joyce then remarked that the Publisher's fair use claim "sounds like a bad joke or wishful thinking" and told Friedman to "kindly bear in mind that there are more than one way [sic] to skin a cat."

59.   Also in the November 21, 2002 letter to Friedman, Stephen Joyce again asserted that Lucia Joyce's medical records should be off limits. Moreover, in response to Friedman's statement that under

copyright law a researcher has the right to make unauthorized use of "information" contained in copyrighted material, Stephen Joyce replied that such "'material' was copyrighted in order to protect the author's rights as well as those who inherit them . . . ."

60.    Stephen Joyce sent yet another letter to Leon Friedman, dated December 31, 2002, which repeated his earlier threats: "As I indicated in my previous letter, there are more ways than one to skin a cat! This is already proving to be true since certain pigeons from California are coming home to roost with very ruffled feathers."

61.    The December 31, 2002 letter further stated that Shloss's Book "is strictly a Joyce family matter to be dealt with by my wife and myself and is of no concern of/to the Trustee, Seán Sweeney."

62.    In their correspondence and communications with Shloss and her publisher, Defendants asserted that as owners of Joyce copyrights they were entitled to protect and enforce the privacy of Lucia and James Joyce (who are deceased) and of the living members of the Joyce family. Upon information and belief, Defendants have frequently made public and private statements asserting that their ownership of copyrights entitled them to protect and enforce the privacy of deceased and living members of the Joyce family, including Lucia and James Joyce.

63.    Friedman sent a final letter to Stephen Joyce on January 2, 2003, informing him that no further correspondence was necessary because it was clear that Stephen Joyce would not grant permission to use any copyrighted material and that therefore the Publisher would rely on fair use in publishing the Book.

## SUPPRESSION OF PORTIONS OF SHLOSS'S BOOK IN RESPONSE TO DEFENDANTS' THREATS

64.    Notwithstanding the valid fair use defense of Shloss's Book as written, to avoid any risk of litigation, significant amounts of the Joyce materials quoted in the Book were cut. On January 23, 2003, the Publisher emailed Shloss, describing the edits that it thought necessary to avoid a suit from Defendants over the Book. These cuts included all unpublished writing of James Joyce and Lucia Joyce.

65.    Shloss replied to the Publisher January 29, 2003. In her email she voiced concerns that "the proposed cuts eliminate almost all of the evidence in the book," which undermined the book's "scholarly integrity" and excluded the evidence it took her "12 years to assemble."

66.    Nevertheless, because of Defendants' threats, many of the proposed cuts were made. Although some manuscript material was later allowed to be reintroduced into the Book, the final edits resulted in over 30 pages being cut from the 400-page Book. The Book was published in its cut-down form in December 2003.

67.    Many reviews of Shloss's Book praised Shloss for her provocative theory, but nonetheless found her documentary support lacking.

68.    For example, the review of the Book in the *New York Times* observed that the unsupported portions of Shloss's argument "damage[] the book's credibility, making it read more like an exercise in wish fulfillment than a biography."

69.    The *New Yorker*'s review of the Book similarly focused on Shloss's documentary support. The review questioned Shloss's "elevation of Lucia to the role of collaborator on *Finnegans Wake*," remarking that "[t]he less Shloss knows, the more she tells us." Nevertheless, "when [Shloss] has some information to go on," the review found Lucia Joyce's untold story to be both "poignant" and "valuable."

70.    A review in the *San Francisco Chronicle* commended the Book for "giv[ing] substance to a life that has previously been treated as a distracting footnote" and for "add[ing] literary criticism of *Finnegans Wake* to illuminate Lucia's role as subject and inspiration that deepened her father's writing." Yet the review then observed that "[m]any of the problems this book presents to readers are probably due to the dearth of data." The review concluded by noting that "[w]hile Shloss corrects errors and unlikely conjectures by Richard Ellmann (in his classic James Joyce biography) and Brenda Maddox (in her biography of Nora Joyce), she adds a daunting quantity of her own speculations, surmises and unconvincingly supported suppositions."

