1   Lawrence Lessig
    Anthony T. Falzone (SBN 190845)
2   David S. Olson (SBN 231675)
    STANFORD LAW SCHOOL CENTER FOR
3   INTERNET AND SOCIETY
    559 Nathan Abbott Way
4   Stanford, California  94305-8610
    Telephone:  (650) 724-0517
5   Facsimile:  (650) 723-4426
    E-mail:     falzone@stanford.edu

6   Mark A. Lemley (SBN 155830)
    Matthew M. Werdegar (SBN 200470)
7   KEKER & VAN NEST LLP
    710 Sansome Street
8   San Francisco, California  94111
    Telephone: (415) 391-5400
9   Facsimile:  (415) 397-7188
    E-mail:     mwerdegar@kvn.com

10
    Bernard A. Burk (SBN 118083)
11  Robert Spoo (*pro hac vice*)
    HOWARD RICE NEMEROVSKI CANADY
12  FALK & RABKIN, P.C.
    Three Embarcadero Center, 7th Floor
13  San Francisco, California  94111-4024
    Telephone: (415) 434-1600
14  Facsimile:  (415) 217-5910
    E-mail:     bburk@howardrice.com

15  Attorneys for Plaintiff

16

17                  **UNITED STATES DISTRICT COURT**

18                  **NORTHERN DISTRICT OF CALIFORNIA**

19                         **SAN JOSE DIVISION**

20

21  CAROL LOEB SHLOSS,                    | CASE NO. CV 06-3718 (JW) (HRL)

22          Plaintiff,
                                          | **PLAINTIFF'S OPPOSITION TO**
23      v.                                | **DEFENDANTS' MOTION TO DISMISS**
                                          | **FOR LACK OF SUBJECT MATTER**
24                                        | **JURISDICTION AND MOTION TO**
                                          | **STRIKE**
25  SEÁN SWEENEY, in his capacity as trustee of
    the Estate of James Joyce, and THE ESTATE OF   | Date:    January 22, 2007
26  JAMES JOYCE,                          | Time:    9:00 a.m.
                                          | Judge:   Hon. James Ware
27          Defendants.

28

---

Dockets.Justia.com

**TABLE OF CONTENTS**

I.     INTROUDCTION ..................................................................................1

II.    BACKGROUND ....................................................................................3

    A.     The Parties And Copyrights At Issue..................................................3

    B.     The Estate's Fifteen-Year Campaign Of Obstruction, Threats And
           Intimidation Against Professor Shloss And Her Publisher.................4

           1.     Shloss's Early Work Regarding Lucia Joyce And The Estate's
                  Attempts To Thwart It ...........................................................4

           2.     The Estate's Resort To Legal Threats....................................5

    C.     The Estate's Other Campaigns And Its History Of Litigation............8

    D.     The Effect Of The Estate's Conduct On Professor Shloss And
           Her Publisher And The Clear Apprehension Of Suit That
           Conduct Created................................................................................9

III.   ARGUMENT .......................................................................................11

    A.     This Declaratory Judgment Action Presents An Actual Controversy .............11

           1.     The Estate's Threats And Other Conduct Were More Than
                  Sufficient To Create A Reasonable Apprehension Of Suit .................12

           2.     Shloss Undertook Sufficient Preparatory Activity Because
                  Her Website Was Ready To Be Published At All Relevant Times ......16

    B.     The Estate's Covenant Not To Sue Over Portions Of The Website
           At Issue Does Not Moot This Controversy.......................................17

    C.     There Is No Proper Ground For The Court To Exercise Discretion
           Not To Hear This Case ....................................................................19

    D.     Plaintiff's Copyright Misuse And Other Affirmative Defenses
           Are Properly Before The Court.........................................................20

E.    There Is No Proper Ground On Which To Strike Any Of
Plaintiff's Allegations ........................................................................................21

1.    The Validity Of The U.S. Copyright In *Ulysses* Is
Relevant To This Action Because Material From *Ulysses*
Appears On The Website .......................................................................22

2.    Facts Concerning Copyright Misuse Against Other Parties
Are Relevant Because They Would Render Copyrights
Unenforceable Against Shloss ...............................................................23

3.    Allegations Regarding Destruction Of Papers Are Conceded
To Be True, And Relevant To Shloss's Apprehension Of Suit ............23

F.    There Is No Basis For An Award Of Attorneys' Fees Or Costs.......................24

IV.    CONCLUSION...............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)....................................................................11

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*,
846 F.2d 731 (Fed. Cir. 1988)...............................................................................13, 14, 15, 16, 17

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003) ...................20, 21

*Bianchi v. State Farm Fire & Cas. Co.*, 120 F. Supp. 2d 837 (N.D. Cal. 2000) ...........................22

*Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003)...................................................................................21

*Bureerong v. Uvawas*, 922 F. Supp. 1450 (C.D. Cal.1996)............................................................22

*C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874 (Fed. Cir. 1983)..........................................................15

*Calderon v. Ashmus*, 523 U.S. 740 (1998) ....................................................................................20

*California Dep't. of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028
(C.D. Cal. 2002)...............................................................................................................................23

*Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83 (1993)..................................................14

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959
(10th Cir. 1996).....................................................................................................12, 13, 15, 16, 17

*Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 39 (9th Cir. 1982) .........................12, 13, 14

*Dewey & Almy Chem. Co. v. Am. Anode*, 137 F.2d 68 (3d Cir. 1943) ..........................................12

*Ethicon, Inc. v. Am. Cyanamid Co.*, 369 F. Supp. 934 (D.N.J. 1973) ...........................................16

*EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996)....................................................14, 19

*Fantasy, Inc. v. Fogerty*, 984 F.2d 1524 (9th Cir. 1993),.............................................................22

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ...................................................21

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) .................................................................22, 24, 25

*Gator.Com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125 (9th Cir. 2005).............................................18

*Guthy-Renker Fitness LLC v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264
(C.D. Cal. 1998)...............................................................................................................................15

*Hakuto Co. v. Emhart Industries, Inc.*, 1989 WL. 24118 (N.D. Ill. 1989) ....................................15

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542 (9th Cir. 1990) .....12, 13, 14, 22

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 126 S. Ct. 1281 (2006)..............................................23

*Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985)....................................12

*Intel Corp. v. Commonwealth Scientific & Indus. Research Org.*, 455 F.3d 1364 (Fed. Cir. 2006) .................................................................................................................................20

*Keene Corp. v. Cass*, 908 F.2d 293 (8th Cir. 1990)......................................................................24

*Lang v. Pacific Marine & Supply Co., Ltd.*, 895 F.2d 761 (Fed. Cir. 1990) ...............................17

*Lasercomb Am., Inc. v. Reynolds*, 911 F.2d at 978................................................................20, 23

*LeDuc v. Kentucky Centr. Life Ins. Co.*, 814 F. Supp. 820 (N.D. Cal. 1992) .........................22, 24

*Matthew Bender & Co. v. West Pub. Co.*, No. 94 CIV 0589, 1996 WL. 442892 (S.D.N.Y. Aug. 5, 1996) .................................................................................................................................14

*Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488 (1942) .........................................................23

*In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087 (N.D. Cal. 2002)..............................20

*New Era Publ'ns Int'l  v. Henry Holt & Co.*, 695 F. Supp. 1493 (S.D.N.Y. 1988) *aff'd*, 873 F.2d 576 (2d Cir. 1989)............................................................................................................21

*Nike, Inc. v. Adidas Am., Inc.*, 2005 WL. 2757293 (D. Or. 2005).................................................16

*Oakley, Inc. v. Bolle Am., Inc.*, 1992 U.S. Dist. LEXIS 9517 (C.D. Cal. Mar. 26, 1992) ..........................................................................................................18

*Open Source Yoga Unity v. Choudhury*, 2005 WL. 756558 (N.D. Cal. 2005)..............................20

*Paramount Pictures Corp. v. Replay TV*, 298 F. Supp. 2d 921 (C.D. Cal. 2004) ........................18

*Plumtree Software, Inc. v. Datamize, LLC*, 2005 WL. 2206495 (N.D. Cal. Sept. 12, 2005) ........................................................................................................................................15

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516 (9th Cir.1997) ..............................20

*Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111 (1962) .....................................................19

*Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir. 1966)...............................21

*Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361
(Fed. Cir. 2004) ..................................................................................................15, 16, 17

*Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938
(9th Cir. 1981) ..........................................................................................................12, 13

*State of California v. United States*, 512 F. Supp. 36 (N.D. Cal. 1981) .......................22

*State of Tex. v. West Pub. Co.*, 882 F.2d 171 (5th Cir. 1989)..................................15, 16

