Lawrence Lessig
Anthony T. Falzone (SBN 190845)
David S. Olson (SBN 231675)
STANFORD LAW SCHOOL CENTER FOR INTERNET
AND SOCIETY
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 724-0517
Facsimile: (650) 723-4426
E-mail:    falzone@stanford.edu

Mark A. Lemley (SBN 155830)
Matthew M. Werdegar (SBN 200470)
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, California 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
E-mail:    mwerdegar@kvn.com

Bernard A. Burk (SBN 118083)
Robert Spoo (*pro hac vice*)
HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN, a Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Telephone: (415) 434-1600
Facsimile: (415) 217-5910
E-mail:    bburk@howardrice.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| CAROL LOEB SHLOSS,<br><br>                    Plaintiff,<br><br>        v.<br><br>SEAN SWEENEY, in his capacity as trustee of the Estate of James Joyce, and THE ESTATE OF JAMES JOYCE<br><br>                    Defendants. | No. C 06 3718 JW HRL<br><br>**DECLARATION OF CAROL LOEB SHLOSS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

Dockets.Justia.com

1    I, CAROL LOEB SHLOSS, declare as follows:

2    1. I am Acting Professor of English at Stanford University, and the Plaintiff in this

3    action. I make this declaration in support of Plaintiff's Opposition to Defendants' Motion to

4    Dismiss. I have personal knowledge of the following facts, and if called as a witness, I could and

5    would testify to them, except for facts stated upon "understanding and belief," which I believe to be

6    true based on facts known to me.

7    2. I received my B.A. from Swarthmore College, my M.A. from Harvard University,

8    and my Ph.D. from Brandeis University. Before joining the English faculty at Stanford University, I

9    taught literature and other subjects at Wesleyan University, the University of Pennsylvania, and

10   West Chester University of Pennsylvania. During my 32-year academic career, I have received

11   grants to enable my writing and have held fellowships from the National Endowment for the

12   Humanities, the Rockefeller Foundation, and the Mellon Foundation. In 1994 I won the Fellowship

13   for Creative Non-Fiction Writing from the Pew Fellowships in the Arts. Prior to coming to

14   Stanford, I held research positions at the Center for the Humanities at Wesleyan University, the

15   Bunting Institute of Radcliffe College at Harvard, the Center for Documentary Photography at Duke

16   University, the Rockefeller Institute at Bellagio, Italy, the Alice Paul Research Center at the

17   University of Pennsylvania, the Center for the Cross Cultural Study of Women at Oxford

18   University, and the Harry Ransom Humanities Research Center at the University of Texas at Austin.

19   3. Until recently I served on the editorial boards of the scholarly journals, *Joyce*

20   *Studies Annual* and *College Literature*. I am the author of four books: *Flannery O'Connor's Dark*

21   *Comedies*, *In Visible Light: Photography and the American Writer*, *Gentlemen Photographers*, and,

22   most recently, *Lucia Joyce: To Dance in the Wake* (Farrar, Straus & Giroux, 2003), a book about

23   Lucia Joyce and the creative impact of Lucia's relationship with her father, the famous Irish

24   expatriate author James Joyce, on his literary works (hereafter, "*Lucia Joyce*"). At Stanford, I teach

25   courses on James Joyce, Virginia Woolf, Women Writers and the Modern Experimental Novel,

26   Modern Irish Literature, Modernism and the Cinema, Novels into Film, and Jane Austen on Film.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### JAMES JOYCE, LUCIA JOYCE, AND THE DESTRUCTION OF PAPERS RELATING TO LUCIA

4.  James Joyce (1882-1941) was an Irish fiction writer and poet, widely considered to be one of the most influential and innovative authors of the twentieth century.  He is best known for his short story collection *Dubliners* (1914), and his novels *A Portrait of the Artist as a Young Man* (1916), *Ulysses* (1922) and *Finnegans Wake* (1939).  In particular, *Ulysses* is regarded by the public generally and by literary scholars as one of the most important works of the twentieth century.

5.  Lucia Joyce, daughter of James Joyce and Nora Barnacle, was born in Trieste, Italy, on July 26, 1907.  Lucia began taking dance lessons when she was fifteen, and this became her main interest during her teens and twenties.  She started to show signs of emotional distress in 1930.  Carl Jung took her in as a patient in 1934.  Many other doctors, all with varying diagnoses, worked with her in ensuing years.

6.  Against her will and the will of James Joyce, her mother, Nora, and brother, Giorgio, committed Lucia to a mental hospital when she was 25, commencing her sporadic confinement in psychiatric institutions that would last until her death on December 12, 1982.

7.  People have destroyed documents about Lucia Joyce for over sixty years, apparently due in large part to the stigma that previous generations attached to young women who had suffered emotional trauma.  As a result, little of the public record remains.  This dearth of information characterized the special circumstances in which I researched Lucia's life, and it explains the special importance of even small amounts of documentary evidence in this case.  Because James Joyce wrote about Lucia in various creative and imaginative ways in *Finnegans Wake*, this documentary evidence is of literary as well as biographical importance.  In the generation of those who knew James and Lucia Joyce personally, those who destroyed or suppressed letters included Maria Jolas, Harriet Shaw Weaver, John Dulanty, Stuart Gilbert, and the family of Charles Joyce.