**THE PLANNED ELECTRONIC SUPPLEMENT**

71.    In 2005, Shloss began creating an electronic supplement to *Lucia Joyce: To Dance in the Wake* (the "Electronic Supplement") and placed it on a website (the "Website") that was and currently is password-protected and thus has not been made available to the public. The electronic supplement is a resource by which scholars, researchers, and the general public will be able to view additional supporting material for *Lucia Joyce: To Dance in the Wake*, including material that was cut from the

Book as a result of the Estate's threats, material that Shloss herself chose to remove for fear of attracting the negative attention of the Estate, and other additional material related to Shloss's scholarly analyses. When made public, the Website will be accessible only within the United States to computers with a U.S. Internet Protocol ("IP") address.

72.    The Electronic Supplement consists of relevant pages of the text of *Lucia Joyce: To Dance in the Wake*, as published, supplemented in the margins by quotations that were cut from Shloss's Book, as published, along with other quotations related to Shloss's analyses. These quotations, which are visually keyed to the passages in Shloss's text to which they relate form part of her biographical commentary and criticism, and are taken from sources that include James Joyce's published works, manuscript versions of Joyce's published works, and published and unpublished letters to, from, or about Joyce or Joyce's family.

73.    For instance, each chapter of the Book was intended to include, as an epigraph, a short quotation evocative of Lucia Joyce drawn from James Joyce's published work, *Finnegans Wake*. The epigraphs would have interacted with and served as a focal point for Shloss's biographical commentary and criticism. In this, Shloss was following in the tradition of Richard Ellmann, whose monumental and acclaimed biography of James Joyce also used epigraphs drawn from Joyce's works to extend and enrich his analyses.

74.    Other quotations in the Electronic Supplement drawn from Joyce's published works and from published and unpublished letters to and from members of the Joyce family and community contain or convey important historical material that documents, supports, and gives context to Shloss's critical analyses.

75.    Some quotations in the Electronic Supplement are taken from James Joyce's 1922 first edition of *Ulysses*, published in Paris by Shakespeare and Company. Though the Estate claims otherwise, this particular edition is in the public domain in the United States.

76.    Some portions of the Electronic Supplement critically compare and contrast the language of manuscript versions of particular James Joyce works with the language of the published versions of the same works.

77.    Some quotations in the Electronic Supplement are taken from Lucia Joyce's own writings and provide important corroboration and context for Shloss's analyses.

78.    In addition the Electronic Supplement offers a visual and analytical illustration of the effects of the Estate's pressures on scholarly research and writing, and is thus itself an important commentary.

79.    On March 9, 2005, Shloss's counsel sent a letter to Defendants describing the planned Electronic Supplement. The letter explained that the Website would be restricted to U.S. access and stated that the omitted material was protected by copyright's fair use doctrine, and thus needed no permission, but nonetheless offered the Estate the opportunity to review the material before publication.

80.    Defendants replied on April 8, 2005, and asserted ownership of copyrights in all writings of James Joyce and Lucia Joyce and disapproved of the planned Electronic Supplement. The letter concluded by requesting that Shloss "respect . . . the Estate's legal rights and wishes in this matter."

81.    In a reply dated April 20, 2005, Shloss's counsel explained that the materials on the proposed Website could be used without permission under the fair use doctrine.

82.    On May 13, 2005, the Estate's counsel reiterated its disapproval of the planned Electronic Supplement. The letter criticized Shloss for not seeking a copyright license from the Estate and declared that it "believe[s] the proposed publication on the Internet to be an unwarranted infringement of the Estate's copyright and request again in the strongest terms that their legal rights on this issue be respected."

83.    Shloss's counsel replied on June 9, 2005, to explain that, in the United States, permission is not required to use material protected by fair use, and that therefore the Estate's repeated observation that Shloss had not asked permission was irrelevant.

84.    On December 23, 2005, the Estate's counsel informed Shloss's counsel that the Estate "does not give its permission for your client's proposed activities and rejects the notion that the proposed use could be made in the absence of consent under the fair use doctrine" and that it "reserves all rights if [Shloss] perseveres with her proposed activities."