*Super Prods. Corp. v. D P Way Corp.*, 546 F.2d 748 (7th Cir. 1976)............................13

*Teva Pharms. USA, Inc. v. Abbott Labs.*, 301 F. Supp. 2d 819 (N.D. Ill. 2004) ...........16

*True Ctr. Gate Leasing, Inc. v. Sonoran Gate, L.L.C.*, 402 F. Supp. 2d 1093 (D. Ariz.
2005) ...............................................................................................................................18

*Wailua Assocs. v. Aetna Cas. & Sur. Co.*, 183 F.R.D. 550 (D. Haw. 1998) ................24

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ...........................................................19

*Xilinx, Inc. v. Altera Corp.*, No. C 93-20709, 1994 WL. 782236 (N.D. Cal. Feb. 8, 1994)..........22

## FEDERAL STATUTES

17 U.S.C. §§ 1, *et seq* (1909) .........................................................................................23

17 U.S.C. § 304 (2006) ...................................................................................................23

28 U.S.C. § 2201(a) (2006)............................................................................................11

## RULES

Fed. R. Civ. P. 12(f) ..........................................................................................21, 22, 24

## MISCELLANEOUS

*Richard A. Posner and William F. Patry, Fair Use And Statutory Reform In The Wake Of
Eldred,* 92 Cal. L. Rev. 1639, 1658-59 (2004) .............................................................20

1    **I.    INTRODUCTION**

2              The Estate of James Joyce has waged a fifteen-year campaign of obstruction,

3    intimidation and threats designed to thwart Stanford University Professor Carol Loeb Shloss in

4    her efforts to write a biography of Lucia Joyce that explores (among other things) Lucia's

5    unacknowledged influence on, and contribution to, her famous father's literary work.  And

6    Shloss has not been the Estate's only target.  It sought and obtained an injunction against the use

7    of literally "a few lines or even less than a line here and there" of Joyce manuscript when

8    displeased with the resulting scholarship, forced another author to remove discussion of Lucia's

9    mental health issues from a book that was already in press, and its beneficiary (and now Trustee)

10   destroyed significant amounts of correspondence to and from Lucia Joyce—some from Samuel

11   Beckett, James Joyce's onetime secretary.  The result of this conduct has been to hamper not

12   only Shloss's work, but that of many other Joyce scholars as well.

13             Despite the Estate's efforts, Shloss persevered in her work.  When the Estate

14   realized she would not be deterred, it began issuing pointed threats of legal action to her and her

15   publisher.  The Trustee of the Estate, Stephen James Joyce, informed Shloss and her publisher

16   that the Estate's copyrights prohibited her from using "any letters or papers by or from Lucia" or

17   "any letters" from James Joyce "to anybody [that] deal with her."  When it became apparent that

18   Shloss intended to use such material under principles of Fair Use, Joyce admonished Shloss and

19   her publisher that the Estate is "willing to take any necessary action" to enforce its copyrights.

20   Joyce went on to warn that the Estate's "record in legal terms is crystal clear" and that it is

21   "prepared to put [its] money where [its] mouth is."  He added that Shloss's work is to be

22   published at "your risk and peril" and that "there are more ways than one to skin a cat."  Shloss

23   had every reason to believe the Estate would follow through on these threats.  Indeed, she knew

24   the Estate had in recent years sued other parties under similar circumstances.

25             Because of these threats, Shloss's publisher required her to excise a substantial

26   portion of Lucia-related materials that formed the primary sources for much of her scholarship.

27   But Shloss persevered.  She created a Website to publish the full and complete story she wished

28   to tell.  When provided with access to the Website and advised of the fact Shloss planned to

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER
JURISDICTION AND MOTION TO STRIKE

1     publish it, the Estate refused to back down.  Indeed, its lawyers advised Shloss that publication

2     of the materials in issue on the Website was an "infringement of the Estate's copyright" and that

3     the Estate "reserves all rights" in regard to that alleged infringement.

4          In view of the Estate's refusal to grant permission to use *any* Lucia-related

5     material, its unmistakable threats, and its history of litigation, Shloss was convinced she would

6     be sued upon publishing the Website.  Seeking to resolve her dispute with the Estate before

7     potential damages accrued, Shloss filed this declaratory relief action to vindicate her Fair Use

8     and First Amendment rights.

9          Now that Shloss has stood up to the Estate's threats, the Estate claims there is no

10    fight to be had.  It thus argues there is no actual controversy here, and that this litigation is a

11    "pretext" to "make[] new law" and "run roughshod over" the Estate.  Ignoring all

12    correspondence prior to 2005, the Estate suggests it merely advised Shloss and her publisher that

13    it "owns certain copyrights" and that it was "not interested in being involved in a dispute."  That

14    is just not so.  The complete correspondence contains multiple threats, thinly-veiled and overt,

15    over many years.  The Estate simply refuses to acknowledge them.

16         In order to rationalize its willful blindness, the Estate seizes on the fact that Shloss

17    revised her Website once, and filed an Amended Complaint to reflect this revision.  It suggests

18    this demonstrates the website was not finished when the original complaint was filed so there can

19    be no actual controversy.  But the Estate again ignores the fact that Shloss twice advised it that

20    the Website was ready to be published prior to suit.  It is likewise ready to be published now.

21         Hoping to side-step the dispute, the Estate also submits with its motion a covenant

22    not to sue Shloss in regard to the website as it existed in 2005 and suggests this covenant moots

23    the controversy because the Estate issued no threats as to the revised Website.  While this

24    covenant demonstrates the website was complete and definite at the time of suit, it does not moot

25    the controversy.  The central controversy here is whether the Website identified in Shloss's

26    Amended Complaint infringes the Estate's copyrights, and whether the Estate can use those

27    copyrights to suppress scholarship.  The Estate's promise not to sue over some – *but not all* – of

28    the material on that Website does not eliminate the controversy; it simply narrows it.  As for the

1  proposition that the Estate's threats were limited to the original Website, that is simply false.

2  The Estate's threats were always targeted at *any* publication of the Lucia-related material it

3  purported to control, and nearly all such threats came before the Website was even created.

4         Ultimately, the Estate seeks to hold Shloss in the same state of limbo she has

5  always feared.  It seeks to retain the right to sue on some of the Website, leaving Shloss either to

6  proceed at her peril or give in to the chilling effect of the Estate's conduct and stand silenced.

7  The purpose of the Declaratory Judgment Act is to relieve a litigant of precisely this dilemma.

8         There is a sharp, clear and justiciable controversy here.  All of Shloss's

9  allegations are pertinent to that controversy and properly before the Court.  The Estate's motion

10  to dismiss and motion to strike should both be denied.

11  **II.     BACKGROUND**

12       **A.     The Parties And Copyrights At Issue**

13         Plaintiff Carol Loeb Shloss ("Shloss") is currently an Acting Professor of English

14  at Stanford University.  *See* Declaration of Carol Loeb Shloss in Opposition to Defedants'

15  Motion to Dismiss ("Shloss Dec.") ¶ 1.  Throughout her 32-year academic career, she has taught

16  or held research positions at numerous universities, including Wesleyan University, Harvard

17  University, and Oxford University.  *See id.* ¶ 2.  She is the author of four books and has won

18  numerous grants and fellowships, including the 1994 Pew Fellowship for Creative Non-Fiction

19  Writing.  *See id.* ¶¶ 2-3.

20         The Estate of James Joyce (the "Estate"), a defendant in this action, operates

21  under foreign laws and under the control of trustee Seán Sweeney ("Sweeney") (also a defendant

22  here), as well as trustee and beneficiary Stephen James Joyce ("Joyce"), the grandson of the

23  famous twentieth century author James Joyce.  Together, Joyce and the Estate assert ownership

24  of the copyrights in all written works of James Joyce and his daughter, Lucia Joyce.  Stephen

25  Joyce is well-known for his aggressive enforcement of these rights, as detailed in the popular

26  press.  *See*, *e.g.*, Declaration of Robert Spoo ("Spoo Dec."), Ex. 4; Amended Complaint ¶¶ 85-

27  105 [Docket No. 14].

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER
JURISDICTION AND MOTION TO STRIKE

**B.    The Estate's Fifteen-Year Campaign Of Obstruction, Threats And Intimidation Against Professor Shloss And Her Publisher**

      **1.    Shloss's Early Work Regarding Lucia Joyce And The Estate's Attempts To Thwart It**

In 1988, Shloss began researching a book about Lucia Joyce. *See* Shloss Dec. ¶ 11. In connection with that work, Shloss has traveled the world to learn about and document the life of Lucia, including her early dancing career, history of mental health treatment and her unacknowledged contributions to her father's literary works. *See id.* ¶¶ 10-20.