1    8. In 1988 Stephen James Joyce—the grandson of James Joyce and sole beneficiary

2    of the Joyce Estate—announced publicly that he had destroyed all of his letters from Lucia as well

3    as correspondence to Lucia from the famous Irish author, Samuel Beckett.    Mr. Joyce's

4    announcement was made at a scholarly panel on Joycean biography that I had organized for the

5    Venice James Joyce Symposium.  Mr. Joyce's announcement was widely reported in the press.  A

6    true and correct copy of an article by Caryn James, "The Fate of Joyce Family Letters Causes Angry

7    Literary Debate," *New York Times*, Aug. 15, 1988, is attached to this declaration as Exhibit A.

8    9. Upon understanding and belief, in or around 1992 Stephen James Joyce persuaded

9    officials at the National Library of Ireland to allow him to remove Joyce family papers, including

10   papers pertaining to Lucia, from the Paul Léon Papers, an important collection of Joyce materials

11   that the National Library of Ireland was about to open to the public.  The actions of Mr. Joyce were

12   the subject of passionate denunciation and debate on the floor of the Irish Senate on April 9, 1992.

13   A true and correct copy of the official report of that debate, obtained from the Irish Historical

14   Debates Web Site (found at http://historical-debates.oireachtas.ie/) (last visited Nov. 24, 2006), is

15   attached to this declaration as Exhibit B.

16

17
### THE 15-YEAR PROCESS OF RESEARCHING *LUCIA JOYCE: TO DANCE IN THE WAKE*

18   10.    My book, *Lucia Joyce*, describes the extraordinary influence that James

19   Joyce's daughter Lucia had on her father's emotions and work.  It also challenges the conventional

20   portrayal of Lucia as a troublesome blight on the Joyce family.  As my publisher, Farrar, Straus &

21   Giroux (hereafter, "FSG"), made clear in a description of the book issued upon its publication in

22   2003, there is an important connection between my archival research and the scholarly value of

23   *Lucia Joyce*: "Though most of the documents about Lucia have been destroyed, Shloss has

24   painstakingly reconstructed the poignant complexities of her life . . . ."

25   11.    I began my research on Lucia Joyce in 1988, when I traveled to Paris to

26   consult Lucia's dance archives at the Bibliothèque de l'Opéra and the Rondelle Collection of the

27   Performing Arts at the Bibliothèque de l'Arsenal.  Because these two libraries provided interesting

28   material about Lucia Joyce's dance career, I expanded my search for records of Lucia's Parisian

1    dancing at the Henry W. and Albert A. Berg Collection at the New York Public Library and the New

2    York Library of the Performing Arts.

3        12.    During this time, I began studying at the Institute for Psychoanalytic

4    Psychotherapies in Bryn Mawr, Pennsylvania, in order to understand the issues involved in

5    diagnosing and treating "schizophrenia" from an historical perspective.  My early research was

6    supported by West Chester University, which, between the years of 1987 and 1995, provided me

7    with nine research grants from the Office of the Dean of Arts and Sciences in the form of Research

8    and Publication Awards and Faculty Development Awards.

9        13.    It was also around this time—once at a private meeting in Paris in 1988 and

10    again at a James Joyce Symposium in Monte Carlo in 1990—that I spoke personally to Stephen

11    James Joyce about my growing scholarly interest in the life and dance career of Lucia Joyce.  Mr.

12    Joyce manifested hostility to the idea of any biographical treatment of Lucia and stated that such a

13    project would be an invasion of Joyce family privacy that he would not approve or condone.

14        14.    In 1990, I traveled to the McFarlin Library Poetry and Rare Books

15    Collection (at the University of Tulsa in Tulsa, Oklahoma) to consult the Richard Ellmann Archives.

16    Ellmann was a major biographer of James Joyce.  In the spring of 1992, I went to Zurich to expand

17    my research on dance at the Zentralbibliothek, the Hauptbibliothek, and the Kunstgewerbe Museum.

18    While in Zurich, I also consulted the C.G. Jung Archives at the E.T.H. Bibliothek (Eidgenössische

19    Technische Hochschule) and spoke to Peter Jung, Carl Jung's grandson, about any documents

20    concerning Jung's care of Lucia that might not be in the possession of public institutions.

21        15.    I then went to Dublin when the papers of Paul Léon, a friend and assistant of

22    Joyce, were opened to the public at the National Library of Ireland in the summer of 1992.  My

23    work in Ireland consisted both of reading the Paul Léon papers and of discerning which Lucia-

24    related materials had been allowed to be removed by Stephen Joyce from the archive before it

25    opened, as discussed above.  After constructing a list of the names of Lucia's doctors whose bills

26    had not been removed from the financial files of the Paul Léon papers, in 1993 I went to the

27    National Library of the History of Medicine in Bethesda, Maryland.  In Bethesda, I read, and when

28    necessary translated from French and German, copies of the medical writings of Lucia's doctors.

16.    In 1994, I received the Award for Creative Non-Fiction Writing from the Pew Charitable Trusts in Philadelphia.  This award allowed me to become a Visiting Scholar at the Alice Paul Center for the Study of Women at the University of Pennsylvania (Fall 1994), and a fellow at the Centre for Cross-Cultural Research on Women at Oxford University, England, in the Spring 1995.

17.    In the winter of 1994, I traveled to Buffalo, New York, to consult the James Joyce papers in the Special Collections Department of the Lockwood Memorial Library at the University of Buffalo, New York.  Prior to coming to Buffalo, I had spoken with Robert Bertholf, curator of Special Collections, and was surprised and disturbed to find him reluctant to allow me to view any papers concerning Joyce or Lucia.  During my research stay in Buffalo, Mr. Bertholf insisted that there be no record of my visit to the Collections.  He would not allow me to sign in at the Collections, and he kept my visit as discreet and low-profile as possible.  At one point during my stay, he explained that if it became known that he had allowed me to see Lucia-related papers in the Collections, there might be a lawsuit by the Joyce Estate.  "The University of Buffalo cannot afford a lawsuit," he said.  When I later wrote Mr. Bertholf for permission to reproduce a photograph of Lucia held in Buffalo's Collections, he refused—even though the Joyce Estate cannot claim rights in the photograph.  My fears of being opposed and menaced by the Estate increased as a result of this experience.