1

**DEFENDANTS' PRIOR PURSUITS OF LITIGATION**

2          85.    Pursuant to Defendants' numerous threats, Shloss reasonably fears that Defendants will sue

3    if she makes the Electronic Supplement on the Website publicly available in its present form. Indeed,

4    Defendants have not shied away from aggressive pursuit of litigation. For example, Defendants sued

5    Cork University Press in 2000, shortly before the planned publication of Cork's anthology *Irish Writing*

6    *in the Twentieth Century*, edited by David Pierce. Defendants also sued the editor, Danis Rose, and

7    publisher, Macmillan Publishers Ltd, for the 1997 publication of the Reader's Edition of *Ulysses*. Upon

8    information and belief, Defendants also sued certain Irish sponsors of an Internet webcast reading of

9    *Ulysses*, which took place on "Bloomsday" 1998, even though the event was supported by leading

10   politicians in the Republic of Ireland. ("Bloomsday" is celebrated every June 16 throughout the world as

11   the day on which the fictional events of Joyce's *Ulysses* unfold.) In April 2004, Defendants sued Swiss

12   wine producer Provins Valais for its production of its "cuvée James Joyce" wines, which it had shipped

13   to Ireland in preparation for the 100th celebration of Bloomsday. In addition, in 2005 Defendants sued a

14   publisher based in Bath, England, Robert Fredericks Ltd, over its publication of a set of volumes entitled

15   "The Works of James Joyce in ten volumes."

16         86.    Upon information and belief, Defendants have threatened lawsuits on a number of other

17   occasions. These occasions include the use of a portion of *Ulysses* in a performance called "Molly

18   Bloom, A Musical Dream" which took place at the Edinburgh Festival Fringe in 2000. Upon

19   information and belief, that performance, which went forward as planned, was lawful under the

20   copyright law of the United Kingdom.

21                  **DEFENDANTS' UNCLEAN HANDS AND ACTS OF MISUSE**

22         87.    In addition to Defendants' attempts to interfere with Shloss's research on Lucia Joyce, to

23   stop publication of Shloss's Book, and to damage her relationship with her employer, Defendants, and

24   especially the Estate's agent, Stephen Joyce, have repeatedly misused the copyrights they control.

25         88.    First, Stephen Joyce has repeatedly represented that he is both a beneficiary of the Estate

26   and an agent of the Estate, in that he has claimed to control the Estate either solely, or jointly, with the

27   Trustee.

28

89.    In addition, Defendants have repeatedly, and upon information and belief, incorrectly, claimed that they were legally entitled under the circumstances to prevent Shloss from making use of Lucia Joyce's writings. Defendants have also claimed the right to control Lucia Joyce's medical records and files, in which, upon information and belief, they cannot claim copyright or physical ownership. They have also stated that "information" contained in copyrighted writings and letters is controlled by the Estate by virtue of copyrights it purports to own or control.

90.    For many years, Defendants have sought to prevent publication of materials and information that might reveal new details about the private lives of James Joyce, Lucia Joyce, and the Joyce family. In addition to consistently denying scholars and critics permission to quote from James Joyce's unpublished letters, notwithstanding that the last published edition of James Joyce's collected letters appeared in 1966 and hundreds of James Joyce letters have come to light since, Defendants have repeatedly misused their control of copyrights in Joyce's works in an effort to prevent the publication of materials and information about Joyce or the Joyce family over which Defendants have no rights or control.

91.    Stephen Joyce has also acted to prevent the scholarly use of materials about the private lives of James Joyce and the Joyce family. For example, upon information and belief, Stephen Joyce removed Joyce family papers, including papers pertaining to Lucia Joyce, from the archives of the National Library of Ireland before those papers could be made available to the public in 1992, despite the express wish of the donor that the papers be made available to the public.

92.    Upon information and belief, Stephen Joyce also publicly announced in 1988 that he had destroyed all of his letters from Lucia Joyce as well as correspondence to Lucia from the famous Irish author, Samuel Beckett, in order to protect and enforce the privacy of Lucia Joyce and the Joyce family.

93.    Defendants' hostility towards Shloss's Book comports with Defendants' customary practice of aggressively leveraging copyrights to control rights that Defendants do not own, and to protect non-copyright interests such as family privacy, including the alleged privacy of deceased persons.