The Estate has worked to thwart Shloss's project from the beginning. In 1988, Stephen Joyce destroyed many of Lucia's letters, as he admitted publicly at an international symposium in Venice and in an interview with the *New York Times*. *See* Shloss Dec., Ex. A. In response to the outrage expressed by Joyce scholars, he taunted them, asking, "What are people going to do to stop me?" *See id.* Similarly, in 1992, Stephen Joyce succeeded in removing documents regarding Lucia from the Paul Léon Papers in the archives at the National Library of Ireland, even though he had no legal claim to these papers that had been donated to the Irish people. *See* Shloss Dec. Ex. B. This generated an angry denunciation on the floor of the Irish Senate. *See id.*

When the Estate could not destroy material, it attempted to block Shloss's access to it. In 1994, Shloss traveled to the University of Buffalo in New York to consult the James Joyce papers in the Special Collections at the Lockwood Memorial Library. *See* Shloss Dec. ¶ 17. But the Library's Director, Robert Bertholf, had already been contacted by "intermediaries" from the Joyce Estate, who warned him that Shloss should not be permitted access to the Library's Joyce materials. *See* Spoo Dec., Ex. 4 at p. 41. Upon arriving, Shloss was told that she could review these materials only if she kept a "low profile." *See* Shloss Dec. ¶ 17. Indeed, the curator expressed fear that the Estate would sue the university if it learned that Shloss had been allowed to see its Joyce materials. *See id.*

Shloss grew concerned about the situation. She was aware that Stephen James Joyce had vehemently objected to an epilogue in fellow Joyce scholar Brenda Maddox's biography of Nora Joyce, the author's wife, because it described the time Lucia spent in a mental

1    asylum.  *See* Shloss Dec. ¶ 65; Spoo Dec., Ex. 4 at p. 34.  Fearing legal action, Maddox removed

2    the section even though copies of the book had already been printed.  *See id.*

3         Shloss decided to write to Joyce in early 1996 in the hope of avoiding a similar

4    dispute and to ask for Joyce's approval and assistance in her work.   This overture was rejected

5    gruffly.  In a March 31, 1996 letter, Joyce told Shloss that his "response regarding helping and

6    working with [her] on a book about Lucia is straightforward and unequivocal: it is a definite

7    NO."  Shloss Dec. Ex. C (emphasis in original).  Furthermore, Joyce added that "you do not have

8    our approval/permission to 'use' *any* letters or papers by or from Lucia. . . . [or] our

9    authorization to use *any* letters from my grandfather to anybody which deal with her."  *Id.*

10   (emphasis added).  Joyce wrote to Shloss again on April 19, 1996.  In this letter, he derided what

11   he termed the "Joycean industry" with which he associated Shloss, and reiterated that "[o]n

12   Lucia's dancing career we have nothing to say."  Shloss Dec., Ex. E.

13        Soon after receiving Joyce's first letter, Shloss wrote to Jane Lidderdale, Lucia's

14   guardian before her death.  *See* Shloss Dec. ¶ 24 and Ex. F.  Worried about the ire Joyce had

15   shown toward her – and the aggressiveness with which he had pursued Brenda Maddox

16   regarding the subject of Lucia – Shloss recognized that she "clearly will have a legal problem

17   [with Joyce] when it comes to publication" of her work.  *Id.*

18            **2.      The Estate's Resort To Legal Threats**

19        Despite her fears, Shloss continued her work.  In 2001, she signed a contract with

20   the publishing house Farrar Straus & Giroux ("FSG") to publish her book, now titled *Lucia*

21   *Joyce:  To Dance In The Wake*.  *See* Shloss Dec. ¶ 25.  Upon learning that Shloss's book would

22   soon be published, Stephen Joyce contacted Shloss again.

23        In an August 8, 2002 letter to Shloss, Joyce reiterated his refusal to give

24   permission for any use of any of the material he controlled, including Lucia's letters, drawings,

25   portraits or caricatures, or any letters from James Joyce to Lucia Joyce.  *See* Shloss Dec., Ex. G.

26   Joyce attempted to justify this total ban by asserting that he must "safeguard whatever remains of

27   the much abused and invaded Joyce family privacy."  *Id.*  Invoking the Estate's history of

28   litigation and intimidation against other authors (Part C, below), Joyce warned that "[o]ver the

1  past few years *we have proven that we are willing to take any necessary action to back and*

2  *enforce what we legitimately believe in.*"  *Id.* (emphasis added).[1]

3         Not content to threaten Shloss alone, Stephen Joyce began contacting her

4  publisher directly.  On November 4, 2002, Joyce called FSG and harangued editor John Glusman

5  for twenty minutes.  *See* Shloss Dec. ¶ 29-30.  Joyce announced that he was opposed to the

6  publication of any Lucia-related material, and pointed out that he had "never lost a lawsuit."  *See*

7  *id.*  That same day, Joyce wrote to FSG president Jonathan Galassi and enclosed his previous

8  correspondence with Shloss.  *See* Shloss Dec., Ex. I; Declaration of Jonathan Galssi ("Galassi

9  Dec.") Ex. 1.  Joyce reiterated his opposition to use of any Lucia-related materials he controlled,

10  and invited a response from Galassi.  *See id.*

11         Rather than waiting for that response, Joyce wrote again to Galassi the very next

12  day.  In his November 5, 2002 letter, Joyce again explained that Shloss did not have permission

13  to use any of Lucia's writings.  Joyce also claimed that Shloss needed his permission to quote

14  from letters written by Harriet Weaver, Shaw Weaver, Paul Léon, or Maria Jolas and again

15  asserted his opposition to publication of both these and any Lucia-related materials.  *See* Shloss

16  Dec., Ex. J; Galssi Dec. Ex. 2.

17         FSG responded to Joyce's objections through its attorney Leon Friedman on

18  November 6, 2002.  Mr. Friedman explained that FSG considered Shloss's use of the Lucia-

19  related material to which the Estate objected to be protected by the Fair Use doctrine and

20  indicated that Joyce's threats would not deter FSG from going forward with publication.  *See*

21  Declaration of Leon Friedman ("Friedman Dec."), Ex. 1.

22         Joyce responded by letter of November 21, 2002.  In that letter, his threats

23  became even more pointed.  He advised FSG that it should "take . . . very seriously" his earlier

24  letters to Shloss and Galassi, and reiterated his earlier statements that Shloss was not permitted to

25  ───────────────────

26  [1]    Joyce also rescinded the one permission he had ever granted Shloss (for a fee) – her use
   James Joyce's published poem *A Flower Given to My Daughter*.  He did so because he viewed

27  Shloss's communications with Estate trustee Sweeney and former Estate lawyer David Monro,
   not as legitimate efforts to identify copyright ownership and secure rights, but as attempts to

28  bypass him.  *See* Shloss Dec., Ex. I.

1   use any of the Lucia-related materials he had identified.  *See* Friedman Dec., Ex. 2.  Joyce went

2   on to warn Friedman that  FSG "should be aware of the fact that over the past decade ***the James***

3   ***Joyce Estate's 'record', in legal terms, is crystal clear and we have proven on a number of***

4   ***occasions that we are prepared to put our money where our mouth is***."  *Id.* (emphasis added).

5   Joyce closed by advising Friedman that in publishing the Lucia-related material Joyce objected

6   to, "you or rather Farrar Straus & Giroux proceed *à vos risques et périls*"—***at your risk and***

7   ***peril***—and that he should "kindly bear in mind ***there are more ways than one to skin a cat***."  *Id.*

8   (emphasis added).

9       Having received no reply from Friedman or FSG, Joyce wrote again on December

10  31, 2002 to remind Friedman that "[a]s I indicated in my previous letter, ***there are more ways***

11  ***than one to skin a cat!***"  Friedman Dec., Ex. 3.  Friedman replied on January 2, 2003, informing

12  Joyce that no further correspondence was necessary because the positions of the two parties were

13  clear.  *See id.*, Ex. 4.

14      Joyce did not stop there.  On May 22, 2003, he wrote to Friedman to "formally

15  inform" him that "Shloss and her publishers are NOT granted permission to use any quotations

16  from anything" that Lucia Joyce "ever wrote, drew or painted."  Friedman Dec., Ex. 5 (original

17  emphasis).  He explained that in his view "fair use does not apply to letters consequently no

18  extracts from letters of any member of the Joyce family can be used in Ms. Shloss' book and I,

19  acting for both the Estate and Family, refuse to grant such permission."  *Id.*   In this letter, Joyce

20  went on to assert that he has never "encountered a case where an author, academic or otherwise,

21  and his or her publisher refused to deal with me directly as is the case in this instance."  *Id.*  He

22  followed this with an open threat:

23          So be it.  I am perfectly willing to play the "game" your way but
        there will be repercussions.  This is not a threat but a statement of
24          fact….