18.    My research on Lucia continued at Oxford in 1995.  During this time I traveled frequently to London to consult the Harriet Shaw Weaver papers at the British Library, the Lucia Joyce papers at University College London, and the *Finnegans Wake* notebooks at the British Library.  In 1996, I returned to Tulsa to work once again with the Richard Ellmann papers.  I also visited the Harry Ransom Humanities Research Center at the University of Texas, Austin, a repository for the Stuart Gilbert papers and for other of Lucia Joyce's papers.  Soon thereafter I received a Mellon Fellowship in Biography from the University of Texas, which allowed me to return for a full month to use their collections in 1998.

19.    In both 1997 and 1998, I was invited to be a Visiting Scholar at Stanford University where I used the Lane Medical Library to further my research into the historical use of

1   pharmacology and to complete the writing of the first draft of *Lucia Joyce*. Thereafter, I made trips

2   to consult manuscripts at Princeton University, Cornell University, Southern Illinois University at

3   Carbondale, the Archive of American Art at the Smithsonian Institution, Washington D.C., the San

4   Francisco Library of the Performing Arts, and the Beinecke Rare Book and Manuscript Library at

5   Yale University.

6          20.      In 2000, I returned to Dublin for more work at the National Library of

7   Ireland and to use archives at University College Dublin and Trinity College Dublin.  In the spring

8   of 2003, I was named Richard Ellmann Visiting Professor at Northwestern University, where I

9   completed the revisions and final copy-editing of my manuscript of *Lucia Joyce*.

10

11          **THREATS BY STEPHEN JAMES JOYCE AND THE JOYCE**
            **ESTATE CONCERNING THE RESEARCH AND WRITING OF**
12          ***LUCIA JOYCE***

13          21.      In 1996, I wrote to Stephen James Joyce for his help with my book on

14   Lucia, inquiring if he had personal documents that he would allow me to see.  In reply, Mr. Joyce

15   stated in a letter to me dated March 31, 1996, that his "response regarding working with you on a

16   book about Lucia is straightforward and unequivocal: it is a definitive <u>NO</u>."  In the same letter, Mr.

17   Joyce specifically prohibited me from using any letters or papers by or from Lucia Joyce, as well as

18   any letters by James Joyce discussing Lucia and her medical condition.  The letter concluded: "As to

19   whether or not your book comes alive or not that's your problem."  A true and correct copy of Mr.

20   Joyce's March 31, 1996 letter is attached to this declaration as Exhibit C.

21          22.      I wrote again to Mr. Joyce on April 16, 1996, stating that I had received his

22   March 31 letter and that I had been upset by some of his comments.  I also expressed the hope that

23   Mr. Joyce might consider reading some material I had written about Lucia as a dancer which was

24   based upon research I had done in public archives in Paris.  A true and correct copy of my April 16,

25   1996 letter is attached to this declaration as Exhibit D.

26          23.      Mr. Joyce replied to my April 16 letter on April 19, 1996, setting forth a

27   catalog of complaints about Joyceans and stated that "[o]n Lucia's dancing career we have nothing

28

1   to say as long as it is not private, family relations." A true and correct copy of Mr. Joyce's April 19,

2   1996 letter is attached to this declaration as Exhibit E.

3          24.    Soon after receiving Mr. Joyce's first letter, I wrote to Jane Lidderdale,

4   Lucia's guardian before her death. Because I was concerned about the anger that Mr. Joyce had

5   shown toward me and my project, and the aggressiveness with which he had pursued Brenda

6   Maddox for a similar project, I stated to Miss Lidderdale that I "clearly will have a legal problem

7   [with Mr. Joyce] when it comes to publication" of my work. A true and correct copy of my letter to

8   Lidderdale of April 16, 1996 is attached to this declaration as Exhibit F.

9          25.    Though I was disturbed and frightened by the Joyce Estate's opposition to

10  my scholarly work, I persisted in my publication plans. In 2001, I signed a contract with FSG to

11  publish my book, now to be titled *Lucia Joyce: To Dance In The Wake*.

12         26.    On August 8, 2002, as I neared completion of my book, Stephen James

13  Joyce wrote to me unexpectedly at my Stanford University address to harangue against my book.

14  The letter was forwarded to me in Maine where I was vacationing and writing. After reiterating that

15  his and the Estate's position had not changed from its expression in previous letters, Mr. Joyce

16  "add[ed] a few 'things' you are <u>not</u> authorized to do and/or use" (emphasis in original). First, Mr.

17  Joyce purported to "forbid[]" the use of any of Lucia's medical files and records, even though I do

18  not believe that Mr. Joyce or the Estate has physical or legal control over such records and cannot

19  claim any copyright interest in them. Second, Mr. Joyce again forbade my use of any materials

20  created by Lucia or any letters to Lucia by James Joyce or other Joyce family members. Mr. Joyce

21  stated that he was protecting "the much abused and invaded Joyce family privacy." A true and

22  correct copy of Mr. Joyce's August 8, 2002 letter is attached to this declaration as Exhibit G.