94.    Another example of Defendants' misuse is that they caused author Brenda Maddox to delete the epilogue from her book *Nora: The Real Life of Molly Bloom* (Houghton Mifflin, 1988), which

discussed Lucia Joyce and her treatment. Even though, upon information and belief, Defendants had no rights to control Lucia-related material or the facts contained in the epilogue, when they learned of the epilogue discussing Lucia they threatened to withdraw all previously granted permissions to use any of James or Nora Joyce's materials. Upon information and belief, neither Defendants nor their agents ever actually read Maddox's book or the epilogue. Maddox eventually entered into an agreement the terms of which prevented Maddox and her descendants from ever publishing the epilogue. Another contractual term barred Maddox from criticizing Stephen Joyce or the Estate.

95.    Defendant similarly forced Catherine Driscoll, now a professor at University of Sydney, to excise a chapter dealing with Lucia Joyce from her Ph. D. thesis by threatening to withhold all permissions to quote from James Joyce's writings.

96.    Upon information and belief, on multiple occasions Defendants have denied permission to quote from James Joyce's writings, or stated that they intended to deny such permission, in retaliation for or as punishment for matters unrelated to the protection of copyright in James Joyce's writings.

97.    In 1996 Professor Michael Groden, a Joyce scholar at the University of Western Ontario, had a project to put *Ulysses* on a CD-ROM with annotated links to relevant multimedia material (the "Multimedia *Ulysses*"). He received limited permission from Defendants to develop prototypes of certain episodes of *Ulysses* for the purpose of applying for scholarly grants.

98.    Later, Professor Groden's Multimedia *Ulysses* project merged with a University of Buffalo project so that *Ulysses* manuscripts, final text, and multimedia material would all be included together. Also, the project changed from a CD-ROM project to one that would be available on the Internet (the "Digital *Ulysses*").

99.    The Digital *Ulysses* project ended in 2003 when Defendants demanded of the University of Buffalo an initial fee of between $500,000 and $1,000,000 for permission to proceed with the project, in addition to a royalty percentage on eventual subscriptions to Digital *Ulysses*. At certain other points, Defendants informed Professor Groden or his university that the permission fee for Professor Groden's original Multimedia *Ulysses* would be seven figures in euros or British pounds.

100.    Defendants also informed the University of Buffalo that before Defendants' permission to proceed with Digital *Ulysses* could be granted, certain other conditions had to be satisfied, including

exclusion from the project of all Irish organizations and institutions as well as of the Zürich James Joyce Foundation and Centre.

101.  Another condition demanded by Defendants was that Professor Groden, the scholar who had initially conceived a Multimedia *Ulysses* and who had labored for years to develop it, be excluded from the Digital *Ulysses* project unless he agreed to provide Defendants with information concerning the National Library of Ireland's purchase in May 2002 of certain previously unknown James Joyce manuscripts, including a number of *Ulysses* manuscripts, from a private source unconnected with Defendants. Professor Groden had served as a scholarly advisor to this purchase, assessing the literary significance of the papers for the National Library of Ireland. Although Defendants knew that Professor Groden's role was thus circumscribed, they made it a condition of Professor Groden's participation in the Digital *Ulysses* that Professor Groden tell Defendants "everything he knows" about the purchase, including information about the sellers' legal title to the papers. Upon information and belief, Defendants had no legal interest in these physical papers and did not challenge the purchase in litigation. The National Library had kept details of the contemplated purchase and its negotiations confidential prior to publicly announcing the acquisition. This had angered Defendants.

102.  Defendants' anger was expressed again shortly after the National Library of Ireland announced its purchase of the James Joyce papers in May 2002, when Stephen Joyce phoned Professor Groden to inform him that he would never again be allowed to quote from a Joyce text. On another occasion Stephen Joyce wrote Professor Groden to vent his anger over Professor Groden's role as scholarly advisor to the National Library of Ireland and other alleged instances in which Professor Groden had acted "against the fundamental interests of the James Joyce Estate," and informed Professor Groden that "[y]ou've made your bed and can now sleep in it."

103.  Again in January 2003, Stephen Joyce wrote a letter to Professor Groden, refusing permission for Professor Groden to reproduce photographically in a scholarly publication certain published facsimiles of page proofs for Joyce's *Ulysses*. Referring to the National Library of Ireland's May 2002 purchase, Stephen Joyce added in the same letter that "days of reckoning usually come when one least expects them and one of these has now come for you."