25  *Id.*

26      Exactly two months later, on July 22, 2003, Joyce wrote Friedman another

27  unsolicited letter to remind Friedman, FSG and Shloss what was by now crystal clear:

28

1
2
3

Let me point out and stress, if need be, that the James Joyce Estate and myself as the sole beneficiary owner hold any and all rights, including copyright, to anything and everything that James, Nora . . . , Giorgio (George), Lucia, Helen (Kastor Fleischman) Joyce and myself ever wrote, drew, painted and/or recorded etc. . . .

4
5
6

In virtually all countries/nations and territories the world over there are laws, International Conventions ad Statutory Instruments which will uphold our intellectual property rights, including copyright and moral rights.

Friedman Dec., Ex. 6.

7

### C.    The Estate's Other Campaigns And Its History Of Litigation

8
9
10
11

Shloss was not the only target of Joyce's animosity during the period she was researching and writing about Lucia Joyce.  Joyce's dispute with Brenda Maddox is but one example of threats and lawsuits against other scholars that were well-known in the Joyce community and which contributed to Shloss's apprehension of suit.

12
13
14
15
16

- In 1997, the Estate sued Macmillan Publishers Limited and Joyce scholar Danis Rose for publishing a new edition of *Ulysses* that incorporated a small amount of manuscript material that had remained unpublished until after Joyce's death. Angered by what it regarded as unacceptable changes to the text, the Estate pursued an injunction and compensatory damages against the two defendants in the English High Court, despite "the fact that the passages taken by Dr. Rose . . . are only a few lines or even less than a line here and there."  Shloss Dec., Ex. Q.

17
18
19
20
21
22

- In 1998, the Estate filed suit in Ireland against sponsors of a global Bloomsday webcast that included a celebratory reading from *Ulysses*.  *See* Spoo Dec. Ex. 1. The Estate claimed the webcast infringed copyright, despite the sponsors' argument that the webcast fell within an exemption in Irish copyright law for works like *Ulysses* that had fallen out of copyright and later been revived pursuant to European Union law.  *Id.*  The webcast was sponsored in association with Dublin's James Joyce Centre, a registered charity that promotes awareness of James Joyce and his writings.  *Id.*  The webcast, which had been supported by the Prime Minister, President and other leading politicians of Ireland, did not go forward the following year when sponsors withdrew support out of fear of further litigation.  Shloss Dec., Ex. R; Spoo Dec. Ex. 1.

23
24
25

- In 2000 the Estate initiated a lawsuit against Cork University Press in Ireland. *See* Shloss Dec., Ex. O; Declaration of David Pierce ¶¶ 3-8.  When the Press refused to pay the exorbitant licensing fee demanded by the Estate but continued preparations for publication, the Estate sought, and the Irish High Court granted, a preliminary injunction that caused the Press to have to physically excise the Joyce extracts from printed copies of the anthology.  *See id.*

26
27
28

- Also in 2000, threats by Joyce stopped an Irish composer from using only eighteen words from *Finnegans Wake*, a novel thousands of words long, in his choral piece.   Despite the nominal use, Joyce stated that he simply did not like the music and thus deemed even eighteen words too much.  *See* Spoo Dec., Ex. 5.

8

1    The Joyce community is close-knit.  Shloss knew of all of these suits and legal

2    threats as they arose as well as others.  If there was any doubt that she was next it was removed

3    in June 2003 during a conference in Tulsa, Oklahoma.  At a social gathering prior to that address,

4    Shloss was approached by Sam Slote, another Joyce scholar.  Slote informed Shloss that he

5    would be reporting on her activities to the Estate.  *See* Shloss Dec., Ex. 43.  Slote also advised

6    Shloss that he had served as an expert witness in the Estate's lawsuit against Danis Rose.  *See id.*

7    Upon being pressed, Slote told Shloss that he would be testifying against her, too.  *See id.*

8    Accordingly, Shloss was "convinced" and "terrified" the Estate would, in fact, sue her.  *See id.*

9    David Pierce, a fellow Joyce scholar who had himself been involved with a lawsuit brought by

10   the Estate (p. 8, above) was at that conference and has never seen an academic "so utterly

11   alarmed."  Declaration of David Pierce ¶ 9.

12        **D.      The Effect Of The Estate's Conduct On Professor Shloss And
             Her Publisher And The Clear Apprehension Of Suit That
13           Conduct Created**

14   The threats issued by the Estate to Shloss and her publisher, coupled with the

15   Estate's history of belligerence and litigation against other authors and scholars, left Shloss with

16   one conclusion.  She believed that if she published the Lucia-related material in her book as

17   written, she and FSG were likely to be sued.  *See* Shloss Dec. ¶ 44.  As she wrote to her agent

18   Tina Bennett in 2003:  "I think there will be a lawsuit, and the suit could be against me

19   individually."  Shloss Dec., Ex. K.

20        FSG's actions left no doubt that it agreed.  FSG ultimately required Shloss to cut

21   thirty pages of Lucia-related material from her 400-page manuscript over her objection and to

22   her great dismay.  *See* Shloss Dec. ¶¶ 45-46.  In her view, the book she had spent fifteen years on

23   was being gutted.  The reason was clear.  As Stephen James Joyce himself stated in a letter to

24   Stanford University's Provost, FSG required the cuts ***out of concern for copyright litigation.***"

25   *See* Declaration of John Etchemendy ("Etchemendy Dec."), Ex. A.

26        There is no doubt that scholarship suffered as a result of excising a substantial

27   portion of Shloss's primary sources.  While reviewers lauded Shloss for her provocative theory,

28   they also criticized her for a lack of documentary support.  *See* Shloss Dec. ¶¶ 47-48.

9

1      Unwilling to compromise her academic and scholarly integrity, Shloss was

2   determined to tell the whole story of Lucia Joyce, despite her profound fear of suit and the

3   financial burden it would inflict on her and her husband.  As she explained to her agent, "It's not

4   a matter of winning or not.  The suit itself would ruin us."  Shloss Dec., Ex. K.

5      In order to tell Lucia's full story—as it existed before FSG's cuts—Shloss created

6   a Website that contained the material FSG had required her to cut, which was ready to be

7   published as of March 2005.  *See* Shloss Dec. ¶ 49-53; Declaration of David Olson ("Olson

8   Dec."), Ex. A.  On March 9, 2005, Shloss's counsel wrote to Joyce to notify him of Shloss's

9   intention to publish this Website containing the excised material, and to inform him that her right

10  to do so was protected by Fair Use principles.  *See* Declaration of Grace Smith ("Smith Dec.")

11  Ex. 1.

12     Shloss's counsel then received an April 8, 2005 letter from the Estate's Irish

13  counsel, McCann Fitzgerald.  *See* Smith Dec., Ex. 3.  The Estate's position had not changed.  Its

14  counsel again reiterated its "request" that Shloss refrain from publishing the Lucia-related

15  material in dispute.  *See id.*  Shloss's counsel responded to McCann Fitzgerald on April 20, 2005,

16  explaining that Shloss planned to release the website to the public on May 10 and asked the

17  Estate to register any objection before that date.  *See* Smith Dec. Ex. 4.  The Estate responded

18  through McCann Fitzgerald on May 13.  *See* Smith Dec. Ex. 5.  They asserted publication of the

19  Lucia-related materials to be an "***unwarranted infringement of the Estate's copyright***" and

20  "***request[ed] in the strongest possible terms that [the Estate's] legal rights on this issue be***

21  ***respected***."  *Id.* (emphasis added).

22     After additional correspondence with Shloss's counsel, McCann Fitzgerald

23  reiterated the position the Estate had established long ago.  *See* Smith Dec., Ex. 10.  The Estate's

24  counsel explained the Estate denies permission to use any of the material in issue, and rejects the

25  notion that fair use permits its use absent the Estate's consent.  Accordingly, McCann Fitzgerald

26  advised that it "***reserves all its rights if your client perseveres with her proposed activities***."  *Id.*

27     Accordingly, Shloss' dilemma remained.  She could remain silent and leave the

28  full story of Lucia she had worked fifteen years to assemble to be lost for all time, or she could

1   risk the possibility of suit and financial ruin by releasing the excised material on the Website she

2   had created and submitted to the Estate.  In order to forestall potential damages, she filed this suit

3   for declaratory relief on June 12, 2006.