23         27.    In the same August 8, 2002 letter, Mr. Joyce threatened me by referring to

24  recent copyright litigation that the Estate had engaged in and warning: "O]ver the past few years we

25  have proven that we are willing to take any necessary action to back and enforce what we

26  legitimately believe in." *See* Ex. G to this declaration. My fears of being targeted legally by the

27  Joyce Estate were increased considerably by Mr. Joyce's letter. On September 9, 2002, I took

28  Stephen Joyce's August 8 letter to show my editor at FSG, Elisabeth Sifton

28.     During this period, I had become so distraught by the correspondence I had received from Mr. Joyce that I sought guidance from Stanford University's Office of Risk Management (the "Office").  In the opinion of the Office, I was at risk of legal attack by the Joyce Estate, and it was suggested that I obtain a Media Perils Policy.  When I explained that the cost of such a policy was prohibitive for me and my family, Stanford University provided funds for limited consultation with attorney Edward G. Black of the Ropes & Gray law firm.  Mr. Black provided substantial assistance during this period.  I also received advice from Professor Lawrence Lessig of Stanford's Legal Clinic and Center for Internet and Society.

### THREATS MADE BY STEPHEN JAMES JOYCE AND THE JOYCE ESTATE TO THE PUBLISHER OF *LUCIA JOYCE*

29.     Stephen James Joyce and the Joyce Estate did not stop with menacing me personally.  After learning that *Lucia Joyce* was to be published by FSG, they switched their tactics and began threatening FSG.  On or about November 4, 2002, Stephen Joyce called FSG to inform it that he had heard about my book and that he was opposed to its publication.  His call had been taken by John Glusman, then an editor at FSG.  Among other things, Mr. Joyce pointedly informed Mr. Glusman that he wished FSG to know that he had never lost a lawsuit.  He also stated that he was sending FSG copies of all his correspondence with me.

30.     I learned of Mr. Joyce's November 4 phone call and his threats to FSG in an email to me datelined "10:53 AM 11/4/02" from my editor at FSG, Elisabeth Sifton.  Ms. Sifton reported that Mr. Glusman "found himself on the receiving end of about twenty minutes' worth of Joyce explaining that he had heard about your book, that he was adamantly opposed to having any Joyce material, especially from Joyce's letters, used to discuss Lucia in public, et cetera."  Mr. Joyce "wanted his opposition and distress about the idea of a book about his aunt fully registered."  As he had done with me, he threatened FSG with his successful litigation record: "He said he absolutely wasn't threatening, but he wanted us to know that he'd never lost a law suit."  A true and correct copy of Ms. Sifton's email is attached to this declaration as Exhibit H.

31.     Later that day, November 4, 2002, Stephen James Joyce faxed a letter to Jonathan Galassi, President of FSG, attaching copies of his correspondence with me and reiterating

his opposition to *Lucia Joyce*. Among other things, Mr. Joyce stated that he was "in complete disagreement with Carol Shloss' conception/definition of fair dealing/use especially when applied to letters." I learned of the contents of this letter when I was provided a copy by FSG. A true and correct copy of Mr. Joyce's November 4, 2002 letter is attached to this Declaration as Exhibit I.

32.    During the course of his earlier communications with me, the only item that Mr. Joyce had ever granted me permission to use—for a fee—was James Joyce's published poem "A Flower Given to My Daughter." But now in his November 4 letter to Mr. Galassi he stated that he was rescinding that permission, claiming that I had tried to "bypass" him by directing communications to Joyce Estate Trustee and Defendant in this action, Seán Sweeney, and former Estate lawyer David Monro, instead of to him. This puzzled and frightened me because I had assumed that communications regarding permissions should properly be directed to representatives of the Estate. I could not understand why I was being punished for attempting to follow an appropriate procedure.

33.    The very next day, November 5, 2002, Mr. Joyce faxed another letter to Mr. Galassi. In that letter, Mr. Joyce tried to undermine publication of my book further by asserting that I did not have permission to use letters written by Harriet Shaw Weaver, Paul Léon, and Maria Jolas, all of whom had engaged in important correspondence concerning Lucia Joyce. One of the reasons given for this attack on my non-Joyce sources was that the excerpts from correspondence that I wished to use "dwell too much on Lucia's health." I learned of the contents of this letter when I was provided a copy by FSG. A true and correct copy of Mr. Joyce's November 5, 2002 letter is attached to this declaration as Exhibit J. The fact that Mr. Joyce had called FSG and written two letters to FSG in the space of two days alarmed me considerably, making me feel as if I and my book were being stalked. I was in great fear of being subjected to legal action by Mr. Joyce and the Joyce Estate.

34.    Leon Friedman, an attorney for FSG, responded to Mr. Joyce in a letter dated November 6, 2002, informing him that FSG considered my work to be protected by copyright's fair use doctrine. I learned of the contents of this letter when I was provided a copy by FSG.