104. In addition to the above examples, Defendants on other occasions have used their copyright monopoly power to deny or discourage uses of Joyce materials that were permissible under the copyright law.

105. Further, upon information and belief, Defendants have on multiple occasions since 1997 asserted that the 1922 Paris first edition of *Ulysses* is protected by copyright in the United States, notwithstanding that they knew or should have known that U.S. copyright laws provide to the contrary with respect to that edition.

FIRST CAUSE OF ACTION

*Declaratory Judgment*

*1976 Copyright Act [17 U.S.C. §§ 101, et seq.] and 1909 Copyright Act*

106. Shloss incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

107. An actual controversy exists as to whether the material in the Electronic Supplement infringes any copyright of the Estate.

108. *De minimis* quotations in the Electronic Supplement are noninfringing.

109. Quotations of material in the U.S. public domain, including but not limited to the 1922 Paris first edition of *Ulysses*, are noninfringing in the United States.

110. Material in the Electronic Supplement that does not quote or paraphrase any work whose copyright is held by or administered by Defendants does not infringe any of Defendants' copyrights.

111. Shloss is entitled to a declaratory judgment that the Electronic Supplement does not infringe any copyright of Defendant, and that the 1922 Paris first edition of *Ulysses* is in the public domain in the United States and that Shloss's quotations from that edition in her Electronic Supplement therefore cannot be infringing as a matter of law in the United States.

SECOND CAUSE OF ACTION

*Declaratory Judgment [17 U.S.C. § 107]*

*Fair Use*

112. Shloss incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

- 19 -

113.  An actual controversy exists as to whether, in the planned Electronic Supplement, Shloss's use of materials to which Defendants hold or administer copyright ("Defendants' Material") falls within the fair use privilege.

114.  Shloss's uses of Defendants' Material in the planned Electronic Supplement are for the purposes of scholarly, biographical research and literary criticism and commentary.

115.  Shloss's use of Defendants' Material in the planned Electronic Supplement is not substantially commercial.

116.  Defendants' Material as used in the planned Electronic Supplement comprises both published and unpublished written works.

117.  Shloss's uses of Defendants' Material in the planned Electronic Supplement are of reasonable length to accomplish her scholarly goals.

118.  Shloss's uses of Defendants' Material in the planned Electronic Supplement establish historical and/or literary facts that are relevant to Shloss's scholarly works.

119.  Shloss's uses of Defendants' Material in the planned Electronic Supplement are transformative because they alter Defendant's Material with new expression, meaning, or message.

120.  Shloss's uses of Defendants' Material in the planned Electronic Supplement have little to no effect on the potential market for or value of Defendants' Material.

121.  Due to the purpose and nature of Shloss's work, her use of Defendants' Material in the planned Electronic Supplement should be considered presumptive fair use.

122.  Shloss is entitled to a declaratory judgment that her use of Defendants' Material in the planned Electronic Supplement is noninfringing fair use.

THIRD CAUSE OF ACTION

*Declaratory Judgment*

*Copyright Misuse*

123.  Shloss incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

124. Shloss alleges, upon information and belief, that Defendants are using threats of copyright infringement to unlawfully secure an exclusive right or limited monopoly not granted by the copyright laws.

125. Shloss alleges, upon information and belief, that Defendants knew or should have known that Shloss's quotations in the planned Electronic Supplement constitute a fair use of copyrighted material under 17 U.S.C. §§ 107 *et seq.*, or are otherwise noninfringing.

126. Defendants engaged in the misuse of their copyrights, including in the letters they sent to Shloss and to her Publisher and University employer, by claiming that Shloss's work constituted copyright infringement when Defendants knew or should have known that it did not.

127. Shloss alleges, upon information and belief, that Defendants' demand that Shloss not use Lucia Joyce's works and letters, along with her medical records and uncopyrighted information contained in those works, letters, and records, was an effort to secure an exclusive right or limited monopoly not granted by the copyright laws.

128. Shloss alleges, upon information and belief, that the Estate is using threats of copyright infringement to restrain Shloss's free speech and artistic expression in order to illegally extend the scope of Defendants' copyright.

129. Shloss alleges, upon information and belief, that Defendants engaged in misuse of their copyrights when they sought to use legal threats against Shloss to protect the privacy of James and Lucia Joyce (deceased persons) and the living Joyce family.