4           Following the initiation of this suit, Shloss revised the website once to add

5   additional materials that had been cut from her manuscript.  *See* Shloss Dec. ¶ 49; Olson

6   Dec. ¶ 4.  This revision was completed and ready to publish in September 2006.  *See* Shloss Dec.

7   ¶ 49; Olson Dec. ¶ 6.  Shloss's counsel provided the revised Website to the Estate's U.S.

8   counsel.  *See* Olson Dec. ¶ 6.  The parties then undertook settlement discussions.  *See* Olson Dec.

9   ¶ 7.  It soon became apparent that a mutually acceptable resolution of the dispute was not

10  possible because the Estate continued to demand the removal of particular material to which it

11  objected.  *Id.*  Shloss then filed an Amended Complaint on October 25, 2006, to reflect the

12  revised Website and put it at issue in her pleadings.  *See id.*, Ex. C.

13          In connection with its motion to dismiss Shloss's Amended Complaint, the Estate,

14  for the first time, covenanted not to sue on material that had been included in the Website as of

15  November 2005.  That covenant, however, provides no relief as to a substantial portion of the

16  Website that is the subject of the Amended Complaint.  Accordingly, the Estate continues its

17  efforts to suppress Shloss's work, and her right to use the Lucia-related materials that were the

18  express subject of years and years of threats from the Estate remains very much in dispute.

**III.    ARGUMENT**

    **A.    This Declaratory Judgment Action Presents An Actual
Controversy**

22          The Declaratory Judgment Act provides a mechanism for the federal courts to

23  "declare the rights and other legal relations of any interested party" seeking declaratory relief in

24  the case of an "actual controversy."  28 U.S.C. § 2201(a) (2006); *see also Aetna Life Ins. Co. v.*

25  *Haworth*, 300 U.S. 227, 239-40 (1937) (finding the judicial power under the Act coextensive

26  with the Constitutional "case or controversy" requirement).  Its purpose is to allow adjudication

27  of a dispute *before* damages accrue, and thus "relieve potential defendants from the Damoclean

28  threat of impending litigation which a harassing adversary might brandish, while initiating suit at

1    his leisure – or never." *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542,

2    1555 (9th Cir. 1990) (quoting *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*,

3    655 F.2d 938, 943 (9th Cir. 1981)); *see also Dewey & Almy Chem. Co. v. Am. Anode*, 137 F.2d

4    68, 71 (3d Cir. 1943) (declaratory jurisdiction serves to prevent accrual of avoidable damages).

5       The touchstone of the case or controversy is whether the "adverse positions [of

6    the parties] have crystallized." *Societe*, 655 F.2d at 943.  Thus:

7    
8       To establish that a particular declaratory action presents an actual
   case or controversy, a party is required to show that, under all the
   circumstances of the case, there is a substantial controversy
9       between parties having adverse legal interests, and the controversy
   is of sufficient immediacy and reality to warrant declaratory relief.

10   *Hal Roach*, 896 F.2d at 1555.

11      In the intellectual property context, this has been interpreted to require a showing

12   that (i) the defendant's actions create a reasonable apprehension of suit and (ii) the declaratory

13   judgment plaintiff engages in either present, or sufficient preparatory, activity that could

14   constitute infringement.  *See id.* at 1555-56; *see also Chesebrough-Pond's, Inc. v. Faberge, Inc.*,

15   666 F.2d 39, 396-973 (9th Cir. 1982) (trademark); *Societe*, 655 F.2d at 943-44 (patent);

16   *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 965-66 (10th Cir. 1996)

17   (publicity rights). Both elements are assessed at the time the plaintiff files suit.  *Indium Corp. of*

18   *Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 883 (Fed. Cir. 1985).

19      Here, both requirements have been met and an actual controversy exists.

20      **1. The Estate's Threats And Other Conduct Were More
21        Than Sufficient To Create A Reasonable Apprehension
     Of Suit**

22      The Estate told Shloss that she does "not have … permission to use *any* letters or

23   papers by or from Lucia" or "*any* letters" from James Joyce that "deal with her."  (P. 5, above.)

24   Upon learning that Shloss planned to publish exactly these sorts of materials, the Estate

25   reiterated its refusal to grant permission to do so, and admonished Shloss that it has "proven that

26   [it is] willing to take any necessary action to back and enforce" its rights.  (P. 6, above.)

27      The Estate then went on to threaten not only Shloss but also her publisher with a

28   string of even more pointed threats; for example, it stated:

1    • The Estate's "record in legal terms is crystal clear" – namely that it is
2      "prepared to put [its] money where [its] mouth is;"

3    • Shloss and her publisher proceed at their risk and peril in publishing
       material concerning Lucia;

4    • There are more ways than one to skin a cat;

5    • There will be "repercussions" if material concerning Lucia is published;
6      and

       • The law "will uphold [its] intellectual property rights."
7

8    (Pp. 6-8, above.)

9        These threats are alone sufficient to create a reasonable apprehension of suit. *See,*

10   *e.g.*, *Hal Roach*, 896 F.2d at 1556 (finding reasonable apprehension based on one letter stating

11   that that upon expiration of a license agreement, licensee would have "no rights of any kind" in

12   the copyrighted work and suggesting the licensee should not continue to sell films containing

13   such works following expiration); *Chesebrough-Ponds*, 666 F.2d at 396-97 (finding reasonable

14   apprehension based on one letter that did not threaten suit, but asserted facts sufficient to state a

15   claim for trademark infringement); *Societe*, 655 F.2d at 944 (definition of "threat" is liberally

16   construed); *Super Prods. Corp. v. D P Way Corp.*, 546 F.2d 748, 754 (7th Cir. 1976) (party's

17   "expressed determination to defend its rights" can induce reasonable apprehension).

18       Moreover, these threats occurred during a period during which Shloss knew the

19   Estate was actively pursuing legal action against other scholars and publishers. (Pp. 8-9, above.)

20   Shloss was aware of these other lawsuits, and a witness for the Estate in at least one of these

21   lawsuits suggested to her that she would be the Estate's next litigation target. *See* Shloss Dec. ¶¶

22   58-65. These facts erase any doubt about reasonable apprehension. *See Cardtoons*, 95 F.3d at

23   966 (holding one letter threatening to pursue "full legal remedies" coupled with "[defendant's]

24   history of suing other card companies in similar situations . . . created a reasonable apprehension

25   ... of impending litigation"); *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731,

26   733, 737 (Fed. Cir. 1988) (finding reasonable apprehension where defendant had sent letter

27   stating it "has . . . not hesitated to protect its patent rights whenever appropriate" and initiated

28   another suit on the patent in issue).

1    The Estate itself says that Shloss's publisher forced her to excise the bulk of the

2    Lucia-related materials it objected to out of fear of litigation.  (P. 9, above.)  Once the Estate was

3    notified of her intention to publish these materials on the Website, it did nothing to dispel its

4    previous threats, or back down from its previous position.  *See Hal Roach*, 896 F.2d at 1556

5    (defendant's failure to dispel the threat implicit in its letter weighed in favor of reasonable

6    apprehension); *Chesebrough-Ponds*, 666 F.2d at 397 (same).

7    Instead, the Estate responded through counsel and advised her that it considered

8    "***the proposed publication on [the Website] to be an unwarranted infringement of the Estate's***

9    ***copyright***" and that it "***reserves all rights***" in regard to that alleged infringement.  (P. 10, above.)

10    This accusation of "infringement" is likewise by itself sufficient to create a reasonable

11    apprehension of suit.  *See Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96 (1993)

12    (where "a party has actually been charged with infringement of [a] patent, there is, *necessarily,* a

13    case or controversy adequate to support jurisdiction" under the Declaratory Judgment Act)

14    (emphasis in original); *Arrowhead*, 846 F.2d at 736 (where a "defendant has expressly charged a

15    current activity of the plaintiff as an infringement, there is clearly an actual controversy, certainty

16    has rendered apprehension irrelevant, and one need say no more").[2]

17    Astonishingly, defendants ignore nearly all of these facts.  *See* Defendants'

18    Motion to Dismiss ("MTD") at 5-7, 10-11 (ignoring all correspondence prior to 2005).  They

19    suggest that the Estate merely advised Shloss and her publisher that it "owns certain copyrights"

20    and tell her that it was "not interested in being involved in a dispute."  *See* MTD at 10-11.  That

21    is simply not the case.  The Estate issued multiple threats over ten years, and specifically told

22    Shloss that it considers her website an "infringement" of its copyrights.  (Pp. 5-10, above.)

23

24    ───────────────────

25    [2]    The fact the Estate responded through counsel heightens the apprehension of suit.  *See*
26    *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 812 (Fed. Cir. 1996) (holding a letter stating an
      inclination to turn the matter over to legal counsel sufficient to create reasonable apprehension of
27    suit); *Matthew Bender & Co. v. West Pub. Co.*, No. 94 CIV 0589, 1996 WL 442892, at *2
      (S.D.N.Y. Aug. 5, 1996) (statement that copyright counsel had been retained together with active
28    pursuit of litigation against other publishers contributed to reasonable apprehension of suit).