35.     On November 21, 2002, Mr. Joyce replied to Mr. Friedman, stating that he "categorically" refused permission for me to use "A Flower Given to My Daughter" or any poem by James Joyce.  He also refused permission to quote anything ever written or drawn by Lucia.  He referred to the letters he had written to me and to Jonathan Galassi and repeated his threat: "I would strongly urge you to take these very seriously indeed.  You should be aware of the fact that over the past decade the Estate's 'record', in legal terms, is crystal clear and we have proven on a number of occasions that we are prepared to put our money where our mouth is."  Mr. Joyce then remarked that FSG's position that it could proceed with publication under the fair use doctrine "sounds like a bad joke or wishful thinking" and told Friedman to "kindly bear in mind that there are more ways than one to skin a cat."  After mocking the idea that my book had literary and historical value as "nonsense, hogwash," he again threatened that "you or rather Farrar Straus & Giroux proceed 'à vos risques et périls' [at your risk and peril], this is a statement of <u>fact</u> not a threat."  He ended by stating that Mr. Friedman's letter had "set off dozens of alarms bells and increased my suspicions.  If such a book is published I will most certainly go over or through it with a fine tooth comb."  I learned of the contents of Mr. Joyce's letter when I was provided a copy by FSG.  The letter increased my fears of being the target of legal attack by Mr. Joyce and the Joyce Estate.

36.     Also in the November 21, 2002 letter to Mr. Friedman, Mr. Joyce again asserted that Lucia Joyce's medical records should be off limits.  Moreover, in response to Mr. Friedman's statement that under copyright law a researcher has the right to make unauthorized use of "information" contained in copyrighted material, Mr. Joyce replied that such "'material' was copyrighted in order to protect the author's rights as well as those who inherit them . . . ."

37.     Stephen James Joyce sent another letter to Leon Friedman, dated December 31, 2002, which repeated his earlier threats: "As I indicated in my previous letter, there are more ways than one to skin a cat!  This is already proving to be true since certain pigeons from California are coming home to roost with very ruffled feathers."  The "pigeons" were evidently a reference to me and my California residence; Mr. Joyce also referred to me insultingly as "not very enviable company," and concluded his letter on another menacing note: "We shall see what we shall see."  I learned of the contents of Mr. Joyce's letter when I was provided a copy by FSG.

38.    Again and again in their correspondence and communications with me and FSG, Mr. Joyce and the Estate asserted that as owners of James Joyce's and Lucia Joyce's copyrights they were entitled to protect and enforce the privacy of those individuals (who are deceased) and of the living members of the Joyce family.  I am very familiar with the public and private statements made by Mr. Joyce and the Joyce Estate that their ownership of copyrights entitles them to protect the privacy of deceased and living members of the Joyce family, including Lucia and James Joyce.

39.    Mr. Friedman, FSG's attorney, sent a reply to Mr. Joyce on January 2, 2003, informing him that no further correspondence was necessary because it was clear that Mr. Joyce would not grant permission to use any copyrighted material and that therefore FSG would rely on fair use in publishing *Lucia Joyce*.  This did not stop Mr. Joyce and the Estate from campaigning against me.

40.    I understand and believe that on May 22, 2003, Mr. Joyce faxed and mailed another letter to Mr. Friedman, asserting again that FSG and I were "NOT granted permission" to use any quotations from writings or art by Lucia, Helen Kastor Fleischman Joyce, Nora Barnacle, Giorgio (George) Joyce, Paul Léon, Solange Joyce, or Stephen James Joyce himself.  He asserted that these measures were necessary to "protect what remains of the much abused family privacy." He also stated that it is the Estate's position that "fair use does not apply to letters."  He threateningly remarked: "So be it.  I am perfectly willing to play the 'game' your [FSG's] way but there will be repercussions.  This is not a threat but a statement of fact."  He ended by insisting that "my wife and I will require a prepublication, complete copy of Ms. Carol Shloss's book to see what's actually in it and in order to be able to take any action we deem appropriate and necessary."

41.    I understand and believe that Mr. Joyce faxed yet another letter to Mr. Friedman on July 22, 2003, in which he again stressed that he and the Joyce Estate owned all copyrights in "anything and everything that James, Nora Barnacle, Giorgio (George), Lucia, Helen (Kastor Fleischman) Joyce and myself ever wrote, drew, painted and/or recorded etc."  He added that international copyright laws "will uphold our intellectual property rights."

42.     I understand and believe that in his May 22 and July 22, 2003 letters to Mr. Friedman, Mr. Joyce referred to "Ms. Shloss holding forth at the mid-June Joyce Conference in Tulsa, Oklahoma on Nonno, Lucia and Mickey Mouse!"  He also stated that I referred to him or to his "attitude" as "'Mickey Mouse.'"  This is evidently a reference to my scheduled plenary address, at the June 2003 Tulsa Joyce conference, on how the writing and publishing of my book had been affected by the Joyce Estate and by legislative extensions of copyrights in the United States and elsewhere.  The term "Mickey Mouse" was actually a reference in the title of my talk to the Sonny Bono Copyright Term Extension Act of 1998—popularly referred to as the "Mickey Mouse" law because it secured longer copyrights for the Walt Disney Company and other owners of copyrights that would have expired shortly in the absence of extensions.  I was not calling Mr. Joyce names.

43.     In fact, I did not give my scheduled plenary address at the Tulsa Joyce conference.  Two days before my talk, Sam Slote, a Joyce scholar who was attending the conference, informed me at a social gathering that he had recently served as an expert witness for the Joyce Estate in its copyright lawsuit against Joyce scholar Danis Rose and his publisher, Macmillan (discussed below).  Mr. Slote then explained that he planned to attend my address and report to Mr. Joyce about what I said.  When I pressed him, he admitted that he would serve as an expert witness in a lawsuit against me, too.  This convinced me that the Estate intended to sue me, and I was terrified because I did not have the financial resources even to pay the costs of litigation.  Indeed, I was so alarmed that an informant might be passing on intelligence about me to Mr. Joyce and the Estate that I decided to abandon my original talk and instead gave a reading of a "safe" portion of *Lucia Joyce*.