130. Defendants engaged in the misuse of their copyrights, including the threats of legal action in its letters to Shloss and her Publisher, by claiming that the creation and dissemination of *Lucia Joyce: To Dance in the Wake* constituted copyright infringement when it knew or should have known that there was no infringement.

131. Defendants engaged in the misuse of their copyrights, including by threatening to withhold permission to use materials over which Defendants controlled copyright from Brenda Maddox upon learning of Maddox's discussion of Lucia Joyce in the epilogue to her book. Defendants' actions thus caused Maddox to remove information and materials from her book over which Defendants had no legal control.

132.  Defendants engaged in misuse of their copyrights, including by causing Professor Catherine Driscoll to excise a chapter dealing with Lucia Joyce from her Ph. D. thesis by threatening to withhold all permissions to quote from James Joyce's writings.

133.  Upon information and belief, Defendants and Stephen Joyce have used their limited copyright monopoly to exact punishment or to gain leverage with respect to matters unrelated to the copyrights in James Joyce's writings. For example, Stephen Joyce engaged in misuse of copyright when he attempted to use his permission-granting power to exact unrelated and unjustified contractual concessions concerning Professor Michael Groden's role as scholarly advisor to the National Library of Ireland, and when he denied copyright permissions to Professor Groden for the same reasons.

134.  Defendants' misuse of their copyrights constitutes a pattern and practice that has continued for many years.

135.  Defendants' misuse of their copyrights violates the public policies underlying the copyright laws.

136.  Shloss is entitled to a declaratory judgment that Defendants' copyright misuse prohibits copyright enforcement by Defendants against Shloss.

FOURTH CAUSE OF ACTION

*Declaratory Judgment*

*Unclean Hands*

137.  Shloss incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

138.  In letters to Shloss, the Publisher, and Shloss's employer, Stanford University, Defendants have incorrectly claimed that they were legally entitled to prevent Shloss under the circumstances from making use of Lucia Joyce's letters, writings, and other Lucia-related materials, and even her medical records and files.

139.  This directly impacted Shloss's scholarly work and compelled the Publisher to suppress portions of Shloss's Book.

140.  Defendants threatened Shloss's employer, Stanford University, and otherwise sought to interfere with her work, including her archival research at the University of Buffalo, in order to obstruct her scholarly efforts related to the Book.

141.  Shloss is entitled to a declaratory judgment that Defendants' unclean hands prohibit enforcement of their copyrights against Shloss.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment:

1.      Declaring that under United States copyright law, Shloss's Electronic Supplement does not infringe any subsisting copyright owned by the Estate;

2.      Declaring that Shloss's activities with respect to the Electronic Supplement are protected as fair use;

3.      Declaring that Shloss's transformative academic work is presumptively fair use;

4.      Declaring that Defendants were not entitled under the circumstances to prevent Shloss from making use of the writings of Lucia Joyce or Lucia's medical records and files and other Lucia-related documents;

5.      Declaring that Defendants cannot assert copyright infringement within the United States of James Joyce's 1922 Paris first edition of *Ulysses*, because that particular edition is in the U.S. public domain;

6.      Declaring that due to Defendants' copyright misuse they cannot assert copyrights they control against Shloss;

7.      Enjoining the Estate and its Trustee Sweeney, along with its agents, attorneys, and assigns, from assertion of copyrights against Shloss regarding the materials on the Electronic Supplement on the proposed Website;

8.    Awarding Shloss her reasonable attorneys' fees and costs; and

9.    Awarding such other relief as the Court deems just and proper.

Dated:  October 25, 2006

STANFORD LAW SCHOOL CYBERLAW CLINIC
CENTER FOR INTERNET AND SOCIETY


By: _____/s/_____

David S. Olson

*Attorneys for Plaintiff*
CAROL LOEB SHLOSS

### **DEMAND FOR JURY TRIAL**

Shloss demands a jury trial on all issues properly triable to a jury.

Dated:  October 25, 2006

STANFORD LAW SCHOOL CYBERLAW CLINIC
CENTER FOR INTERNET AND SOCIETY


By: _____/s/_____

David S. Olson

*Attorneys for Plaintiff*
CAROL LOEB SHLOSS