1    Defendants can make this assertion only by focusing entirely on correspondence

2   from 2005 and 2006 – presumably because that was when the parties discussed the Website

3   specifically. *See* MTD at 10-11. If the Estate is suggesting that earlier correspondence is

4   irrelevant because it does not mention the Website specifically, it is mistaken. The Estate's

5   threats were directed broadly and expressly toward *any* unauthorized publication of Lucia-related

6   materials. Ultimately, FSG required the deletion of the a substantial portion of the material that

7   was the subject of those threats. But that material – along with other, similar material that was

8   likewise the subject of the Estate's repeated threats – was the very material included in the

9   Website. The fact the material that was the subject of the Estate's threats is to be published in

10   one medium or another does not render the Estate's threats any less potent. *See Sierra Applied*

11   *Scis., Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1374-77 (Fed. Cir. 2004) (broad

12   threats of litigation as to any pulsed power supply created reasonable apprehension of suit as to

13   all potentially infringing power supplies, not merely those known to threatening party).[3]

14    The Estate goes on to suggest that lawsuits against other parties are irrelevant

15   here. *See* MTD at 11. That is simply false. It is well-established that suits against other parties

16   may contribute to reasonable apprehension. *See Cardtoons*, 95 F.3d at 966; *Arrowhead*, 846

17   F.2d at 733, 737; *State of Tex. v. West Pub. Co.*, 882 F.2d 171, 176-77 (5th Cir. 1989) (noting

18   that lawsuits against third parties contribute to a plaintiff's reasonable apprehension); *see also*

19   *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 n.6 (Fed. Cir. 1983) (initiating litigation against

20   other manufacturers of similar products helps create reasonable apprehension); *Guthy-Renker*

21   *Fitness LLC v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264, 278-79 (C.D. Cal. 1998)

22   (enforcement activities against other parties contributed to reasonable apprehension).

23

24   _____

25   [3]    It is likewise irrelevant that the parties did not correspond during the six months prior to
26   filing. *See Plumtree Software, Inc. v. Datamize, LLC*, 2005 WL 2206495, at *9 (N.D. Cal. Sept.
    12, 2005) (letters sent two years prior to initiation of declaratory relief action created reasonable
27   apprehension of suit); *Hakuto Co. v. Emhart Industries, Inc.*, 1989 WL 24118 at *3 (N.D. Ill.
    1989) (letters sent three years prior to initiation of declaratory relief action created reasonable
28   apprehension of suit).

1    The fact other lawsuits occurred outside the United States is irrelevant. *See Nike,*

2   *Inc. v. Adidas Am., Inc.*, 2005 WL 2757293 at *3 (D. Or. 2005) (European litigation contributed

3   to apprehension of suit); *see also Teva Pharms. USA, Inc. v. Abbott Labs.*, 301 F. Supp. 2d 819,

4   822 (N.D. Ill. 2004) (Canadian regulatory proceeding initiated by defendant contributed to

5   reasonable apprehension); *Ethicon, Inc. v. Am. Cyanamid Co.,* 369 F. Supp. 934, 937 (D.N.J.

6   1973) (holding suit on foreign counterpart patent created sufficient threat of suit).

7    Based on the totality of the Estate's conduct, Shloss had every reason to believe

8   that if she published the Lucia-related materials on the Website, she would suffer the same

9   consequence that the Estate asserts FSG feared:  litigation.

10    **2.    Shloss Undertook Sufficient Preparatory Activity**
        **Because Her Website Was Ready To Be Published At**
11        **All Relevant Times**

12    In order to create a proper case or controversy, a declaratory judgment plaintiff

13  must engage in either a present or sufficiently preparatory activity that could constitute

14  infringement. *See, e.g.*, *Arrowhead*, 846 F.2d at 735; *State of Texas v. West Pub. Co.*, 882 F.2d

15  171, 175 (5th Cir. 1989) (to establish actual controversy "plaintiff must show that it has actually

16  published or *is preparing to publish* the material that is subject to the defendant's copyright")

17  (emphasis added).

18    There should be no dispute that Shloss met that rule here.  Her Website was ready

19  to be published as of March 2005.  Indeed, Shloss's counsel notified the Estate of that fact on

20  March 9, 2005 and again on April 20, 2005.  (P. 10, above.)  Accordingly, the Website was ready

21  for publication long before this lawsuit was filed. *See Cardtoons*, 95 F.3d at 966 (finding proper

22  case or controversy when all work in preparation for the production of the potentially infringing

23  cards was completed at the time the complaint was filed).

24    The Estate suggests the fact Shloss has not released her website to the public

25  somehow demonstrates the lack of an actual controversy. *See* MTD at 10.  It does not. *See*

26  *Cardtoons*, 95 F.3d at 966 (finding actual controversy where cards in issue had not been

27  released); *see also Sierra*, 363 F.3d at 1378-79 (plaintiff need not release accused product onto

28  the market to create actual controversy; "concrete steps" or "meaningful preparation" will

1    suffice). Indeed, the only reason Shloss has not released her Website to the public is because of

2    the Estate's threats.

3         The Estate likewise tries to seize upon the fact Shloss chose to revise the Website

4    in 2006 – after this lawsuit was filed – and filed an Amended Complaint reflecting that revision.

5    *See* MTD at 12-13. Based on that revision, the Estate asserts the website was incomplete at the

6    time the original complaint was filed. *See id.* That is simply a non sequitur. The website was

7    ready to be released in March 2005 and upon filing of this lawsuit. It is likewise ready to be

8    released now. The fact it has undergone one revision does not change the fact that it was – and

9    is – ready to be released immediately.

10        This is not a case where the potentially infringing product is unfinished, and it

11   remains to be seen what might be in issue and what might not be. *See* MTD at 13 (citing *Lang v.*

12   *Pacific Marine & Supply Co., Ltd.*, 895 F.2d 761, 764 (Fed. Cir. 1990)). Unlike the ship that

13   would not be complete for nine months in *Lang*, Shloss's website is complete today and ready

14   for release. See Olson Dec., Ex. B. The material in issue here is contained in the Website

15   identified in the Amended Complaint. It is fixed and will not change absent leave to amend. *See*

16   Shloss Dec. ¶ 49. Accordingly, the dispute is sharp, concrete and sufficiently definite to create

17   an actual controversy. There is nothing hypothetical or contingent about it. *See Cardtoons*, 95

18   F.3d at 965-66; *Arrowhead,* 846 F.2d at 735.

19
         **B.      The Estate's Covenant Not To Sue Over Portions Of The**
20                 **Website At Issue Does Not Moot This Controversy**

21        Defendants contend that their covenant not to sue Shloss in connection with "the

22   2005 version of [Website]" moots this controversy. *See* MTD at 11-12. It does not. The

23   dispute before this Court is whether the Website identified in Shloss's Amended Complaint

24   infringes the defendants' copyrights. Defendants' covenant prevents them from suing over *some*

25   – but *not all* – of the Lucia-related material contained in that Website. Accordingly, the dispute

26   has been narrowed, but not eliminated. *See Sierra*, 363 F.3d at 1375 (covenant not to sue as to

27   in-house use of power supply did not moot controversy because it did not cover other potentially

28   infringing activity).

1          The cases defendants rely on confirm this fact.  All of the covenant cases

2    defendants cite deal with covenants that covered the whole dispute between the parties. *See*

3    *Oakley, Inc. v. Bolle Am., Inc.*, 1992 U.S. Dist. LEXIS 9517, at *9 (C.D. Cal. Mar. 26, 1992)

4    (plaintiff covenanted not to sue defendant for infringement of its trademark for *any* current or

5    past products); *True Ctr. Gate Leasing, Inc. v. Sonoran Gate, L.L.C.*, 402 F. Supp. 2d 1093,

6    1096-97 (D. Ariz. 2005) (defendant covenanted it "will not sue True Center or its customers for

7    infringement . . . arising out of *any* past or present acts or products") (emphasis added).  The

8    other cases defendants cite likewise dismiss the action only upon the elimination of the entire

9    controversy between the parties.  *See Gator.Com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1130-

10    31 (9th Cir. 2005) (dismissing after plaintiff agreed to discontinue *all* use of the accused

11    advertisement in exchange for a release from *all* liability for past activities); *Paramount Pictures*

12    *Corp. v. Replay TV*, 298 F. Supp. 2d 921, 927 (C.D. Cal. 2004) (dismissing individual DVR

13    owners' suit when copyright owners dropped their secondary liability suit against DVR

14    manufacturers).