44.     The threats issued by the Estate to me and my publisher, combined with the Estate's history of belligerence and litigation against other authors and scholars, made it clear to me that if I published the Lucia-related and other Joyce material in my book as written, both I and FSG were likely to be sued.  As I wrote to my agent Tina Bennett on February 6, 2003:  "I think there will be a lawsuit, and the suit could be against me individually."  A true and correct copy of my February 6, 2003 letter to Ms. Bennett is attached to this declaration as Exhibit K.

1        45.      Despite the valid fair use defense of my book as it was originally written, to

2   avoid any risk of litigation, significant amounts of the documentary materials quoted in *Lucia Joyce*

3   —Joyce's literary works, letters by Joyce and his family, short snatches of *Finnegans Wake* to be

4   used as epigraphs for my chapters, and more—were cut.  On January 23, 2003, my editor at FSG,

5   Elisabeth Sifton, emailed me with a description of the edits that FSG thought necessary to avoid a

6   suit from the Joyce Estate over the book.  These cuts included all unpublished writing of James

7   Joyce and Lucia Joyce.  I replied to Ms. Sifton in an email datelined "29 Jan 2003 00:22:53,"

8   voicing my concern that "the proposed cuts eliminate almost all the evidence in the book," thus

9   undermining the book's "scholarly integrity" and excluding evidence it had taken me "12 years to

10  assemble."  I expressed the hope that Stephen James Joyce would not "come between" me and my

11  publisher, because it was "his ugliness that has caused this situation."  As this email shows, I was

12  greatly in fear of being assailed legally by Mr. Joyce and the Joyce Estate.  A true and correct copy

13  of my January 29, 2003 email to Ms. Sifton is attached to this declaration as Exhibit L.

14       46.      Because of Mr. Joyce's and the Joyce Estate's threats, many of the proposed

15  cuts to *Lucia Joyce* were made.  Although some manuscript material was later allowed to be

16  reintroduced into the book, the final edits resulted in over 30 pages being cut from the 400-page

17  manuscript.  *Lucia Joyce* was published in its cut-down form in December 2003.

18       47.      Many reviews of *Lucia Joyce* that I read praised it for its provocative theory,

19  but nonetheless found my documentary support lacking.  For example, the review of *Lucia Joyce* in

20  the *New York Times* observed that the unsupported portions of my argument "damage[] the book's

21  credibility, making it read more like an exercise in wish fulfillment than a biography."  *The New

22  Yorker*'s review of the book similarly focused on its documentary support, questioning my

23  "elevation of Lucia to the role of collaborator on *Finnegans Wake*" and remarking that "[t]he less

24  Shloss knows, the more she tells us."  Nevertheless, "when [Shloss] has some information to go on,"

25  the review found Lucia Joyce's untold story to be both "poignant" and "valuable."  True and correct

26  copies of these book reviews are attached to this declaration as Exhibit M.

27       48.      A review in the *San Francisco Chronicle* commended *Lucia Joyce* for

28  "giv[ing] substance to a life that has previously been treated as a distracting footnote" and for

DECLARATION OF CAROL LOEB SHLOSS

-13-

1  "add[ing] literary criticism of *Finnegans Wake* to illuminate Lucia's role as subject and inspiration
2  that deepened her father's writing." Yet the review also observed that "[m]any of the problems this
3  book presents to readers are probably due to the dearth of data." The review concluded by noting
4  that "[w]hile Shloss corrects errors and unlikely conjectures by Richard Ellmann (in his classic
5  James Joyce biography) and Brenda Maddox (in her biography of Nora Joyce), she adds a daunting
6  quantity of her own speculations, surmises and unconvincingly supported suppositions." A true and
7  correct copy of this review is attached to this declaration as Exhibit N.

8

9  **THREATS MADE BY STEPHEN JAMES JOYCE AND THE JOYCE**
10 **ESTATE TO SHLOSS'S LAWYERS AND UNIVERSITY**
   **EMPLOYER CONCERNING THE ELECTRONIC WEBSITE**
11 **SUPPLEMENT TO LUCIA JOYCE THAT IS THE SUBJECT OF**
   **THIS LAWSUIT**

12        49.      I have created an electronic supplement to *Lucia Joyce: To Dance in the*
13 *Wake* (the "Electronic Supplement") and placed it on a website (the "Website") that was and
14 currently is password-protected and thus has not been made available to the public. The Electronic
15 Supplement is a resource by which scholars, researchers, and the general public will be able to view
16 additional supporting material for *Lucia Joyce*, including material that was cut from my book as a
17 result of the Joyce Estate's threats, along with material that I myself chose to remove for fear of
18 attracting the negative attention of the Estate. The Website was ready to be published as of March
19 2005. In the Summer of 2006, I revised the Website once to add additional materials. This revision
20 was complete and ready to publish in September 2006. The Website is now fixed and I will not
21 change it.When made public, the Website will be accessible only within the United States to
22 computers with a U.S. Internet Protocol ("IP") address.

23        50.      The Electronic Supplement consists of relevant pages of the text of *Lucia*
24 *Joyce* as published, supplemented in the margins by quotations that were cut from the book.  These
25 quotations, which are visually keyed to the passages in the published text where they would have
26 appeared and formed part of the biographical commentary and criticism, are taken from sources that
27 include James Joyce's published works, manuscript versions of Joyce's published works, and
28 published and unpublished letters to, from, or about Joyce and Joyce's family.