15          Defendants attempt to respond to this problem by suggesting that Shloss "cannot

16    complain that the covenant not to sue does not cover" the revised Website because it was not

17    "ready for publication by May 2005."  *See* MTD at 12.  Thus, defendants suggest it is somehow

18    improper for Shloss to revise her website after filing suit.  Defendants present no authority that

19    would suggest this is the case, and cannot point to any prejudice that would result from revision

20    and amendment. On the contrary, the Website is fixed, the parties know exactly what is in issue

21    and the Website is ready for publication now, just as it was in May 2005.  (Pp. 10-11, above.)

22          Defendants likewise report that "no reasonable apprehension can exist" as to

23    material added after this suit was filed.  *See* MTD at 12.  Yet the Estate's ten years of threats

24    concerned the publication of *any* Lucia-related material or other Joyce family material it

25    controlled.  (Pp. 5-10, above.)  Those threats were not confined to the material contained in the

26    original version of the Website.  On the contrary, nearly all of the Estate's threats were issued

27    before the creation and disclosure of the Website in any form.  (*Id.*)

28

1

2

### C.    There Is No Proper Ground For The Court To Exercise Discretion Not To Hear This Case

3

Defendants also suggest the Court should exercise its discretion to decline

4

jurisdiction over this case. *See* MTD at 14. While district courts have discretion to dismiss an

5

actual controversy if it "will serve no useful purpose," *Wilton v. Seven Falls Co.*, 515 U.S. 277,

6

288 (1995), "[c]ourts cannot decline to entertain such an action as a matter of whim or personal

7

disinclination." *Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962). Courts thus

8

rely on a number of "well-founded reasons" to dismiss a suit." *Capo, Inc. v. Doptics Med.*

9

*Prods., Inc.*, 387 F.3d 1352, 1355 (Fed. Cir. 2004). These include forum shopping and wasted

10

judicial efforts. *See EMC*, 89 F.3d at 815 (holding dismissal proper where concurrent

11

negotiations suggested the plaintiff was using the Act to garner a more favorable bargaining

12

position). Defendants present no such justification here.

13

Instead, defendants recycle their argument that the dispute is "hypothetical"

14

because the Website is not finished and they have promised not to sue as to part of it. *See* MTD

15

at 14-15. But – again – the website is finished; it will not be revised absent leave to amend the

16

complaint. (P. 17, above.) If the Court were to dismiss this action based on the covenant that

17

immunizes Shloss from suit as to some – but not all – of the Website in issue, it would leave

18

Shloss on the horns of the same dilemma with which she started. She can either proceed to

19

publish the Website at peril of liability for damages and other costs, or not publish it and stand

20

silenced.

21

Exercising jurisdiction over this case serves the purpose of the Declaratory

22

Judgment Act by protecting Shloss from this "*in terrorem* choice." *EMC*, 89 F.3d at 814-15

23

(citing *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734-35 (Fed. Cir. 1988)).

24

She has chosen to file this suit "to clear the air" and "settle the conflict" between her and the

25

Estate. *Id.* This is consistent with, not contrary to, the purposes of the Declaratory Judgment

26

Act. Discretionary dismissal is therefore not appropriate.

27

28

1    **D.    Plaintiff's Copyright Misuse And Other Affirmative Defenses**
        **Are Properly Before The Court**

2

3              Defendants suggest that Shloss's affirmative defenses are not properly before the

4    Court.  *See* MTD at 13-14 (citing *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) (denying

5    inmates a determination on the State's ability to rely on a specific statute as a defense to future

6    federal habeas corpus petitions)).  This is simply wrong.  Adjudication of affirmative defenses is

7    proper in a declaratory judgment action.  *See, e.g.*, *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,*

8    121 F.3d 516, 520 (9th Cir.1997) (declaratory relief plaintiff permitted to assert copyright misuse

9    defense); *Intel Corp. v. Commonwealth Scientific & Indus. Research Org.* 455 F.3d 1364, 1368

10   (Fed. Cir. 2006) (adjudicating declaratory judgment plaintiff's affirmative defenses of patent

11   misuse, equitable estoppel, and laches); *Open Source Yoga Unity v. Choudhury*, 2005 WL

12   756558, *8 (N.D. Cal. 2005) (allowing copyright misuse to be pleaded as an affirmative defense

13   in a declaratory judgment action).

14             Defendants also suggest that Shloss's copyright misuse cause of action is

15   "improper on its face" because "copyright misuse  has only been applied when a copyright

16   owner commits antitrust violations" or creates unduly restrictive licensing agreements.  *See*

17   MTD at 13-14.  That is also wrong.  Copyright misuse covers more than anti-trust violations and

18   restrictive licenses.  It applies to any use "violative of the public policy embodied in the grant of

19   a copyright."  *Practice Mgmt.*, 121 F.3d at 521 (citing *Lasercomb Am., Inc. v. Reynolds*, 911

20   F.2d 970, 978 (4th Cir. 1990)); *see also In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d

21   1087, 1103 (N.D. Cal. 2002) ("[The] test is whether [the copyright owner]'s use of his or her

22   copyright violates the public policy embodied in the grant of a copyright, not whether the use is

23   anti-competitive.").  Thus, any attempt to extend copyright protection beyond its appropriate

24   scope is recognized as misuse.  *See Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d

25   640, 642 (7th Cir. 2003) (noting attempts to control uncopyrighted material amount to misuse);

26   *Lasercomb*, 911 F.2d at 978 (finding manufacturer committed copyright misuse where a license

27   asserted control over the idea, not just the expression); *see generally* Richard A. Posner and

28   William F. Patry, *Fair Use And Statutory Reform In The Wake Of Eldred*, 92 Cal. L. Rev. 1639,

1  1658-59 (2004) (exaggerating copyrights to deny Fair Use rights is "serious form" of copyright

2  misuse).

3          Here, the Estate is attempting to control what scholars and academics say about

4  Lucia Joyce and her relationship with her father, and it openly admits it is asserting its copyrights

5  in order to "protect the much abused and invaded privacy of the Joyce family."  MTD at 5.  But

6  the "protection of privacy is not a function of the copyright law."  *Bond v. Blum*, 317 F.3d 385,

7  395 (4th Cir. 2003); *See Rosemont Enters., Inc. v. Random House, Inc.* 366 F.2d 303, 311 (2d

8  Cir. 1966) (Lumbard, J., concurring) ("It has never been the purpose of the copyright laws to

9  restrict the dissemination of information about persons in the public eye even though those

10 concerned may not welcome the resulting publicity."); *New Era Publ'ns Int'l  v. Henry Holt &*

11 *Co.*, 695 F. Supp. 1493, 1504-05 (S.D.N.Y. 1988) *aff'd*, 873 F.2d 576 (2d  Cir. 1989) ("It is

12 universally recognized . . . that the protection of privacy is not the function of our copyright law.

13 . . . An individual who seeks to protect the privacy of the content of private letters may do so by

14 bringing suit under the right of privacy.").  The Estate's use of its copyright to protect privacy

15 interests does not comport with the purpose and policy of copyright, and is therefore a misuse of

16 the Estate's copyrights.

17         But the Estate has not stopped there.  In addition to exercising control over

18 material it may own copyrights in, it has attempt to exert control over material in which it plainly

19 has no copyrights at all.  Thus, for example, the Estate purported to forbid the use of medical

20 records in which the Estate cannot claim ownership or any valid copyright.  *Feist Publ'ns, Inc. v.*

21 *Rural Tel. Serv. Co.*, 499 U.S. 340, 347-48 (1991) (holding facts unprotectable); *Assessment*

22 *Techs.*, 350 F.3d at 647 (noting that attempts to control uncopyrightable facts and prevent fair

23 use amount to copyright misuse).