1      51.    For instance, each chapter of *Lucia Joyce* was intended to include, as an

2 epigraph, a short quotation evocative of Lucia Joyce drawn from James Joyce's published work,

3 *Finnegans Wake*. The epigraphs would have interacted with and served as a focal point for my

4 biographical commentary and criticism. In this, I was following in the tradition of Richard Ellmann,

5 whose monumental and acclaimed biography of James Joyce also used epigraphs drawn from

6 Joyce's works to extend and enrich his analyses. My epigraphs are restored in the Electronic

7 Supplement.

8      52.    Other quotations in the Electronic Supplement drawn from Joyce's

9 published works and from published and unpublished letters to and from members of the Joyce

10 family and community contain or convey important historical material that documents, supports, and

11 gives context to my critical analyses. Some quotations in the Electronic Supplement are taken from

12 James Joyce's 1922 first edition of *Ulysses*, published in Paris by Shakespeare and Company.

13 Though the Estate claims otherwise, this particular edition is in the public domain in the United

14 States. The *Ulysses* quotations reproduce passages involving Milly Bloom, the daughter of Leopold

15 Bloom, the main character in *Ulysses*. Because Milly was based in many ways on Joyce's daughter,

16 Lucia, a collection of the Milly passages will be useful to scholars interested in studying Joyce's

17 transformation of family life into art. Some portions of the Electronic Supplement quote and discuss

18 the language of manuscript versions of particular James Joyce works. In addition to these

19 transformative purposes for including the previously deleted material in my Electronic Supplement,

20 the Supplement with its restored quotations offers a visual and analytical illustration of the effects of

21 the Estate's pressures on scholarly research and writing.

22      53.    On March 9, 2005, my Stanford legal counsel sent a letter to Defendants

23 describing the planned Electronic Supplement. The letter explained that the Website would be

24 restricted to U.S. access and stated that the omitted material was protected by copyright's fair use

25 doctrine, and thus needed no permission, but nonetheless offered the Estate the opportunity to

26 review the material before publication. The Estate through its counsel replied on April 8, 2005, and

27 asserted ownership of copyrights in all writings of James Joyce and Lucia Joyce and disapproved of

28 the planned Electronic Supplement. The letter concluded by requesting that I "respect . . . the

DECLARATION OF CAROL LOEB SHLOSS

-15-

1   Estate's legal rights and wishes in this matter."  In a reply dated April 20, 2005, my counsel

2   explained that the materials on the proposed Website could be used without permission under the

3   fair use doctrine.  I was provided copies of these letters by my attorneys.

4         54.     On May 13, 2005, the Estate's counsel wrote again to my Stanford

5   attorneys, reiterating its disapproval of the planned Electronic Supplement.  The letter, of which I

6   was provided a copy by my attorneys, criticized me for not seeking a copyright license from the

7   Estate and declared that it "believe[s] the proposed publication on the Internet to be an unwarranted

8   infringement of the Estate's copyright and request again in the strongest terms that their legal rights

9   on this issue be respected."

10        55.     It was not enough for Stephen James Joyce to threaten me, my publisher, my

11  publisher's attorneys, and my Stanford attorneys; he decided he would attack me by threatening my

12  employer, Stanford University, as well.  I understand and believe that in a letter dated May 18, 2005,

13  Mr. Joyce wrote John Etchemendy, Provost of Stanford, stating that he was "trustee of the Estate of

14  James Joyce" and expressing his and the Estate's opposition to the Electronic Supplement.  Mr.

15  Joyce stressed that the material included in the Electronic Supplement was material that FSG

16  "declines to include . . . in [Shloss's] book out of concern for copyright litigation."  Mr. Joyce added

17  that "we do not believe that this material can be legally published against the wishes of the Estate as

18  copyright owner," and that "[w]e . . . take this matter very seriously."

19        56.     My Stanford counsel replied on June 9, 2005, to explain that, in the United

20  States, permission is not required to use material protected by fair use, and that therefore the Estate's

21  repeated observation that I had not asked permission was irrelevant.  I was provided a copy of this

22  letter by my attorneys.

23        57.     On December 23, 2005, the Estate's counsel again wrote my Stanford

24  counsel that the Joyce Estate "does not give its permission for your client's proposed activities and

25  rejects the notion that the proposed use could be made in the absence of consent under the fair use

26  doctrine" and that it "reserves all rights if [Shloss] perseveres with her proposed activities."  I was

27  provided a copy of this letter by my attorneys.

28

58.     As a result of Stephen James Joyce's and the Joyce Estate's numerous threats, I fear that they will sue me if I make the Electronic Supplement on the Website publicly available.  The material that has been included in the Electronic Supplement—much of it material that was cut from *Lucia Joyce* as published—is in large part the same material that Mr. Joyce and the Joyce Estate so aggressively sought to suppress in their letters to me and FSG between 1996 and 2003.  It was this very material concerning which, on November 21, 2002, Mr. Joyce wrote Mr. Friedman, FSG's attorney, that FSG should "kindly bear in mind that there are more ways than one to skin a cat" and that "you or rather Farrar Straus & Giroux proceed 'à vos risques et périls' [at your risk and peril], this is a statement of <u>fact</u> not a threat."