24     **E.     There Is No Proper Ground On Which To Strike Any Of**
          **Plaintiff's Allegations**
25

26         Defendants suggest the Court should strike portions of Shloss's Amended

27 Complaint because they are immaterial, impertinent, or scandalous.  *See* MTD at 15-19; Fed. R.

28 Civ. P. 12(f).  On the contrary, the portions are pertinent – if not central – to Shloss's claims.

1    In ruling on a motion to strike, the court must view the pleadings in the light most

2  favorable to the non-moving party.  *See State of California v. United States*, 512 F. Supp. 36, 39

3  (N.D. Cal. 1981).  Rule 12(f) motions "are generally not granted unless it is clear that the matter

4  to be stricken could have no possible bearing on the subject matter of the litigation."  *LeDuc v.*

5  *Kentucky Centr. Life Ins. Co.*, 814 F. Supp. 820, 830 (N.D. Cal. 1992); *see also Bureerong v.*

6  *Uvawas*, 922 F. Supp. 1450, 1478 (C.D. Cal.1996) (Rule 12(f) "motions are generally disfavored

7  because they are often used as delaying tactics, and because of the limited importance of

8  pleadings in federal practice.") (internal quotes and citations omitted); *State of California*, 512 F.

9  Supp. at 38 (Rule 12(f) motions are disfavored).

10    While Courts may strike claims for legal insufficiency, that is only appropriate

11  where the claim fails as matter of law.  *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527-29 (9th

12  Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) (upholding order striking claim under

13  res judicata): *Bianchi v. State Farm Fire & Cas. Co.*, 120 F. Supp. 2d 837, 841-42 (N.D. Cal.

14  2000) (striking claim as preempted by federal law); *Xilinx, Inc. v. Altera Corp.*, No. C 93-20709,

15  1994 WL 782236, at *4 (N.D. Cal. Feb. 8, 1994) (striking when no link exists between the

16  allegations and the claim); *State of California*, 512 F. Supp. at 41 (striking defense against a

17  sovereign).

18    The Estate does not meet this standard as to any of the allegations it attacks.

19    **1.    The Validity Of The U.S. Copyright In *Ulysses* Is**
      **Relevant To This Action Because Material From**
20    ***Ulysses* Appears On The Website**

21    Defendants suggest that Shloss's allegation that the 1922 Paris edition of *Ulysses*

22  is out of copyright and in the public domain in the United States is not germane to this action.

23  *See* MTD at 18.  The fact is that Shloss quotes from the 1922 Paris edition of *Ulysses* on the

24  Website.  If *Ulysses* is in the U.S. public domain, Shloss cannot infringe the Estate's copyright

25  by quoting from it.  Accordingly the validity of the copyrights in this work has a direct

26  relationship to Shloss's claims.  *See Hal Roach*, 896 F.2d at 1553 (reversing order striking

27  plaintiff's affirmative defense of copyright invalidity where "the validity of the copyrights [was]

28  material to the outcome of the declaratory relief action").

1    Defendants also suggest that the Court should strike allegations on this issue

2  because Shloss has not alleged sufficient facts or because resolution of this issue might be

3  complicated.  *See* MTD at 16-17.  But Shloss has alleged more than sufficient facts to give the

4  Estate proper notice of its claim.  As to complexity, courts are the place where complicated legal

5  disputes get resolved.  Whether *Ulysses* has in fact fallen into the public domain is to be

6  determined based on the place and date of publication.  *See* 17 U.S.C. § 304 (2006); 17 U.S.C.

7  §§ 1, *et seq.* (1909 Act).  Since the Defendants cannot show that *Ulysses* cannot possibly have

8  fallen into the public domain as a matter of law, their Motion to Strike must fail.  *See California*

9  *Dep't. of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028, 1032 (C.D. Cal.

10  2002) ("moving party must demonstrate that there are no questions of fact . . . and that under no

11  set of circumstances could the defense succeed.").

12          **2.      Facts Concerning Copyright Misuse Against Other**
                        **Parties Are Relevant Because They Would Render**
13                      **Copyrights Unenforceable Against Shloss**

14    Returning to copyright misuse, defendants contend that Shloss's allegations

15  concerning copyright misuse by the Estate against other parties are irrelevant.  *See* MTD at 17-

16  19.  That is simply wrong.  Shloss need not have been a party, or indeed even been harmed, by

17  the Estate's misuse in order to assert a copyright misuse defense because misuse renders a

18  copyright unenforceable against everyone until the misuse is cured.  *See Lasercomb*, 911 F.2d at

19  979; *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 493 (1942) ("Equity may rightly

20  withhold its assistance from [a misuse] of the patent by declining to entertain a suit for

21  infringement, and should do so at least until it is made to appear that the improper practice has

22  been abandoned and that the consequences of the misuse of the patent have been dissipated."),

23  *overruled on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 126 S. Ct. 1281

24  (2006).  Thus, the Estate's conduct towards others is highly relevant to this defense.

25          **3.      Allegations Regarding Destruction Of Papers Are**
                        **Conceded To Be True, And Relevant To Shloss's**
26                      **Apprehension Of Suit**

27    Defendants ask the Court to strike Shloss's allegations concerning Stephen

28  Joyce's destruction of papers relating to Lucia Joyce on the ground those allegations are

1    scandalous and Joyce is not a party to this case. *See* MTD at 18-19. But Joyce is a Trustee of

2    the Estate (which is a party to this case), and the source of nearly every threat of suit Shloss

3    suffered. In addition, Shloss's Amended Complaint alleges he acted as an agent of the Estate.

4    His destruction of Lucia's papers bears on Shloss's apprehension of suit because it demonstrates

5    the lengths to which Joyce will go to thwart perceived invasions of privacy. In any event, Joyce

6    has bragged about this supposedly "scandalous" conduct at an international symposium and in an

7    interview with *The New York Times*. *See* Shloss Dec., Ex. A. His public acknowledgement of

8    this destruction belies any claim that such allegations are "unduly prejudicial" to him. *LeDuc*,

9    814 F. Supp. at 830.

10    While some overlap exists in the facts alleged, this likewise does not create undue

11    prejudice. *Wailua Assocs. v. Aetna Cas. & Sur. Co.*, 183 F.R.D. 550, 555 (D. Haw. 1998)

12    (declining to strike paragraphs asserting the same allegation in slightly different language since

13    such repetition did not result in prejudice to the defendant).

14    The Defendants fail to show that any claims or allegations should be stricken as

15    legally insufficient or for containing redundant, immaterial, impertinent, and scandalous matter.

16    The standards for Rule 12(f) motions are high, and have not been met here.

17    **F.    There Is No Basis For An Award Of Attorneys' Fees Or Costs**

18    The Copyright Act allows the Cout to award costs, including reasonable

19    attorneys' fees, to a prevailing party who succeeds in promoting the purposes of the Copyright

20    Act. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994). Defendants suggest they are

21    entitled to such an award on this basis. *See* MTD at 19-20. They are not.

22    First, defendants have not prevailed in any sense. On the contrary, they have

23    accomplished nothing except to forever give up their right to sue on a substantial portion of

24    Lucia-related materials in issue, and cannot obtain dismissal (much less declare any plausible

25    victory) on that basis. Second, even if defendants could obtain dismissal of this action by

26    operation of their partial covenant not to sue, that dismissal would not entitle them to fees. *See,*

27    *e.g.*, *Keene Corp. v. Cass*, 908 F.2d 293, 298 (8th Cir. 1990) (reversing award of attorneys' fees;

28

1  "[w]here a complaint has been dismissed for lack of subject matter jurisdiction, the [d]efendant

2  has not prevailed over the plaintiff" for purposes of awarding attorneys' fees).

3          Third, and in any event, it is Shloss's claims that have promoted the purposes of

4  the Copyright Act, not the Estate's.  Shloss risks personal liability in the name of academic

5  freedom, seeking to vindicate her rights to use certain copyrighted works in scholarly,

6  biographical writings.  She has already forced the Estate to back down from its threats as to a

7  substantial portion of the material in issue.  Academics, writers, and artists should not be deterred

8  from bringing suits seeking vindication of their scholarly rights to Fair Use when faced with

9  threats from copyright holders.  An award of costs or fees to the Estate would frustrate, not

10  further, the purposes of the Copyright Act.  *See Fogerty*, 510 U.S. at 524, 527 ("The primary

11  objective of the Copyright Act is to encourage the production of original literary, artistic, and

12  musical expression for the good of the public" and "[t]o that end, [litigants] who seek to advance

13  a variety of meritorious copyright defenses should be encouraged to litigate them. . . .").

14  **IV.    CONCLUSION**

15          The Court should deny defendants' motion to dismiss and motion to strike.

16  DATED:  December 15, 2006

17                                    STANFORD LAW SCHOOL
                                      CENTER FOR INTERNET AND SOCIETY

18

19
                          By: _____/S/_____
20                                    Anthony T. Falzone
                                      Attorneys for Plaintiff
21                                    CAROL LOEB SHLOSS

22

23

24

25

26

27

28