### LAWSUITS FILED BY THE JAMES JOYCE ESTATE IN RECENT YEARS

59.     My fears of legal reprisal have been intensified by my knowledge that in recent years Mr. Joyce and the Joyce Estate have aggressively pursued copyright litigation against a number of scholars and others who have made use or attempted to make use of James Joyce's writings.  For example, the Joyce Estate brought a lawsuit in the Irish High Court against Cork University Press in 2000, shortly before the planned publication of an anthology, *Irish Writing in the Twentieth Century*, edited by David Pierce.  I was aware that Professor Pierce—a noted scholar and teacher of modern literature at York St. John University in York, England—had requested permission of the Joyce Estate to print certain extracts from Joyce's works in the anthology.  Stephen James Joyce and the Joyce Estate aggressively opposed the project and eventually sought and obtained an injunction against inclusion of the Joyce extracts.  The anthology was eventually published with the Joyce material physically removed and replaced by a cardboard notice that the material had been the subject of a copyright dispute.  A true and correct copy of the published Judgment in that case—*Sweeney v. National University of Ireland Cork t/a Cork University Press*, [2000] IEHC 70; [2001] 2 IR 6; [2001] 1 ILRM 310 (9th October, 2000)—obtained from the British and Irish Legal Information website (found at http://www.bailii.org/ie/cases/IEHC/2000/70.html) (last visited Dec. 10, 2006), is attached to this declaration as Exhibit O.  I also attach, as Exhibit P, true and correct copies of press articles from the *Irish Times*, *Irish Examiner*, *Irish Independent*, and

*Sunday Business Post*, describing the Estate's lawsuit against Cork University Press. This lawsuit is described further in the accompanying declaration of David Pierce In Support of Plaintiff's Opposition to Defendants' Motion to Dismiss.

60.    I also had knowledge that the Joyce Estate also sued a scholar-editor, Danis Rose, and his publisher, Macmillan Publishers Ltd., for the 1997 publication of Mr. Rose's Reader's Edition of *Ulysses*. After years of litigation, the English High Court granted the Estate an injunction against the Reader's Edition. A true and correct copy of the published Judgment in that case— *Sweeney v. Macmillan Publishers Ltd*, [2001] EWHC Ch 460 (22nd November, 2001)—obtained from the British and Irish Legal Information website (found at http://www.bailii.org/ew/cases/EWHC/Ch/2001/460.html) (last visited Dec. 10, 2006), is attached to this declaration as Exhibit Q.

61.    Upon understanding and belief, the Joyce Estate also sued the Irish Distillers Group and the Irish Times as the Dublin sponsors of an Internet webcast reading of *Ulysses*, which took place on "Bloomsday" 1998—even though the event was supported by leading politicians in the Republic of Ireland. ("Bloomsday" is celebrated every June 16 throughout the world as the day on which the fictional events of Joyce's Ulysses unfold.) The lawsuit was filed in the Irish High Court and was entitled *Sweeney v. Irish Distillers Group PLC and The Irish Times Ltd.*, No 1998 6968P. A true and correct copy of an article from the Sunday *Irish Independent*, Jan. 16, 2000, describing the Joyce Estate's lawsuit against the Irish Distillers and the Irish Times is attached to this declaration as Exhibit R.

62.    Upon understanding and belief, around February 2004, the Joyce Estate sued Swiss wine producer Provins Valais over its "cuvée James Joyce" wines, which were being sold and imported in Ireland in preparation for the 100th celebration of Bloomsday.

63.    Upon understanding and belief, in 2005 the Joyce Estate sued a publisher based in Bath, England, Robert Frederick Ltd, over its publication of a set of volumes entitled "The Works of James Joyce in ten volumes." The Estate evidently obtained an injunction and damages in that case. I attach as Exhibit S a true and correct copy of a press release describing that litigation which is found on the website of Bird & Bird, which represented the Joyce Estate in that matter,

1  (http://www.twobirds.com/english/pressreleases/Estate_of_James_Joyce_wins_copyright_case.cfm)

2  (last visited Dec. 10, 2006).

3        64.    I also had knowledge that Stephen Joyce and the Joyce Estate have

4 threatened lawsuits on a number of other occasions. These occasions include the use of a portion of

5 *Ulysses* in a performance called "Molly Bloom, A Musical Dream" which took place at the

6 Edinburgh Festival Fringe in 2000. Upon understanding and belief, that performance, which went

7 forward as planned, was lawful under the copyright law of the United Kingdom. True and correct

8 copies of press articles from the Sunday *London Times: Ireland*, the Sunday *Herald*, and the

9 *Guardian/Observer* describing the Estate's threats against the Fringe event are attached to this

10 declaration as Exhibit T.

11        65.    I have also been fearful of legal attack by the Joyce Estate because I knew

12 that *Lucia Joyce* resembles an earlier project that Stephen James Joyce aggressively opposed. I was

13 aware that Mr. Joyce and the Joyce Estate caused author Brenda Maddox to delete the epilogue from

14 her book *Nora: The Real Life of Molly Bloom* (Houghton Mifflin, 1988), which discussed Lucia

15 Joyce and her medical condition and institutionalization. When Mr. Joyce and the Estate learned of

16 that epilogue, they threatened to withdraw all permissions previously granted to Maddox to use any

17 of James Joyce's or his wife Nora's materials. Maddox eventually entered into an agreement the

18 terms of which prevented Maddox and her descendants from ever publishing the epilogue. Another

19 contractual term barred Maddox from criticizing Stephen Joyce or the Estate. My fears have been

20 intensified by the fact that Mr. Joyce suggested a disapproving comparison between Maddox's book

21 and my work on Lucia in his letter to me of March 31, 1996. *See* Ex. C to this declaration.

22

23

24

25

26

27

28

1        I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct. Executed this 15th day of December, 2006, at Stanford, California.

3

4                                           *Carol Loeb Shloss*

5                                           CAROL LOEB SHLOSS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF CAROL LOEB SHLOSS

-20-