# EXHIBIT Q

Dockets.Justia.com





# England and Wales High Court (Chancery Division) Decisions

**You are here:** BAILII >> Databases >> England and Wales High Court (Chancery Division) Decisions >> [2001] EWHC Ch 460

[Database Home Page] [Database Search] [Database Case Name Search] [Recent Cases] [Noteup] [Download RTF] [Help]

---

## Sweeney & Anor v. MacMillan Publishers Ltd & Anor [2001] EWHC Ch 460 (22nd November, 2001)

Case No: CH 1997 S 3257

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL
22 November 2001

B e f o r e :

**THE HONOURABLE MR JUSTICE LLOYD**
———————————

**(1) SEAN SWEENEY(2) GRAHAM EDWARD CAMPS** Claimants
**- and -**
**(1) MACMILLAN PUBLISHERS LIMITED(2) DANIS ROSE**                **Defendants**
———————————

**John Baldwin Q.C. and Fiona Clark (instructed by Bird & Bird for the Claimants)**
**Guy Burkill (instructed by Denton Wilde Sapte for the Defendants)**
———————————

**HTML VERSION OF JUDGMENT**
**I DIRECT THAT NO OFFICIAL SHORTHAND NOTE SHALL BE TAKEN OF THIS HTML VERSION OF JUDGMENT**
**AND THAT COPIES OF THIS VERSION AS HANDED DOWN MAY BE TREATED AS AUTHENTIC.**

———————————

Crown Copyright ©

**Mr Justice Lloyd:**

1. In this action the Claimants are the present trustees of the estate of the late James Joyce, to whom I will refer as Joyce. The Defendants are, respectively, the publisher and the editor responsible for an edition of Joyce's Ulysses

in 1997 and described as a Reader's Edition, a phrase which I will use to refer to it. The Claimants contend that their rights have been infringed in three different respects: by unauthorised publication of the bulk of the text of Ulysses which had been published during Joyce's lifetime, by unauthorised publication of some text of Ulysses which was not published during Joyce's lifetime, and by publishing as Joyce's Ulysses something which cannot properly be described as such, or not without more in the way of clear warning to the public of how it differs from what they might otherwise expect under that title, thereby passing the Reader's Edition off as being something other than it is. In essence the copyright claim is aimed at the respects in which the Reader's Edition is copied from previous texts of Ulysses and the passing off claim at the respects in which it is not.

2. It is not now in dispute that the Claimants have title to the copyright. The Defendants deny that the Claimants can sue in passing off but, subject to one point to which I will refer, if the estate of a deceased author can sue in passing off, it is clear that the Claimants are entitled to bring such an action.

3. Joyce died in 1941. Under the Copyright Act 1956 (which is as far back as I need to go) his estate was entitled to copyright in his works published during his lifetime until the end of 50 years from the end of the year in which he died. Those works therefore were out of copyright as from 1 January 1992. In respect of works not published during his lifetime, by contrast, the period of copyright lasts until 50 years have expired from the end of the year in which the particular work was first published. Ulysses was first published, as a whole book, in 1922. However, the main manuscripts, typescripts, and proofs which led to its publication were not themselves published until the 1970's. There is some material in the text of the Reader's Edition which was not included in any edition of Ulysses published during Joyce's lifetime. It is that which gives rise to the need to consider separately material which was, and that which was not, published during Joyce's lifetime.

4. So far as the material that was published in Joyce's lifetime is concerned, if the law had remained as I have mentioned, no issue would now arise. In the Copyright Designs and Patents Act 1988, as originally enacted, there was no material change. However, in 1993 the European Commission made a Directive under which all member states had to extend the period of copyright to 70 years after the death of the author. The United Kingdom implemented this Directive with effect from 1 January 1996, 6 months late, by regulations which did extend the copyright in literary works accordingly, including reviving copyrights which had expired. The regulations included special provisions in relation to revived copyrights, which I will have to examine in some detail. These also make it necessary to examine what it was that Mr Rose, the Second Defendant, did during all or part of the period during which Ulysses, as published in Joyce's lifetime, was in the public domain.

**Ulysses**

5. Joyce's Ulysses is famously complex and radical in its literary style. The circumstances of its writing and publication were not such as to lead to the author's intended text being made available to the reading public in the most faithful and accurate manner. It is a long and extremely complex work, and was written over a lengthy period. Nor was it all written in anything like a straightforward narrative process or style. Especially in the later sections the process seems to have been more one of compilation, from many and various external sources. A lot of the material which came into existence in the course of its preparation survives, but some is lost, and although hitherto unknown or lost material does come to light from time to time, some is presumably lost for ever. Perhaps the most important single item in the preparatory materials is a manuscript, known as the Rosenbach manuscript, covering all, or almost all, of the book. This was created by Joyce as a fair copy of the text as it then stood, in order to be sent to a Mr John Quinn in the United States who had offered to buy the manuscript of Ulysses, having already acquired that of Joyce's Exiles. Joyce sent the manuscript to Quinn in instalments between 1920 and 1922, the later episodes not having been completed at the time he sent the earlier. Quinn sold the manuscript in 1924 to a Dr Rosenbach, hence the name the Rosenbach manuscript. It remained in his ownership until his death, and then passed to a foundation. It was published in facsimile in 1975. There is or has been lively critical debate about the precise status of various parts of the Rosenbach manuscript in the sequence from Joyce's earliest work on the text to the publication of Ulysses in 1922, but I do not need to go into that. There has been active debate about, and intensive scholarly scrutiny of, many aspects of Joyce's work in general, and of Ulysses in particular, which is manifest from some of the material shown to me. What I have to say about Ulysses and about Joyce is limited to that which appears to me to be necessary for the purposes of my judgment, and it may be that the simplification involved will result in what, in another context, would be regarded as distortion.

6. Whether from the Rosenbach manuscript or from another source, typescripts were prepared before the work was printed. These do not conform exactly with the Rosenbach manuscript. This may be for a number of reasons, including the typist's error, for example in skipping over several lines and thereby omitting text, as well as misreading of particular words. The typescript has handwritten additions by Joyce, as do the several successive stages of printer's proofs. Ulysses was first published, as a whole, in 1922 in Paris, because the obscenity laws in the UK and the USA prevented its publication in either of those places. The first publication had been intended to

be in the USA in serial form, by the Little Review, but this was frustrated after the first thirteen episodes and part of the fourteenth had been published, when the work was seized as being obscene and the publisher was then prosecuted. The publication in Paris was by a bookseller, Sylvia Beach, under the imprint Shakespeare & Co, who had no experience of publishing at all, let alone so substantial and complex a work. The printer was French and it may be that the printing techniques were less than ideal even for the time. No copyreader or editor was involved. All of this, together with Joyce's tendency to make late changes, even where he had approved a text as correct at an earlier proof stage, led the publisher to include an apology at the front of the 1922 edition, as follows:

> "The publisher asks the reader's indulgence for typographical errors unavoidable in the exceptional circumstances."

Undoubtedly there are mistakes in the 1922 edition, some of which were corrected by errata during Joyce's lifetime, though later editions suffer from further and different printer's errors. Writing to his patron, Harriet Shaw Weaver, in 1921, Joyce said:

> "I am extremely irritated by all those printer's errors. Working as I do amid piles of notes at a table in an hotel I cannot possibly do this mechanical part with my wretched eye and a half. Are these to be perpetuated in future editions? I hope not."

7.  During Joyce's lifetime Ulysses was published first, in part, in the Little Review, secondly in the 1922 edition, and later in various other editions (disregarding those unauthorised) which differed in minor respects from the 1922 version. Between them these provided the basis for editions published after Joyce's death up to the 1980's. In 1975 as already mentioned, the Rosenbach manuscript was published in facsimile, and in the following years the James Joyce Archive was published, including facsimiles of the typescript and the various printers' proofs. In 1984, there appeared the first new edition of Ulysses since Joyce's death, known as the Gabler edition, or more formally as the Critical and Synoptic Edition. This sought to reproduce a corrected text of Ulysses, by reference to Joyce's manuscripts (I include in that term the corrected and amended typescript and proofs). This edition includes a clear text, which was also published on its own, (including a paperback edition by Penguin, published as Ulysses: The Corrected Edition) but in the scholarly edition it was published as the right hand page of each opening, with the left hand page and the footnotes showing all the relevant variants from which the clear text was derived.

8.  The Gabler edition gave rise to a good deal of controversy among scholars. It was heavily criticised by Dr John Kidd. The advisory committee who advised the Joyce estate about it fell out with Dr Gabler, and had to be persuaded not to dissociate themselves from it. Nevertheless it was published with the consent of the estate. Two members of that committee, Dr Gaskell and Professor Hart, later published a list of corrections which they recommended should be made to the Gabler edition (with other lists of corrections to the 1922 edition and one other edition) in order to produce an improved text. This volume, which the authors described as a repair kit for existing editions, rather than a new edition in its own right, was published in 1991 at a time when Professor Hart was a trustee of the estate. It is not on its face expressed to have been published with the consent of the estate, but at least there appears to have been no attempt to stop it. Both the Gabler edition and the Gaskell Hart repair kit drew on material published for the first time in the Rosenbach manuscript or in the Archive. That was the state of things as regards publications of Ulysses when the fifty-year term of copyright, after Joyce's death, expired at the end of 1991. At that stage, however, Penguin announced that they would withdraw their paperback edition of the Gabler clear text and replace it with a reprint of one of the editions published during Joyce's lifetime.

**The Reader's Edition**

9.  Mr Rose, the Second Defendant, has been involved in the study of Joyce texts since the 1970's. He played a part in the publication of the Archive in 1977-8 and in the work for the Gabler edition up to 1984. In recognition of his work on the Archive he was given a complete set of the volumes when published. In the course of this work and that involved in the Gabler edition he acquired copies of many of the preparatory texts in electronic form. He has written, edited or co-edited a number of books on Joyce, as well as articles. He has worked for many years on a long term project about Finnegans Wake. Since 1977 (if not earlier) he has also worked extensively on Ulysses.

10.  On 4 January 1992 Mr Rose, who lives in Dublin, read an article in an Irish newspaper which commented on the implications of Joyce's works being out of copyright, with a heading "Now it is open season on James Joyce". The article mentioned that some publishers would be reprinting the error-laden versions published during Joyce's life, but also that Dr John Kidd was under contract to prepare a new edition for publication by Norton. Mr Rose said in his witness statement that although he had given some thought before the end of 1991 to whether he might be able to prepare a new edition of Ulysses, he did not consider it seriously, still less decide to embark on the vast amount of work that would be needed until he read this article.

11.   Mr Rose decided to test the waters as regards the likelihood of securing a publishing contract for such an edition. He prepared a memorandum describing what he had in mind, and sent it to a Mr Anthoine, an American lawyer. He in turn sent it to Penguin in New York, who passed it on to Penguin in London, where it landed on the desk of Mr Jonathan Riley. The latter was already involved in discussions with Mr Rose about the proposal to publish a new edition of Finnegans Wake. They met to discuss the Ulysses idea, which Mr Riley found attractive. He encouraged Mr Rose, though without any contractual commitment on the part of Penguin. Mr Rose said that he was confident that Penguin would publish his version of Ulysses in due course. In fact Penguin dropped the Finnegans Wake project, in circumstances about which Mr Rose feels strongly but which are not relevant to this case, and did not take up the Ulysses proposal. Mr Riley left Penguin and moved to Macmillan in September 1993. Mr Rose contacted him there soon after that, and Mr Riley again encouraged him to proceed with Ulysses, but without committing Macmillan in any way.

12.   The initial response from Penguin in 1992 had been sufficient to lead Mr Rose to undertake his work on Ulysses. He embarked on it during 1992, and devoted a great deal of time to it. It was for him a full time task, precluding him from any other full time job; during the autumn of 1992 and the spring of 1993 his only earnings were from part time teaching at a community college in Dublin.

13.   According to his oral evidence, initially by way of supplementary evidence in chief, his first step was to type out the entire text of the 1922 edition. Doing this in 1992 did not involve any breach of copyright. He then obtained another electronic version of the same text from the Internet and compared the two electronically to check for errors. In this way he established his starting text.

14.   In his introduction to the Reader's Edition he spoke of by-passing the 1922 text. He explained the process as consisting of three elements. First, he constructed a text (which he calls an isotext) "in which all the manuscript-attested textual operations are described and critically evaluated and prioritized". Next he "condensed this into a text free of apparatus", by which I understand that he eliminated all but one of any variant readings, and all the descriptive and critical material. Thirdly, he subjected the resulting text to a copyreading process. In his second witness statement, made for the purposes of an interim application, he elaborated on this passage, and said this about the second of these processes:

        "Instead of physically copying out, or having a typist copy out, all of the parts of the isotext and merging them into a single document, I felt that as I possessed an accurate electronic copy of the 1922 edition then for practical purposes (to save time and to avoid introducing new errors) I would amend that to conform to what would have been the result in every detail of the other option. The use of an electronic copy of the 1922 edition as the "basis" of the Reader's Edition was simply a practical matter. Any of the editions of Ulysses should have done as well."

15.   In detail, having once established his starting point with an accurate copy of the 1922 text, his first task was to compare this text with all the preparatory materials and any later versions that might be of relevance. He worked in sections of one or more complete paragraphs, amounting to about a page at a time. He printed each section out, with the lines well spaced out to allow room for annotations, and then checked it.

16.   I should say that his evidence on this was criticised by Mr Baldwin, for the Claimants, as being inherently implausible and inconsistent, and also because he had been ordered to give details of how he went about his task, but failed to do so, despite protest from the Claimants and assurances from the Defendants, until the eleventh hour, after the start of the trial. The latter criticism, at any rate, is entirely justified, and the lateness of the evidence in these circumstances makes it right to consider it with special care. A matter of particular interest to Mr Baldwin was the extent to which Mr Rose used electronic resources in the course of his work, and he suggested that Mr Rose's oral evidence was designed to conceal the use he did make of texts on computer, because Mr Baldwin in opening the case had made it clear that any use of an electronic text (other than that of the 1922 edition or another version published during Joyce's life) would be a breach of copyright. Mr Baldwin is right to say that there are inconsistent versions from Mr Rose of what he did, in a number of respects. However, I am satisfied that I should accept his account given in the witness box. It seems to me to be inherently probable, and although he did from time to time previously use phrases which convey a different impression I find his account in the oral evidence to be credible and reliable.

17.   Having printed a particular section of text, he first checked it against Joyce's lists of errata, and made any necessary changes, noting them on the hard copy and on the electronic version as well. Next, he said, he would check the text and apply what he called his house style to it. This involved a different use of capitals from that in the 1922 edition, a different approach to punctuation in some cases, and also different treatment of compound words, which are a distinctive feature of Joyce's writing. In general, Mr Rose broke such compounds up, either dividing them into separate words, or hyphenating them. Also at this stage he noted words or passages which needed

external checking, such as references to people and to other sources. Any changes which he made in these processes would be marked on the hard copy and then changed on the electronic copy. Mr Baldwin suggested that he did not apply his house style, as regards capitalisation and so on, until a later stage, and some of his evidence is consistent with that. I find that he applied it in part at first, though there may have been some passages to which he did not apply it until later, and there were points on which he had not settled on his treatment of particular words, for example some compound words, until late in the process. This point is significant (if at all) in relation to a point of Mr Baldwin's as to what he was doing when making various particular changes from the 1922 text, namely whether he was acting of his own accord, or rather copying what appeared in the underlying manuscripts. In turn this goes to Mr Baldwin's submission that Mr Rose was not copying the 1922 edition at all, but rather the underlying manuscripts.

18.   Then Mr Rose checked the text against all the relevant preparatory material in turn, starting with the latest and going back to the earliest. His purpose in this was to verify, where possible, what autograph authority there was for each word included in the 1922 text. He started with the page proofs, examining the text of the passage against the latest of those and then the earlier ones, then moving on to the galley proofs or placards, then to the typescript, then to the Rosenbach manuscript, and then to any relevant other manuscript. Where relevant he would also check with the Little Review; although that is collateral, in the sense that it did not form part of the line of descent between Joyce's first drafts and the 1922 edition, there are one or two instances where the Little Review has a word or words that do not appear in the 1922 edition, but which seem likely to have been intended and authorised by Joyce. These would have been the result of changes made by Joyce to the copy of the typescript (no longer available) which was supplied as the basis for the Little Review but which were not also made to the typescript used for the 1922 edition.

19.   As and when he found, in these materials, manuscript authority from Joyce for words in the 1922 text, Mr Rose marked the words in pencil on his printed copy. Ideally, having checked all the sources, he would have found such authority for every part of the text of the printed copy. In some cases, however, one or more of the sources is missing, and one (or more) word or feature of the text is not accounted for in that way. In such a case an assessment has to be made from the prior and subsequent documents as to whether the undocumented text is likely to be correct or whether something may have gone wrong in its transmission. In many cases the Rosenbach manuscript is the earliest available source, but where an earlier draft, or proto-draft, survives then Mr Rose checked against that, to see whether any error may have crept in when Joyce transcribed the text into the fair copy which the Rosenbach manuscript is. Once this process was complete, he would note any changes, as well as any other points which required more leisurely checking, and move on to the next passage. External checking was done later. He said that the initial tasks up to this stage were complete, as regards the whole book, by the end of 1992. This was the second stage described in his Introduction, as mentioned in paragraph 14 above, namely the preparation of the text free of apparatus.

20.   What then remained to be done, above all, was the external checking, against outside sources and for the accuracy of references to real people, places and things. Ulysses is set in Dublin on 16 June 1904 and contains much reference to real people and places, in relation to which Joyce went to pains to be accurate. He had with him, when writing, a copy of Thom's Dublin Directory for 1904 with which he could check place-names and addresses. Mr Rose had such a copy as well, or at any rate a copy of all of its contents of any relevance to Ulysses. Mr Rose also used other contemporary sources, such as newspapers, to check names and their spelling. Joyce had included in Ulysses a reference to a boxer called Corbett, but had spelled the name with only one t; later he was told of the correct spelling, and instructed that later editions should use the correct spelling. In that spirit, Mr Rose, having seen a reference to the name Torry, checked in newspapers of the time and found that there was someone of that name, but spelled Torrey. He therefore altered that word accordingly in the text.

21.   More controversially, he made other changes. For example, at one point Joyce refers to a shop called Hely's and gives its address as 85 Dame Street. Reference to the directory, however, shows that the correct address was 27-30 Dame Street, and indeed that the numbers in Dame Street only went up to 82. Mr Rose changed the number so as to correspond with the true position. Further afield geographically, the 1922 text (as corrected for errata) includes this passage: "its unplumbed profundity in the Sundam trench of the Pacific exceeding 8.000 fathoms" (OUP Worlds Classics edition page 624). According to the 1911 edition of the Encyclopaedia Britannica, which Joyce owned and used, the Sunda trench, south of Java, was sounded in 1906 and found to be 3,828 fathoms deep. The same edition refers to the Marianne Trench, near Guam, as being 5,629 fathoms deep, though that has now been measured at 6,033 fathoms. Thus, Joyce's text is incorrect in the name of the trench, which ocean it is in, its depth and in asserting, by implication, that it is the deepest part of the sea, quite apart from the oddity of describing as unplumbed a trench whose depth had been measured, and of which a measurement, even if not precise, is given. To correct the errors, Mr Rose substituted in the Reader's Edition "its unplumbed profundity in the Marianne Trench, exceeding 6000 fathoms" (Reader's Edition page 585).

22.   Another change concerns Leopold Bloom's budget for the day (OUP Worlds Classics edition page 664). This part

of the text sets out what appears to be an account of Bloom's financial dealings of the day, starting with 4/9d in hand, including two incoming items and 17 outgoing items and a balance figure which should be what was left in his pocket at the end of the day. As printed in 1922 the sums do not work, and the balance figure (16/6d) is 11d too low. During Joyce's lifetime this was corrected in an errata list, to 17/5d. However, if the budget is intended (as it appears to be) as a true account of Bloom's expenditure during the day, it is inaccurate in a different way. In the episode Circe, Bloom visits a brothel, and spends 11 shillings there as well as a penny train fare to get there. That expenditure does not feature in the budget. Thus the true balance in hand at the end of the day ought to be 6/4d. The Reader's Edition does include the 11 shillings and the extra 1 penny. With another discrepancy of a penny, it gives a balance of 6/3d (Reader's Edition page 622). The evidence before me did not suggest that there is any other indication in the text of the amount which Bloom had left in hand at the end of the day. While, therefore, Joyce's own correction of the figures by way of errata shows that he wanted the figures printed to balance, it is a matter of speculation whether his omission of the sums attributable to the visit to the brothel was deliberate, as Dr Slote, the Claimants' expert, considers, or was inadvertent, as Mr Rose would have it.

23.  Coming back, then, to the progress of Mr Rose's work, he said that he had done 90% of the work necessary for the Reader's Edition by the end of 1993. What remained to be done was much of the external checking process, which was less intensive than the earlier stages, but took a long time to do. In terms of the steps taken towards publication, apart from carrying on with this work, the next thing that Mr Rose did was to approach Macmillan again in August 1995. Discussions and negotiations led to the signing of an option agreement on 6 December 1995 under which Macmillan paid Mr Rose £5,000 in return for an option "until three months following ratification by Parliament of the revisions to the Copyright Act" giving Macmillan the right to a negotiation in good faith of terms for the publication of the work, defined, inappropriately, as the definitive edition of Ulysses. A recital to the agreement stated that Mr Rose had compiled the work and had done so with the knowledge of the Joyce estate. None of this was correct: Mr Rose's work was not complete, it would not be a definitive edition, and the estate knew nothing about it. It seems likely that these statements were included through misunderstanding. The reference to the revisions to the Copyright Act are to the final text of the regulations to which I have referred, in paragraph 4 above, which were not made until later in December.

24.  In due course Macmillan decided that it did wish to publish the Reader's Edition, and negotiated a publishing agreement with Mr Rose. This was signed on 13 August 1996. Its recitals include statements that copyright in the Reader's Edition belongs to Mr Rose alone, that copyright in Ulysses by Joyce has been revived, and that copyright in the Reader's Edition is made possible by regulation 23 or 24 of the relevant regulations. Mr Rose's obligation as regards delivery was to supply the text in typescript or on disk by 2 February 1997. He had supplied the first chapter a few days previously. He delivered to Macmillan a large part of the remaining material early in December 1996, and the balance of the text in time by the due date. Having done so, or maybe even earlier, he discarded all the printed versions of the successive passages on which he had been working as already described. The documents disclosed by the Defendants include working notes of his dating from 1996, but none of the print-outs. Mr Baldwin put it to Mr Rose that the agreed delivery date of 2 February showed that even in August 1996 there was a lot of work still to be done, and that this was confirmed by a letter from Mr Rose to Macmillan dated 12 November 1996 in which he asks for "as much time as possible to prepare the disks of the first 200 pages or so … the later in December the better". By that stage what remained to be done was largely proof-reading of the copy, but Mr Rose accepted in cross-examination that the work was not in a sufficiently advanced form for publication until the end of 1996. Publication of the Reader's Edition took place on 16 June 1997.

25.  Mr Rose told Macmillan in a letter dated 30 October 1995 that he had made substantial preparations for the Reader's Edition in the window of opportunity from 1992 to 29 October 1993 or 1 July 1995, and that this was demonstrable. In particular he said that it could be verified that the substantive work behind the edition was prepared in the open period specified in the statutory instrument. He did not, however, create any copies of his work as it stood at any given date, before final delivery to the publishers, and the only method of verification he mentioned in evidence was that his brother Dr John O'Hanlon, who worked with him in certain respects, could verify it. If it were necessary, therefore, to come to a conclusion as to how much work had been done by any given date, this would be very difficult. Mr Rose did set up a publishing imprint of his own, called Shakespeare & Co, Dublin, in case he needed to publish the work himself. Under this imprint he did publish one short work, of a few pages, in 1995. However, he accepted that if he had had to publish the Reader's Edition himself it would have taken even longer than doing it through Macmillan, since he would have had to have coped himself with all the printing and publishing processes, as well as producing the text itself.

26.  Before the publishing contract had been signed, Macmillan, with legal advice, had written to Messrs. Monro Pennefather, the solicitors for the Joyce estate, to inform them of the intended publication. In fact the letter, though sent on 15 July 1996, did not arrive. In March 1997 Mr Monro, the solicitor acting for the estate, got to know of the intended publication of the Reader's Edition from an advertisement by Macmillan, which stated that it was due for publication in June that year. He contacted Macmillan, and in particular Mr Riley. The latter sent him a copy of the 15 July 1996 letter. The letter asserted that the publication would be permitted by virtue of one of the regulations

relating to revived copyrights, but said that, if that were wrong, another such regulation would apply, under which a reasonable royalty would be payable. Mr Monro protested and asked for sight of the work intended to be published. This was refused. Eventually proceedings were brought in June, the first purpose being to get hold of copies, which were supplied under an order made by agreement.

27.   The Reader's Edition was thus published, first in hardback and later in paperback. It contains a preface and introduction, a chronology and acknowledgements, by Mr Rose, in which he no doubt owns the copyright. Besides the text of Ulysses, in his version, it also contains an alternative version of the last episode, Penelope, in an appendix. In the introduction Mr Rose explains how he has gone about his task. He identifies several different kinds of process. One is the extirpation of printer's errors. Another is described as being to "identify and eliminate errors in a text that has descended through a non-critical line of transmission", for which one needs "a reliable road map of the genesis of the work in question, allowing an informed judgement to be made as to the relative levels of authority to ascribe to the variants that are thrown up by a detailed comparison of text against text in the line of descent of the various copies of the work that have survived". In addition, besides the skills "acquired by critics over long years of immersion in the study of the lives of authors and in multiple close readings of their texts", (and it is here that Mr Rose enters on more controversial ground) one needs the skills of publishers' copyreaders.

28.   As regards the application of the skill of copyreading, Mr Rose explains that he means not only what might be called the application of a house style, for example as regards capitalisation of proper names, division or hyphenization of compound words, or the use of italics for words other than for emphasis, but also the identification and elimination of textual faults. He gives a number of examples of the ways in which such faults can arise, but as a matter of policy states that they can only be corrected where the full manuscript record indicates that a fault may have arisen in a straightforward and usually quite simple way. It is not necessary to go into detail as to the kind of fault he categorises in this way. Some involve faulty copying by Joyce from one draft to the next, or faulty typing from Joyce's manuscript, others involve faulty incorporation of added text shown by interlineation on a typescript or a proof, which result in a word or passage being inserted in the wrong place, the sentence reading wrongly, but not being corrected at any later stage. One example of textual fault given is a passage where the Rosenbach manuscript reads "eying juicy tomatoes", the typescript has "ying juicy tomatoes" and Joyce altered this to "young juicy tomatoes"; thus both "eying" and "young" have Joyce's autograph authority, and arguably the later version is not necessarily to be preferred, since the earlier is said to fit better into the sense of the whole passage. Another small example to which attention was directed in the evidence is a passage in Eumaeus, which in the Rosenbach manuscript read "All focussed their attention at a group of savage women". The typescript has the same and in the first placard (or galley proof) it was so printed. Joyce marked this with the insertion of the words "the scene exhibited", after "at". The second placard shows that this was inserted incorrectly, before the word "at". Joyce did not change this until the page proof stage, and then only by inserting "on" before "the scene exhibited". Thus in 1922 the passage reads: "All focussed their attention on the scene exhibited, at a group of savage women". The Reader's Edition omits the word "at", as being superseded by Joyce's later corrections.

29.   Mr Rose's class of textual faults also includes misspellings, such as the boxer Corbett already mentioned and, according to Mr Rose, mistakes such as the reference to the Sundam trench, as well as the figures in the budget. To support this approach, especially in the passage, Ithaca, which includes the reference to the trench as well as the budget, he quotes a letter from Joyce to Harriet Weaver as follows:

        "As regards Ithaca the question of printers' errors is not the chief point. The episode should be read
        by some person who is a physicist, mathematician and astronomer and a number of other things."

30.   It is also in the context of textual faults that he discusses one of the more controversial features of the Reader's Edition, namely the inclusion of many apostrophes and punctuation in the last episode, Penelope, which featured in the Rosenbach manuscript but were excluded at proof stage. Mr Rose says that, because of pressure of time, there were fewer intervening stages between the original manuscript text and the published version for this episode than for the others, so that Joyce had fewer opportunities to reflect on the text and to change it. Mr Rose points out that apostrophes are integral parts of the relevant words (such as we'd, we'll, I'd, I'll) which cannot be understood correctly if the apostrophe is omitted, and that the reader is therefore forced to supply them while reading the text. He asserts that "nothing really has been gained by their removal and a great deal - the undisturbed flow of the text - has been lost". On this basis he includes a text with all apostrophes restored as his primary version of this episode, but also provides one without apostrophes, though with some added punctuation, as an alternative for the reader in an appendix.

**The claims for breach of copyright**

31.   I can now turn to consider the legal issues, and how the relevant principles apply to the facts. So far as copyright is concerned, different considerations apply to copying what was published during Joyce's life from those that apply

to other material. It is therefore necessary to establish what was so published, and what it was that Mr Rose copied. If and insofar as Mr Rose copied material which had been published while Joyce was alive, two sets of questions then arise, alternatively, under the regulations. The first turns on whether what Mr Rose and Macmillan have done falls within regulation 23, in which case it is not a breach of copyright at all. If their acts are not immune from the estate's claim on that ground, the second question is whether what they have done is covered by the compulsory licence provisions of regulation 24. If, however, what they have done is not limited to material published in Joyce's lifetime, the next questions concern whether their acts constitute an infringement of copyright in other material. I will address all those questions in that order, and then turn to the passing-off claim.

**What was published in Joyce's lifetime?**

32. In a sense it is easy to say what was published during Joyce's life: it is the 1922 edition, as well as the Little Review and the various other later editions (so far as authorised) before 1941. But Mr Burkill, for the Defendants, says that this is not a sufficient answer. He says that what was published was Ulysses as a whole, and that it is absurd to suggest that the underlying materials were not also published when the first edition was published. He accepts that successive drafts of a literary work are, in principle, the subject of separate copyright. But leaving aside a case in which, for example, an author writes a work in 10 chapters and deliberately decides to exclude 5 of them from the ultimate publication of the work, he submits publication of a work is the publication of all the material which led to its creation.

33. In order to address this issue, it is first necessary to examine the question of subsistence of copyright. In certain cases, publication is a necessary element in the subsistence of copyright, but not in the present case, since it is common ground that Joyce was a qualified person, in terms of the British legislation, at the relevant times. Copyright subsists in a literary work if it is "original". It may be a good deal less literary or original than Ulysses, but it must be a work, and must be the result of the expenditure by the author of skill, judgment and labour, or selection, judgment and experience, or labour, skill and capital, to quote phrases used by various judges in order to explain the requirement of originality. Clearly copyright does subsist in Ulysses as a whole (leaving aside the question of the different versions). Copyright would also have subsisted in each chapter, or indeed each page or perhaps each sentence, as written. But as each passage became incorporated into the larger work, it seems to me that it is right to regard the copyright as subsisting in the work as a whole, in the condition in which it then existed, rather than in the several constituent parts.

34. In the case of a creative process as complex as that of Ulysses, it may be unclear, now, in what form the author's text, as a whole, stood at any given moment of time. However, the text set out in the Rosenbach manuscript, at any rate, once complete, must be regarded as a work in its own right. As I have mentioned, it was created as a fair copy. If it was, in fact, an exact copy of a pre-existing text, then it was not the first embodiment of the work, but it does not seem to me that it matters. Either it was an exact copy in which case it shows (in the current absence of the pre-existing version) what the work was, or it was not an exact copy, in which case it is the first embodiment of a new work. The text underwent a series of further changes, as I have described, at one or more stages in typescript, and at several stages in printers' proofs. Without needing to establish, at any of these successive stages, exactly what the latest state of the developing work consisted of, it seems to me that, as Joyce allowed each part of the text to move on from one stage to the next, after making such changes as he then wanted, he had created a new work in which copyright subsisted in its own right. In principle, therefore, I regard the Rosenbach manuscript as comprising one copyright work in itself, the successive typescripts and proof stages each as constituting new such works, and, going back before the Rosenbach manuscript, earlier drafts, including notebooks setting out early versions of particular passages or sections, as also constituting separate copyright works. It may be, and certainly it should be, that the final proof, with any amendments made on it by Joyce, is identical with the text published in 1922. That would mean no more than that both those texts set out the same original work in which copyright subsists.

35. Several cases were cited to me in which the courts have had to consider, mostly in relation to very different subject-matter from that with which I am concerned, the question whether copyright subsists in successive versions of a particular design or other work. These included *Interlego AG v. Tyco Industries Inc* [1988] RPC 343, *L.A. Gear Inc v. Hi Tec Sports* [1992] FSR 121, *Cala Homes (South) Ltd v. Alfred McAlpine Homes East Ltd* [1995] FSR 818, and *Robin Ray v. Classic FM Ltd* [1998] FSR 622, by way of recent cases, and an older Scottish case, *Black v. Murray* [1870] Scots Law Reporter 261, which did concern copyright in an edition of a literary work, by Sir Walter Scott. *Interlego* related to a claim for copyright in engineering drawings for the manufacture of Lego model-building units. The original manufacturers had enjoyed monopoly protection for a long time by virtue of patent and registered design rights, and sought to continue that protection by contending that reverse engineering involved copying of the engineering drawings from which their own units were made, and that they were entitled to a new copyright in respect of each variation of these drawings. The Privy Council, on appeal from Hong Kong, dismissed this argument. I will quote two passages from Lord Oliver's opinion, at pages 365 and 367:

"In the nature of things the original drawings come to be reproduced, probably many times, and updated from time to time as minor modifications are made in design or methods of manufacture. To accord a separate artistic copyright to every such reproduction would be to enable the period of artistic copyright in what is, essentially, the same work to be extended indefinitely. Thus the primary question on Tyco's appeal can be expressed in this way: can Lego, having enjoyed a monopoly for the full permitted period of patent and design protection in reliance on drawings from which no copyright any longer subsists, continue their monopoly for yet a further, more extensive period by re-drawing the same designs with a number of minor alterations and claiming a fresh copyright in the re-drawn designs?"

"What is important about a drawing is what is visually significant and the re-drawing of an existing drawing with a few minimal visual alterations does not make it an original artistic work, however much labour and skill may have gone into the process of reproduction or however important the technical significance of the verbal information that may be included in the same document by way of information or instruction."

36.  In *L.A. Gear* the subject of copyright was designs for shoes. The Plaintiff relied on several drawings relating to a particular model of shoe as having been infringed by the Defendant. The Defendant sought to argue that it had not been proved that the drawings were original. Nourse LJ said this at page 136:

"What the Copyright Acts require is that the work should be the original work of the author. If, in the course of producing a finished drawing, the author produces one or more preliminary versions, the finished product does not cease to be his original work simply because he adapts it with minor variations, or even if he simply copies it, from an earlier version. Each drawing having been made by him, each is his original work. It would be an extraordinary state of affairs if the law were otherwise. Indeed it might have far-reaching consequences on other literary and artistic works, for example on the manuscripts of books and plays. We were told that there was no authority in point. I agree with Mr Baldwin that the principle is so obvious that it needs no authority to support it."

37.  *Cala Homes* involved designs for the construction of houses in standard ranges. These underwent a continuing process of development. No question of copyright having expired arose, but the Defendants challenged the originality of the designs which they were alleged to have infringed. Laddie J. rejected this defence. He envisaged that, if the process of amendment involved was slight, the later drawing might not enjoy a separate copyright, on the basis of the *Interlego* case, but that even if that were so the drawing would be evidence of the possibly untraceable or unidentifiable original drawing which was the subject of a copyright which was infringed by the copying of a later slight variant derived from it.

38.  In *Robin Ray* the issue concerned copyright in a database developed by the Plaintiff for use by the Defendant in programming selection. At page 638 Lightman J. said this:

"[Counsel suggested] that, because the five documents and the catalogue were prepared as preliminary stages to the creation of the database, the copyright of the plaintiff in the five documents and the catalogue was subsumed in and merged in the copyright jointly owned by the Plaintiff and the Defendant in the database. This suggestion finds no support in any authority or textbook; this is perhaps not surprising since it is wholly repugnant to the basic principles of the law of copyright. Where a work goes through successive stages in writing in the course of its creation or development, the copyright in the earlier of the writing subsists whatever the use later made of the material contained in it."

39.  *Black v. Murray* was a decision of the Inner House of the Court of Session in 1870. The pursuers, the well known publishers A & C Black, had published an edition of the works of Sir Walter Scott the copyright in which had expired. However, they had also published a second edition with notes, alterations and additions, in relation to which the period of copyright had not expired. The defenders published an edition of certain of the works, which professed to be a reprint of the first edition, but also included material taken from the second. It was held that they had infringed copyright in the second edition in respect of the copying of notes, but not otherwise, in one respect because what was done was within the limits of legitimate quotation and in another because the alteration made in the second edition from the first was too insignificant. The Lord President referred to the question as to when a second edition is the subject of a separate copyright. Clearly it is not if it is a mere reprint, equally clearly it would be if it is "so largely added to and annotated as to become practically a new work". He speaks in his judgment of the value of notes, even (or particularly) brief ones, and even if consisting or including quotations from others. A curious point, with an echo in the present case, arose as regards the alleged copying of a poem. On this point he said this, at 264:

"Now this poem was in the first edition of the Antiquary which is now out of copyright, but it is said that this is taken from the copyright edition, and not from the first, on account of an alteration in the word "spear" which appeared in the first edition, to "spur" in the copyright edition. This is no doubt perfectly true but it is not possible to convict the editor of 1869 of such a slavish adherence to the copyright edition in this respect as in some of the others for here he takes it upon himself to make an alteration of his own, so that his version of the poem is different from both the others. The original version of the poem is free to all, and I think it would be very hard to hold that because one slight emendation has been made copyright has been kept up in it."

40.   Lord Kinloch dissented on the facts on one point, but his judgment does include the following passage at 264-5, cited and relied on by Lord Oliver in *Interlego*:

"I think it clear that it will not create copyright in a new edition of a work, of which the copyright has expired, merely to make a few emendations of the text, or to add a few unimportant notes. To create a copyright by alterations of the text, these must be extensive and substantial, practically making a new book. With regard to notes, in like manner they must exhibit an addition to the work which is not superficial or colourable, but imparts to the book a true and real value, over and above that belonging to the text. This value may perhaps be rightly expressed by saying that the book will procure purchasers in the market on special account of these notes. When notes to this extent and of this value are added, I cannot doubt that they attach to the edition the privilege of copyright."

41.   None of these passages seem to me to lead to any other conclusion than that which I have expressed above about the successive stages of Joyce's creation of Ulysses. *Black v. Murray* has passages which are clearly relevant to the separate copyright in a later edition of a work already published. It does not seem to me to bear on the rather different question of the progress of a literary work through drafts or versions towards that which is eventually published. What Nourse LJ said in *L.A. Gear* supports directly the view I have expressed.

42.   The next question is what was published in 1922. So far as publication is concerned, Mr Baldwin pointed out that the legislation does require, and has always required, publication of the whole copyright work, and that it does not suffice to publish a substantial part of it. Section 175(1) of the Copyright Designs and Patents Act 1988 says that publication, in relation to a work, means the issue of copies to the public. This is to be contrasted with the definition of acts restricted by the copyright in a work, which refers to the doing of such things in relation to the work as a whole or any substantial part of it: see section 16(3)(a). The same position prevailed under the 1911 Act, section 1 (3) and 1(2), and the 1956 Act, section 49(2)(c) and 49(1). Thus the publication of a substantial part of a work only amounts to the publication of that part, not of the whole. I do not need to consider a case where the difference between the work as it stood, not yet published, and the published work is minimal. It seems to me clear that, in terms of the law of copyright, the publication of the 1922 edition of Ulysses amounted to publication of the whole text set out in that edition, but not of text which had been set out in an earlier version, whether the Rosenbach manuscript or another, and which was not included in the published work, for whatever reason. Indeed, if I am right in concluding that each successive stage of Joyce's work on Ulysses, from the proto-drafts of particular sections, via the Rosenbach manuscript and the typescripts, to the various proofs, constituted a new copyright work, at any rate in all cases where there was any change beyond the purely minimal and insignificant, it follows that the only work that was published was the last pre-publication version, namely the final approved page proofs including any amendments made by Joyce on them. If and insofar as it were possible to reconstruct the state of the preparatory work at any given stage, such as the Rosenbach manuscript, that complete work remained unpublished, even though a lot of text from it was the same as appeared in the last version, which was published. I therefore reject Mr Burkill's argument that publication in 1922 involved publication not only of the actual published 1922 text but also of all preparatory versions of the text, or indeed any such preparatory versions other than the final one which corresponded exactly, or virtually so, with that which was published.

43.   Mr Burkill cited to me *Fairlie v. Boosey* (1879) 4 App Cas 711 (on appeal from 7 Ch D 301) concerning the protection of an opera by Offenbach under the International Copyright Act 1844 by virtue of registration which appeared to relate not to the whole work but to a published vocal score of it, the alleged infringement being not a publication but a stage performance. On a close reading of the decision, assisted by reference to the judgment of the Court of Appeal, it seems to me that the provisions with which it was concerned, in section 6 of the 1844 Act, are so different from the questions I have to consider that I cannot derive any assistance from the observations of the House of Lords on the issues before me. He also cited *Merchant Adventurers Ltd v. M Grew & Co Ltd.* [1973] RPC 1, about the copyright in designs for light fittings, and *British Northrop Ltd v. Texteam Blackburn Ltd* [1974] RPC 57, also concerned with copyright in designs for items of manufacture, both being interlocutory judgments. I do not get any assistance from either of these cases on the questions which I have to consider in the present case.

**What did Mr Rose copy?**

44.  Mr Baldwin submits that what Mr Rose was doing was copying the preparatory material, not the 1922 edition at all, and that therefore no question of copying material published in Joyce's lifetime arises, and it is not necessary to go into the questions of revived copyright under the regulations. Even if he were right I would need to address those questions, since they have been argued, but I will first consider his submission on the facts as to what Mr Rose was doing.

45.  I have referred above to Mr Rose's speaking of by-passing the 1922 text, and to how he went about his task. Mr Baldwin submitted that, on this evidence, Mr Rose took the 1922 text only as a convenient starting point which, on any basis, includes a large amount of text as to which no problem arises, and for which there is undisputed autograph authority in Joyce's manuscript. Mr Rose himself said that he could have taken the 1926 edition or a later published version. He did not say that he could have started with an electronic version of the Rosenbach manuscript or any other pre-publication version. If he had done that his process would have been quite different.

46.  Looking at the matter as a whole, Mr Rose was not setting out to copy any particular edition or version of the work. He sought to establish a text for which there is as full and accurate authority as possible in terms of Joyce's autograph, but to go further in terms of his processes of dealing with errors and faults, as well as his copyreading processes. Mr Baldwin put to him that he was essentially copying the Rosenbach manuscript. He denied that and, in my judgment, rightly so. Of course the Rosenbach manuscript does contain, in Joyce's hand, most of what appeared in 1922, and it is an important source for emendations where the 1922 text differs from what Joyce wrote at earlier stages. But the importance of the Rosenbach manuscript, apart from its bulk, is no more than that of any other autograph text of Joyce in the development of the published version. In general, where (as happened any number of times) Joyce introduced new material at the typescript or proof stages, to reproduce the Rosenbach manuscript would be to omit that new material and would therefore depart from what Joyce ultimately wanted, and would not achieve Mr Rose's objective. As regards material included in the Reader's Edition which was not in the 1922 edition but was in a previous version of the work, I will have to address the question whether what Mr Rose did involved an infringement of the separate copyright in that work, but as regards the bulk of the Reader's Edition, I conclude that it was copied from the 1922 edition, rather than from any earlier version of the work. It was therefore the subject of the revived copyright provisions in the regulations, to which I will now turn.

### Revived copyright

47.  The issues I have to decide on this turn on two of the regulations, but because of the submissions made to me I will start with the Directive. This Directive, 93/98/EEC of 29 October 1993, harmonizing the term of protection of copyright and certain related rights, required member states to bring into force the laws and other provisions necessary for compliance by 1 July 1995. It opens with the usual series of recitals of which I will quote the last two:

> "(26) Whereas Member States should remain free to adopt provisions on the interpretation, adaptation and further execution of contracts on the exploitation of protected works and other subject matter which were concluded before the extension of the term of protection resulting from this Directive;
>
> (27) Whereas respect of acquired rights and legitimate expectations is part of the Community legal order; whereas Member States may provide in particular that in certain circumstances the copyright and related rights which are revived pursuant to this Directive may not give rise to payments by persons who undertook in good faith the exploitation of the works at the time when such works lay within the public domain,"

48.  These recitals provide the context for article 10.3, under the general heading Application in time. This reads:

> "This Directive shall be without prejudice to any acts of exploitation performed before the date referred to in article 13(1) [i.e. 1 July 1995]. Member States shall adopt the necessary provisions to protect in particular acquired rights of third parties."

49.  Thus, the Directive indicates that provision should be made by Member States to protect acquired rights and legitimate expectations, as identified in recitals (26) and (27), but does not dictate what form they are to take. Member States have a degree of latitude as to how they proceed in this respect. The UK Government implemented the Directive by making the Duration of Copyright and Rights in Performances Regulations 1995, SI 1995/3297, made on 19 December 1995 and coming into force on 1 January 1996. As regards copyright (in general, and considering only literary works), the effect of these regulations is to extend the term of copyright to 70 years after the death of the author, but to make a distinction between extended copyright, i.e. where the copyright had not already expired under the previous law on or before 1 January 1996, and revived copyright, where the author had

died after 1925 but before 1945, so that the copyright had expired under the existing law but part of the 70 year period remained to run after the regulations came into force. I only need to consider regulations 23 to 25 dealing with revived copyright.

50.   No act done before 1 January 1996 is to be regarded as an infringement in relation to a revived copyright. Regulation 23 contains provisions protecting acts done after 1 January 1996 following steps taken while the work was in the public domain; I will have to deal with these in some detail. Regulation 24, on the other hand, provides for a compulsory licence as regards any acts restricted by the copyright in a work in which revived copyright subsists, subject only to, first, the giving of notice and, secondly, the payment of a reasonable royalty or other remuneration. The amount payable does not have to be decided before the acts can be done. If it is not agreed it is to be determined by the Copyright Tribunal, and regulation 25 deals with that. The parties are at odds both as to regulation 23 and, if regulation 23 does not apply, as to regulation 24, on their true construction and their application to the facts of this case. I will deal with them in turn.

**Regulation 23: no infringement**

51.   I must start by setting out the relevant parts of the regulation, namely paragraphs (2), (3) and (5).

"(2) It is not an infringement of revived copyright in a work

(a) to do anything after commencement in pursuance of arrangements made before 1 January 1995 at a time when copyright did not subsist in the work, or

(b) to issue to the public after commencement copies of the work made before 1 July 1995 at a time when copyright did not subsist in the work.

(3) It is not an infringement of revived copyright in a work to do anything after commencement in relation to a literary, dramatic, musical or artistic work or a film made before commencement, or made in pursuance of arrangements made before commencement, which contains a copy of that work or is an adaptation of that work if

(a) the copy or adaptation was made before 1 July 1995 at a time when copyright did not subsist in the work in which revived copyright subsists, or

(b) the copy or adaptation was made in pursuance of arrangements made before 1 July 1995 at a time when copyright did not subsist in the work in which revived copyright subsists.

(5) In this regulation "arrangements" means arrangements for the exploitation of the work in question."

52.   Mr Burkill submits that the publication of the Reader's Edition in 1997 was something done in pursuance of arrangements made before 1 January 1995, at a time when copyright did not subsist in the 1922 edition, those arrangements being arrangements for the exploitation of the copyright work set out in the 1922 edition. Alternatively, he says that, if the better view is that the Reader's Edition is a literary work which contains a copy or is an adaptation of the 1922 edition text, then the copy or adaptation was made in pursuance of arrangements made before 1 July 1995 at a time when copyright did not subsist in the 1922 edition text. Either way, the question is whether what was done before 1 January 1995 (or, if regulation 23(3) is relevant, 1 July 1995) amounted to arrangements for the exploitation of the 1922 edition text, and whether the Reader's Edition was published in pursuance of those arrangements. The Defendants rely on both paragraphs (2) and (3) of regulation 23, but no particular distinction was drawn between them on the facts in argument. I have no idea why a different cut-off date was applied for the arrangements according to which paragraph applies. Nothing turns on the difference, since it is not suggested that anything done between January and June 1995 makes a difference to whether the publication of the Reader's Edition is within regulation 23.

53.   Mr Baldwin submitted that things done by someone such as Mr Rose on his own, working away however diligently, cannot amount to "arrangements" for the purposes of the regulation. His primary submission is that arrangements have to be at least bilateral and contractual. He backs this up by reference to a decision of the European Court of Justice on a reference from the Italian courts about the validity of the Italian legislation introduced to implement the Directive, to which I must refer.

54.    The case is *Butterfly Music srl v. Carosello Edizioni Musicali e Discographiche srl* Case C-60/98 [1999] ECJ I-3939, [2000] 1 CMLR 587. As regards phonograms, the Italian implementing law allowed a free period of 3 months after implementation for the distribution of works the subject of revived copyright. By contrast, as regards literary works, where third parties had begun to exploit them while in the public domain, the legislation permitted them to continue freely to exploit the work in question without limit of time. It appears that the Italian Government was even later than that of the UK in bringing in the necessary legislation: there the commencement date was 26 February 1996. Butterfly Music published recordings of popular songs which were in the public domain, but came back into copyright on implementation. They continued to distribute the recordings after the three month period. In proceedings by the copyright owner, they argued that the three month provision was invalid under Community law since it did not adequately protect the rights of those who had started before commencement to exploit the works which were the subject of revived copyright. The European Court of Justice rejected this argument, emphasising the width of discretion allowed to member states in deciding what protection to afford, and in particular that it was not necessary for the same provision to be made in relation to different types of copyright work, and it also relied on the fact that, because of the late implementation, the period of grace had in fact been not just three months from the date when the Directive ought to have been implemented but almost 11 months. What is important is what was said about the policy of the relevant provisions and the scope of the discretion. Advocate-General Cosmas said that the 3 month (or in practice 11 month) period allowed appeared in principle to be sufficient to safeguard the economic interests of third parties acting in good faith, and was certainly not manifestly inadequate and disproportionately restrictive, noting also that such third parties must be considered to have known from 29 October 1993, the date of the Directive, that the revival of copyright had been set for 1 July 1995 at the latest (see para. 31). As regards the argument based on disparity with the treatment of literary works, he said, first, that it was open to member states to make different provision for different kinds of copyright, so long as each was within the scope of the discretion afforded, but secondly (at para. 34) that it was by no means clear that the extensive provision allowed for literary works was confined to what was permitted. Since the point was not raised by the referring court, he did not recommend that the court enter into this question, and the court did no more than mention it. But in case the court wished to deal with it, he offered his opinion, as follows:

> "34. … I consider that it should be found that the effect of such extended - in effect unlimited - protection of the interests of third parties is to completely undermine copyright and related rights, which the Community legislature seeks to safeguard, and is therefore contrary to the Directive. …
>
> 35. In the final analysis … the power which is conferred on the Member States by the relevant provision of the Directive relates to the adoption of transitional provisions which, by their nature, must be as narrow as possible, since they are equivalent to exceptions inserted into the general system for the protection of related rights which is created by the rules of the Directive. In other words when the national authorities are called on to give effect to the requirement in article 10(3) of the Directive to protect acquired rights of third parties, they must have in mind that that protection is by way of exception; the scope of the protection afforded to copyright and related rights, the safeguarding of which constitutes the Directive's central and principal objective, must be restricted as little as possible."

55.    The Court's judgment includes the following passages which bear on the question of the scope for transitional provisions:

> "23. Reading those various provisions together [i.e., those parts of the Directive which I have quoted above], it is apparent that the Directive did provide for the possibility that copyright and related rights which had expired under the applicable legislation before the date of its implementation could be revived, without prejudice to acts of exploitation performed before that date, while leaving it to the Member States to adopt measures to protect acquired rights of third parties. In view of the wording of those provisions, such measures must be regarded as measures which the Member States are obliged to adopt, but whose detail is left to the discretion of the Member States, provided, however, that they do not have the overall effect of preventing the application of the new terms of protection on the date laid down by the Directive."
>
> "28. Secondly such legislation [i.e. the three month grace period for phonograms], by limiting in that way the protection of acquired rights of third parties with regard to the distribution of sound recording media, meets the need to circumscribe a provision of this kind, which must necessarily be transitional in order not to prevent the application of the new terms of copyright and related rights on the date laid down by the Directive, that being the Directive's principal objective.
>
> 29. That interpretation is not affected by the fact that another provision of [the Italian implementing law], which does not apply in the main proceedings, lays down different protective rules for acquired

rights of third parties with regard to the distribution of literary works. This second provision is for the benefit of a distinct class of persons, who are not in the same situation as the persons concerned by the first provision. Irrespective of whether the protective rules covering that class meet the requirements of the Directive, they cannot have any bearing on the assessment of the measure which governs an objectively different situation."

56.   Mr Baldwin submits, relying particularly on the opinion of the Advocate General, that regulation 23 as regards revived rights must not be construed too widely, since it would otherwise prevent the application of the new term of revived copyright, and he points out that acts which are not immune under regulation 23 can nevertheless be done as of right (subject only to notice) under regulation 24 on condition of making a reasonable payment to the copyright owner. I may mention at this point that Mr Burkill sought to rely, in aid of his wider interpretation of the regulation, on Parliamentary materials. I do not doubt that such materials could, in principle, assist if there is ambiguity as to the interpretation of a national provision which is made in pursuance of a discretion afforded by a Community Directive. However, as is often the case, having looked at the passage from Hansard, I get no assistance from it as to the meaning of "arrangements" in regulation 23. I do not need the Minister's help to see that the word "arrangements" is of potentially wide meaning, and otherwise what he said was that the answer would have to come from the courts as cases come to be decided.

57.   I do not propose to attempt a definition of "arrangements". I can accept Mr Burkill's proposition that they are not necessarily limited to arrangements by way of contract. Nevertheless they must be of some degree of solidity or certainty, such that it can be said that acts done later are done in pursuance of the arrangements. Regulations 23 (2)(a) and (3)(b) are not so wide as to extend to anything done after commencement in consequence of anything at all which has been done, or any steps of any kind taken, with a view to exploiting the work in question, before 1 January 1995. Apart from anything else a very wide reading of "arrangements" would produce a very odd contrast with the fairly narrow and specific provisions of regulation 23(2)(b). That deals only with the distribution of stock in hand on 1 July 1995. Of course that could include items produced since 1 January 1995 and not in pursuance of any arrangements for the exploitation of the work made before 1 January 1995. But apart from that rather limited case, the effect of Mr Burkill's reading of regulation 23(2)(a) would be to provide a vastly wider exception for the distribution of copies, whether made before or after 1 July 1995, so long as they could be attributed to something done before 1 January 1995.

58.   I accept Mr Rose's evidence that he did not start on his Reader's Edition project until after 1 January 1992. All that he did in respect of the project before 1 January 1995 was done while the 1922 edition was in the public domain. But what did that amount to? He started work on the project, and no doubt achieved a great deal of what he intended by the end of 1994. He got into discussion with Penguin, to whom he was already talking about Finnegans Wake. He told me that he was confident that Penguin would publish the Reader's Edition, but he was wrong. In 1993 he approached Macmillan, and may at that stage have showed them some sample text. They were encouraging but without any commitment. Mr Rose was again confident that they would publish the Reader's Edition, once Penguin withdrew, and this confidence was enhanced when Mr Riley moved from Penguin to Macmillan in September 1993. It does not seem to me that these limited contacts with publishers can fairly be described as amounting to "arrangements for the exploitation of the work". That aside, what he relies on is his having done a great deal, even the vast bulk, of the work needed to prepare his new edition. That, by itself, does not seem to me to be arrangements in pursuance of which it could be said that the eventual publication was done. If it were sufficient it is difficult to see how a distinction could be made between this case and one in which only a small amount of the work had been done before 1 January 1995, but the work was thereafter carried on, eventually brought to completion, and finally published. The publication could be said to have been done in that case too in pursuance of the work started before 1 January 1995. Such an interpretation of the regulation would, in my judgment, be far too wide, even in its own terms, and the more so with the guidance of the European Court of Justice given in the passages from *Butterfly Music* which I have quoted above. It would interfere to an excessive extent with the rights conferred by the revived copyright. I also see force in Mr Baldwin's submission that a narrower reading of regulation 23 does not, as Mr Burkill contended, sterilise the efforts of those such as Mr Rose made while the work was in the public domain. Whatever Mr Rose may have believed would happen, once he got to know in late 1993 of the Directive, in fact he and Macmillan are entitled to publish the Reader's Edition, so far as the 1922 edition text is concerned, and thus to reap the reward for their efforts; they only have to give the notice necessary under regulation 24 and pay the reasonable royalty or other remuneration provided for thereby.

59.   Mr Riley said in evidence that it was not unknown for books to be published without contracts having been signed. In a case where, without a contract being signed before 1 January 1995, all or a great deal of the work preparatory to publication had been done before that date, on the basis of an understanding or negotiations on the part of the author and the publishers, but the work had not in fact been published until then, then it seems likely that the case would fall within regulation 23(2)(a) or (3)(b), as the case may be. Mr Burkill submitted that it would be wrong to confine arrangements to those which are at least bilateral, involving an author and a publisher, since that would unfairly and unnecessarily prejudice an author who decided to be his own publisher. He mentioned Mr Rose's

having set up his own imprint in 1995, but that, if an arrangement at all, was too late to count on the facts. I will leave for later decision, if it ever arises on the facts, a case where a single person, setting out to be author and publisher, has taken, by 1 January 1995, the sort of steps which, on the part of different persons collaborating, would amount to relevant arrangements, and the question whether such steps qualify. On the facts of the present case, it seems to me that nothing that Mr Rose did before 1 January 1995 qualifies as arrangements for the exploitation of the work, so that the eventual publication of the Reader's Edition in 1997 can be said to have been in pursuance of those arrangements. The position is the same as regards things done before 1 July 1995 if regulation 23(3) is that which is relevant. I therefore reject the defence that the publication, so far as it would otherwise infringe the revived copyright in the 1922 edition text, does not do so because it is within regulation 23.

### Regulation 24: compulsory licence

60. The next question is whether, so far as the 1922 edition text is concerned, the Reader's Edition falls within regulation 24, and can therefore be published subject to payment. I must quote the first four paragraphs of regulation 24.

> "(1) In the case of a work in which revived copyright subsists any acts restricted by the copyright shall be treated as licensed by the copyright owner, subject only to the payment of such reasonable royalty or other remuneration as may be agreed or determined in default of agreement by the Copyright Tribunal.
>
> (2) A person intending to avail himself of the right conferred by this regulation must give reasonable notice of his intention to the copyright owner, stating when he intends to begin to do the acts.
>
> (3) If he does not give such notice, his acts shall not be treated as licensed.
>
> (4) If he does give such notice, his acts shall be treated as licensed and a reasonable royalty or other remuneration shall be payable in respect of them despite the fact that its amount is not agreed or determined until later."

61. The Defendants rely on the notice given by Macmillan when the letter originally sent (but not received) in July 1996 was sent to Monro Pennefather in March 1997. The letter does not state when the publication is intended to be, but by then the estate's representatives knew from elsewhere, and had had it confirmed orally, that the intended date was June 1997. Apart from that point, the issues on this are whether it is incumbent on a person giving such a notice to supply a copy of the intended publication, and whether a notice may be given on a contingent basis, as a fall-back in case a claim to be entitled to publish free under regulation 23 is not made out.

62. In order to qualify for the compulsory licence afforded by regulation 24, all that has to be done is for the person intending to avail himself of the right conferred by the regulation to give reasonable notice of his intention to the copyright owner, stating when he intends to begin to do the acts. The first question is whether Macmillan, when they told the estate, via Mr Monro, of their intention in March 1997, stated when they intended to begin the acts. The letter of 1996 does not contain that information. But it seems to me that, in the context of the exchanges that took place in March 1997, it would be wrong to regard Macmillan as not having given notice of that simply because the intended publication date of June 1997 was not stated in that letter. Normally it would be sensible for a notice which is intended to take effect under regulation 24 itself to state the intended date. But here Mr Monro already knew the intended date from the publicity which had been drawn to his attention, and this was confirmed by Mr Riley in their telephone conversation. I am not prepared to hold that no sufficient notice was given because the intended publication date was not included in the 1996 letter, as received in March 1997.

63. A puzzle about regulation 24 is the requirement for "reasonable" notice, which must refer to the period of notice. Since the copyright owner cannot do anything to stop the intended acts once notice is given, so long as they are within the regulation, it seems to be arguable that only quite short notice needs to be given. The requirement of notice means that the acts must be open and not clandestine, and that a person who hoped to get away with publication in breach of copyright in secret cannot justify his acts retrospectively by reference to the regulation. But on any basis notice in March for publication in June would be reasonable, and I need not say anything about what is required to make the period of notice reasonable. Mr Baldwin submitted that the notice had to include full particulars of what was to be done, including, he said, a copy of the intended publication. I cannot get that out of the text of the regulation, and it seems to me that it would not be compatible with a notice given at all well in advance, since the text may well not be finalised until near the time of publication. In my judgment Macmillan's notice was not invalid on this account.

64.    The other question is whether it is open to the person seeking to take advantage of the regulation to give notice on a contingent basis, as a fall-back to, for example, an argument under regulation 23 as here. Mr Baldwin submitted not, but was not able to offer me any convincing reason why such a notice should be regarded as inconsistent with the statutory purpose. It might be said, on a very literal reading of regulation 24(2), that such a fall-back notice was not a notice of an intention "to avail himself of the right conferred by this regulation", but only a notice to do so if all else failed. In other fields of law notices with statutory effect may be given so as to take effect only if it is later found, contrary to the arguments of the notice-giver, that the relevant provisions apply. For example, the owner of property may consider that the occupier is there under a licence, with no security of tenure, and may give a common law notice accordingly, but may also, as a fall-back, give the notice that would be required, for a business tenant, under Part II of the Landlord and Tenant Act 1954, if the occupation turns out to be under a tenancy. I am not aware that such an approach has ever been regarded as legally impossible. It seems to me that it would be reading a great deal too much into regulation 24(2) to say that the notice can only ever be given unequivocally, and that no such notice can be given in the alternative to an argument that it is not necessary.

65.    The only point suggested in argument which might bear on this last question turned on the fact that, if the parties have first to argue whether, for example, regulation 23 applies, there may be a long delay (as here) before the royalty or remuneration can be quantified and therefore paid. Mr Baldwin and Miss Clark argued that the Copyright Tribunal could not award interest whereas Mr Burkill drew attention to the wide power given under regulation 25 and submitted the contrary; Counsel thus took positions the opposite of what one would expect them to argue, for their respective clients, before the Tribunal. I do not propose to decide anything on that point. Clearly there can be a delay between the date when acts start to be done under regulation 24 and the date when the royalty or remuneration is agreed or determined and therefore becomes payable. Whether or not the Tribunal can do anything about that by way of awarding interest on sums payable in respect of acts done some time in the past, it does not seem to me that regulation 24 requires an unconditional or unequivocal notice.

66.    Accordingly, as to whether a valid notice was given under regulation 24, I find for the Defendants. If and insofar as their acts would otherwise infringe revived copyright, they would be entitled to do them but would have to pay a sum to be agreed or determined under the regulations.

**Copyright in material not published by 1941: infringement**

67.    Having held that copyright subsisted separately in the text set out in the Rosenbach manuscript and other preparatory materials, and that, except insofar as that text was in fact published in 1922, it remained unpublished at Joyce's death, I must now consider whether what Mr Rose did in respect of text not so published amounts to an infringement of the copyright. I have rejected Mr Baldwin's submission that Mr Rose was, in fact, copying wholesale the unpublished text rather than the published text, but the fact remains that Mr Rose did include in the Reader's Edition some passages which had first been published, from the Rosenbach manuscript and other sources, after Joyce's death. By virtue of an order made by way of case management directions, the question of infringement was ordered to be determined by reference to 8 pages of the Reader's Edition, four chosen by each side. Since the Reader's Edition runs to 689 pages (excluding the alternative version of Penelope) the task might otherwise have been very onerous. The Defendants chose 4 consecutive pages, the Claimant 4 separate pages. In an Appendix to this judgment I set out the eight pages. The text in the Appendix shows the main differences (as regards words) from the 1922 edition by the use of a different typeface, and it is annotated as to the variants shown in this way.

68.    Essentially the question here is whether what Mr Rose took from the Rosenbach manuscript or other preparatory materials amounted to a substantial part of the text in which the prior copyright subsists. I will limit myself for this purpose to the Rosenbach manuscript, which is the principal source for the material added to the 1922 text in the 8 sample pages. Mr Burkill's submission is that it does not, because it is so small in amount in comparison with the total extent of the text of the copyright work. To judge by the 8 selected pages, there is certainly not a lot of text in the Reader's Edition which had not been published in Joyce's lifetime. It is reasonable to assume that the 4 pages chosen by the Claimant include their best examples, but that there are others, though what and how many I do not need to know. Whether part of a copyright work which has been copied is a substantial part depends as much on qualitative as on quantitative factors. The fact that the passages taken by Mr Rose, mainly from the Rosenbach manuscript, which were omitted, usually at the typescript stage, and not reinstated, are only a few lines or even less than a line here and there, is not a sufficient answer. Their importance lies in the very fact that they are being restored to the text, and that their inclusion is one of the things that makes the Reader's Edition special and distinct. Of course, they have been published before, in Gabler and in the Gaskell / Hart book, but those publications are of no assistance to Mr Rose and Macmillan. In my judgment, despite the relative brevity of the passages taken, they do amount to a substantial part of the text of the Rosenbach manuscript, and therefore their copying from that source infringes the copyright in that work.

69.    It follows from my finding of copying that, although the copying from the 1922 edition in the Reader's Edition would

by itself have been the subject of a compulsory licence under regulation 24, the copying from the Rosenbach manuscript and other sources (not including the Little Review) of material which was not included in the 1922 edition is a breach of copyright for which regulation 24 is of no assistance, because it is not a revived copyright. The Reader's Edition does therefore constitute an infringement of the Claimants' copyright.

70.   The Defence also relied on fair dealing for the purposes of research, private study, criticism and review. Mr Burkill did not mention these in his submissions, and rightly so. None of those defences could apply to the publication of the Reader's Edition. The Defence also alleged an implied licence, waiver or estoppel based on the Estate's consent to or at least acquiescence in the Gaskell / Hart book (see paragraph 8). This too was absent from Mr Burkill's submissions. Consent to the publication of that work could not possibly justify another commercial enterprise publishing for sale a new edition of Ulysses incorporating text in accordance with Gaskell and Hart's recommendations, or dispense with the need for obtaining consent from the copyright owner to such a publication.

**The claim in passing-off**

71.   I turn, then, to the Claimants' case in passing-off. This is an unusual version of a passing-off claim. The Claimants do not produce or sell products themselves. They do however have a commercial interest in products made and sold by others, in that, for so long as they have a copyright in Joyce's works, they can collect a royalty or other remuneration from sales by other undertakings. They are, therefore, at one remove from the product in question. Their commercial interest could be regarded as being of the kind which can be protected by the tort of passing-off, in that, while Joyce's works are in copyright, they are interested in ensuring that what members of the public buy thinking it to be Joyce's Ulysses is indeed that work and not something quite other, because in that way the Claimants can seek to ensure that they derive their royalty or licence fee from each sale of something which is sold as Joyce's Ulysses.

72.   The essence of the Claimant's complaint in this respect is that the Reader's Edition is so different from what Joyce intended, in certain respects, that it cannot properly be described as Joyce's Ulysses, or not without some differentiating words which make it clear to potential buyers that what they would be getting is different from the original text. They say that the label Reader's Edition conveys nothing in particular and is not sufficient for this purpose. Neither side ventured a label which might suffice, and I do not intend to do so but, merely for purposes of illustration, one might think of something such as "Modernised Edition".

73.   The respects in which the Reader's Edition is said to depart from the model are listed in the Particulars of Claim. The points made include the following:

i) It is well recognised that Joyce chose his words (including the meaning, sound and spelling of those words and the punctuation used therewith) and constructed his phrases and his sentences and the setting and staging thereof carefully and deliberately in order to achieve particular effects of meaning, ambiguity of meaning, associations and references.

ii) Joyce built up a substantial reputation and goodwill in connection with the work called Ulysses. That work is a product of Joyce's encyclopaedic consciousness unfettered by conventional literary form. It is a classic example of his distinctive and innovative style.

iii) Any book which is published as the work of Joyce will be expected by members of the public to be the work of Joyce and not otherwise. If the book claims to be an edition of a work of Joyce, members of the public (or a substantial number of them) will believe that the contents of the text of the novel will have been written by Joyce and approved for publication by him or his representatives (including the Claimants) and will include the distinctive style and nuances of meaning for which the work is famous.

iv) Since Ulysses by Joyce is not simply conventional prose, readers do not always know what to expect from one sentence to the next or from one page to the next. As such they are dependent on the integrity of the edition and are particularly vulnerable to being deceived if they are presented with something which purports to be Ulysses by Joyce when it is not something which has been approved for publication by him or his representatives (including the Claimants).

v) The Reader's Edition is materially different in form meaning and effect from any work published as Ulysses by Joyce with the approval of Joyce or his representatives.

vi) The text has been completely redesigned, and is different from anything previously published as Ulysses, with 8,000 to 10,000 changes being made from any previous edition of Ulysses.

vii) A number of characteristic features specific to Ulysses are well-known and commonly regarded as contributing to its place in literature. In the Reader's Edition changes have been made which affect these features and are such that the overall effect is a work which is different in kind from anything that has been published before as Ulysses by Joyce. These features are as follows:

 a) Narrative techniques such as interior monologue and "free internal discourse";

 b) Unconventional syntax, for example: compound words, word order and grammar, capitalisation;

 c) Motifs and internal echoes;

 d) Errors of fact;

 e) Allusions;

 f) Formatting.

viii) In particular, the Claimants point to significant changes in the punctuation in the Reader's Edition, of which the biggest single example is punctuation and the insertion of apostrophes in Molly Bloom's monologue, the episode Penelope; the destruction of Joyce's neologisms, often in the form of compound words which Mr Rose has separated or hyphenated; the altered presentation of stage directions in episode 15 [Eumaeus]; alterations of the order of words, the spelling of words, and even the identity of words in a piece of text. Fifteen particular examples are given in the Particulars of Claim and elaborated in Dr Slote's report.

74. It is evident from this that the question whether the Defendant's product is being misrepresented as a product of or connected with the Claimant is of a different order in this case from a more conventional passing-off case. It is not like selling lemon juice in a plastic lemon-shaped container which customers associate with a different manufacturer, as in *Reckitt & Colman v. Borden Inc* [1990] 1 W.L.R. 491. It is not like selling your product as Champagne, or as Advocaat, when it does not satisfy the objective characteristics of the products sold on the English market by those who make the product, as in *Taittinger v. Allbev* [1993] FSR 641 or *Erven Warnink BV v. J Townend & Sons (Hull) Ltd* [1980] RPC 31. It is not even like publishing a regular diary item in a newspaper in a way which imitates the style and presentation of similar items by a well-known living and active politician and writer, as in *Clark v. Associated Newspapers* [1998] 1 W.L.R. 1558.

75. The cases cited to me, apart from the Alan Clark case, were in the line of what one may call the class passing-off cases, concerning champagne, advocaat and Swiss chocolate. But the present is different from these, because there is not a class of traders all entitled to share in the goodwill of Joyce's works in the same way. Of course Penguin, or Macmillan, or other publishers who publish works by Joyce have their own goodwill, but that is not the same goodwill as Joyce would have had in his lifetime, or as the Claimants claim to have now. The reason why Mr Baldwin took me to the class cases is that, although his clients are the only people entitled (if at all) to sue in order to protect the goodwill, they cannot do so in respect of their own products, but only in respect of a class of products made and sold by others.

76. Given the novelty of the case in passing-off, it seems to me that it is right to look at the essential requirements of the tort, as they have been laid down recently, above all in the Advocaat case, to see whether the Claimants can satisfy them.

77. These requirements are now often cited in two formulations from the Advocaat case: Lord Diplock at [1980] RPC 93, and Lord Fraser at pages 105-6. Both were cited to me, with other passages from the case. Both, in the context of the speeches as a whole, are important and instructive. I will limit myself in terms of express quotation to Lord Fraser, as follows:

 "The plaintiff is entitled to protect his right to property in the goodwill attached to a name which is distinctive of a product or class of products sold by him in the course of his business. It is essential for the plaintiff in a passing off action to show at least the following facts:

 (1) That his business consists of or includes selling in England a class of goods to which the particular trade name applies;

 (2) That the class of goods is clearly defined, and that in the minds of the public, or a section of the

public, in England the trade name distinguishes that class from other similar goods;

(3) That because of the reputation of the goods, there is goodwill attached to the name;

(4) That he, the plaintiff, as a member of the class of those who sell the goods is the owner of goodwill in England which is of substantial value;

(5) That he has suffered, or is really likely to suffer, substantial damage to his property in the goodwill by reason of the Defendants selling goods which are falsely described by the trade name to which the goodwill is attached."

78.  A first difficulty for the Claimants is that they do not sell the product at all. I will assume, without deciding, that their commercial interest in sales in England of Ulysses, which attract a copyright royalty, may be sufficient to enable them, at one remove, to satisfy the first requirement. Mr Burkill submits that the Claimants cannot even satisfy this requirement, even apart from this feature. He says, generally, that the estate of a deceased author has no goodwill to protect, and that the goodwill dies with the author, and specifically that this estate has no right to control the goodwill even if it did survive because Joyce appointed Harriet Shaw Weaver to deal with literary questions, rather than his personal representatives. I do not find either of these points particularly persuasive, but I do not propose to decide them either way.

79.  The second difficulty, however, is that, because the product is not the Claimants' own, sold under their trade name, they have to have resort to the class of goods approach, but as Lord Fraser says the class must be clearly defined, and the trade name must distinguish in the minds of the public goods of that class from other goods not of the class. Lord Diplock was equally categorical as to the need for clarity of definition, even though he does not mention this point in his list of the requirements: see [1980] RPC at 95 and 96, and above all 98:

"It is the reputation that that type of product has gained in the market by reason of its recognisable and distinctive qualities that has generated the relevant goodwill. So if one can define with reasonable precision the type of product that has acquired the reputation, one can identify the members of the class entitled to share in the goodwill as being all those traders who have supplied and still supply to the English market a product which possesses those recognisable and distinctive qualities."

80.  In the course of his closing submissions I asked Mr Baldwin for a clear statement of the characteristics which he relied on for the definition of the class of products in which he says the goodwill subsists under the name "Ulysses by James Joyce", and outside which he argues that the Reader's Edition falls. His first answer is by reference to paragraph 8 of the Particulars of Claim, relevantly quoted in paragraph 73(iii) above, as amplified by sub-paragraphs (a) to (f) of paragraph 73(vii). He offered two other versions, first: "Ulysses as written by Joyce and as presented in works published prior to 1997", and second: "Ulysses as written by Joyce and published in his lifetime [with his approval] or as published thereafter with the approval of his estate". Any defining characteristic which involves or allows for the consent of the Claimants to be given or withheld seems to me to be irrelevant. Otherwise the Claimants could decide for themselves freely that a work which otherwise does satisfy the relevant tests shall not be sold. I accept that the owner of the goodwill can alter the class by selling other goods under the same trade name, in such a way that the goodwill will then, eventually, attach to the wider or different class of goods. But that is quite different from allowing the proprietor of the goodwill to decide, in relation to each product as it arises, whether to admit it to the class or not. Mr Baldwin accepts that, once a version has been published with consent, whether given by Joyce or by his personal representatives, then it cannot be said that a reproduction of that version is outside the class. But he argues that any other version, not identical with one already published with consent, is only within the class if the personal representatives approve, they being under no constraint as to whether or not they do. A test for membership of the class which consists of or includes that degree of subjectivity seems to me to have nothing in common with the formulation of the test by Lord Diplock and Lord Fraser.

81.  Mr Burkill submitted that the definition of the class put forward by Mr Baldwin would have to involve approval either by the estate or by the general body of academic opinion at any given time as regards what could fairly be described as an edition of Joyce's Ulysses. The first would be invalid, for the reasons I have mentioned, and the second would not satisfy the requirements because of its inherent uncertainty. Mr Baldwin did not in terms put his case in this second way, but it seems to me that his resort to the characteristics of the work as listed in the Particulars of Claim and set out in paragraph 73 above could only be determined by reference to academic opinion. That is an impossible way to define a class of products which, in the mind of the public, has acquired a collective goodwill such that one work falls within it and another can clearly be seen to fall outside it. In my judgment Mr Baldwin has not put forward, and I do not see how he could put forward, a definition of the class to which the goodwill attaches which satisfies the tests laid down in the cases, and which allows the court to determine that all editions published before 1997, including Gabler and, presumably, the various editions taken with the Hart Gaskell

repair kit, are within it, but the Reader's Edition is not. On that ground I hold that the estate cannot succeed in passing-off. I do not exclude the possibility that there could, in theory, be a publication passed off as Joyce's *Ulysses* which did fall outside some clearly and objectively definable class, and could possibly be the subject of a passing-off claim if the other requirements are satisfied. But Mr Baldwin's attempt to define a class which includes that which has been published before 1997 but does not include the Reader's Edition does not work in terms of the law of passing-off.

82.   The Claimants called as witnesses a few members of the public who had been interviewed as they left a major bookshop in central London. Mr Baldwin submitted that their evidence supported his contention that an essential feature of the class, as perceived by the relevant public, was approval by Joyce or his estate. However, the questions put to them were rather leading, and both for that reason and because the sample was so very small, I get no assistance from this evidence. Even if the evidence had been more substantial and reliable, it seems to me that it would not have overcome the difficulty of principle identified in paragraph 80.

83.   I should also refer to the expert witnesses called on each side on the passing-off issue. I have mentioned the Claimants' witness Dr Slote, who put forward the characteristics mentioned in paragraph 73(vii)(a) to (f). He is evidently a considerable expert on Joyce's texts. Professor Greetham, called by the Defendants, is an expert in textual criticism generally, rather than Joyce in particular, but Joyce's works are clearly an absorbing subject for textual criticism, and Professor Greetham told me that he teaches a course on Joyce. It seemed to me that much of the evidence of each of them failed to meet that of the other. Though reading their reports and listening to their testimony has educated me on some matters of which I previously knew little or nothing, I cannot say that it has assisted me greatly in resolving the issues before me, except to show that which I might have guessed, that the approval of the general body of academic opinion would be an impossibly vague test to apply as an element in the definition of the class.

84.   It follows that I reject the claim in passing-off.

**Conclusion**

85.   In summary, therefore, I hold that the Reader's Edition did involve copying of the 1922 edition text, but is not limited to a copying of text which was published during Joyce's lifetime, and that it involves an infringement of copyright owned by the Claimants in, at least, the Rosenbach manuscript. Since this was first published after Joyce's death, no question of revived copyright arises. If the publication of the Reader's Edition had only related to copyright material published during Joyce's lifetime, I would have held that the Defendants could not claim to be able to publish free under regulation 23, but that their publication was lawful, but gave rise to an obligation to pay a reasonable royalty or other remuneration, to be determined if not agreed, under regulation 24. I also hold that the publication of the Reader's Edition is not actionable by way of passing-off.

**Appendix: the 8 selected pages from the Reader's Edition**
(See paragraph 67 of the judgment)

The text set out here is that of the eight pages selected by the respective parties from the Reader's Edition for the purposes of deciding the question of copyright infringement, though omitting a few words at the beginning or end of some pages which do not matter on the question of copying. The pages are 144 to 147, which are presented continuously with an indication of where successive pages start, and then separately pages 344, 487, 541 and 670.

I have not shown all divergences from the 1922 text. Apart from one footnote referring to the added apostrophes in Penelope, I have not noted or shown any changes of punctuation, capitalisation, presentation or formatting, nor the division of compound words.

I have shown verbal differences by the use of a different font and, for omissions, I have included the word omitted but shown it struck through.

I have added footnotes to describe briefly the position as regards each such verbal difference in the text.

_____

**Pages 144 to 147:**

[Page 144]

Pineapple rock, lemon platt, butterscotch. A sugarsticky girl shovelling scoopfuls of creams for a Christian Brother. Some school treat. Bad for their tummies. Lozenge and comfit manufacturer to His Majesty the King. God. Save. Our. Sitting on his throne, sucking red jujubes white.

A sombre Y.M.C.A. young man, watchful among the warm sweet fumes of Graham Lemon's, placed a throwaway in the[1] hand of Mr Bloom.

Heart-to-heart talks.

Bloo . . . Me? No.

Blood of the Lamb.

His slow feet walked him riverward, reading. Are you saved? All are washed in the blood of the Lamb. God wants blood victim. Birth, hymen, martyr, war, foundation of a building, sacrifice, kidney burnt offering, druids' altars. Elijah is coming. Dr John Alexander Dowie, restorer of the church in Zion, is coming.

Is coming! Is coming!! Is coming!!!

All heartily welcome.

Paying game. Torrey[2] and Alexander last year. Polygamy. His wife will put the stopper on that. Where was that ad some Birmingham firm the luminous crucifix? Our Saviour. Wake up in the dead of night and see Him on the wall, hanging. Pepper's Ghost idea. Iron Nails Ran In. Phosphorus it must be done with. If you leave a bit of codfish for instance. I could see the bluey silver over it. Night I went down to the pantry in the kitchen. Don't like all the smells in it waiting to rush out. What was it she wanted? The Malaga raisins. Thinking of Spain. Before Rudy was born. The phosphorescence, that bluey greeny. Very good for the brain.

From Butler's Monument House corner he glanced along Bachelor's Walk. Dedalus' daughter there still outside Dillon's auction rooms. Must be selling off some old furniture. Knew her eyes at once from the father. Lolling[3] about waiting for him. Home always breaks up when the mother goes. Fifteen children he had. Birth every year almost. That's in their theology or the priest won't give the poor woman the confession, the absolution. Increase and multiply. Did you ever hear such an idea? Eat [page 145] you out of house and home. No families themselves to feed. Living on the fat of the land. Their butteries and larders. I'd like to see them do the black fast Yom Kippur. Crossbuns. One meal and a collation for fear he'd collapse on the altar. A housekeeper of one of those fellows if you could pick it out of her. Never pick it out of her. Like getting £.s.d. out of him. Does himself well. No guests. All for number one. Watching his water. Bring your own bread and butter. His reverence. Mum's the word.

Good Lord, that poor child's dress is in flitters. Underfed she looks too. Potatoes and marge, marge and potatoes. It's after they feel it. Proof of the pudding. Undermines the constitution.

As he set foot on O'Connell Bridge a puffball of smoke plumed up from the parapet. Brewery barge with export stout. England. Sea air sours it, I heard. Be interesting some day get a pass through Hancock to see the brewery. Regular world in itself. Vats of porter, wonderful. Rats get in too. Drink themselves bloated as big as a collie floating. Dead drunk on the porter. Drink till they puke again like Christians. Imagine drinking that! Rats: vats. Well of course if we knew all the things.

Looking down he saw flapping strongly, wheeling between the gaunt quay walls, gulls. Rough weather outside. If I threw myself down? Reuben J.'s son must have swallowed a good bellyful of that sewage. One and eightpence too much. Hhhhm. It's the droll way he comes out with the things. Knows how to tell a story too.

They wheeled lower. Looking for grub. Wait.

He threw down among them a crumpled paper ball. Elijah thirty-two feet per sec is com. Not a bit. The ball bobbed unheeded on the wake of swells, floated under by the bridge piers. Not such damn fools. Also the day I threw that stale cake out of the *Erin's King* picked it up in the wake fifty yards astern. Live by their wits. They wheeled, flapping.

*The hungry famished gull*

*Flaps o'er the waters dull.*

That is how poets write, the similar sounds. But then Shakespeare has no rhymes: blank verse. The flow of the language it is. The thoughts. Solemn.

*Hamlet, I am thy father's spirit*

*Doomed for a certain time to walk the earth.*

– Two apples a penny! Two for a penny!

His gaze passed over the glazed apples serried on her stand. Australians [page 146] they must be this time of year. Shiny peels: polishes them up with a rag or a handkerchief.

Wait. Those poor birds.

He halted again and bought from the old applewoman two Banbury cakes for a penny and broke the brittle paste and threw its fragments down into the Liffey. See that? The gulls swooped silently, two, then all, from their heights, pouncing on prey. Gone. Every morsel.

Aware of their greed and cunning he shook the powdery crumb from his hands. They never expected that. Manna. Live on fish[4], fishy flesh they have to, all seabirds, gulls, sea goose. Swans from Anna Liffey swim down here sometimes to preen themselves. No accounting for tastes. Wonder what kind is swan meat. Robinson Crusoe had to live on them.

They wheeled, flapping weakly. I'm not going to throw any more. Penny quite enough. Lot of thanks I get. Not even a caw. They spread foot-and-mouth disease too. If you cram a turkey, say, on chestnut meal it tastes like that. Eat pig, like pig. But then why is it that saltwater fish are not salty? How is that?

His eyes sought answer from the river and saw a rowboat rock at anchor on the treacly swells lazily its plastered board.

*Kino's*

*11/-*

*Trousers*

Good idea that. Wonder if he pays rent to the Corporation. How can you own water really? It's always flowing in a stream, never the same, which in the stream of life we trace. Because life is a stream. All kinds of places are good for ads. That quack doctor for the clap used to be stuck up in all the greenhouses. Never see it now. Strictly confidential. Dr Hy Franks. Didn't cost him a red cent[5]. Like Maginni the dancing master self-advertisement. Got fellows to stick them up or stick them up himself for that matter on the q. t. running in to loosen a button. Fly-by-night. Just the place too. POST NO BILLS. POST 110 PILLS. Some chap with a dose burning him.

If he . . . ?

O!

Eh?

No . . . No.

No, no. I don't believe it. He wouldn't surely?

No, no. [page 147]

Mr Bloom moved forward, raising his troubled eyes. Think no more about that. After one. Timeball on the Ballast

Office is down. Dunsink time. Fascinating little time. Fascinating little book that is Sir Robert Ball's. Parallax. I never exactly understood. There's a priest. Could ask him. Par, it's Greek: parallel, parallax. Met him pike hoses she called it till I told her about the transmigration idea[6]. O rocks!

Mr Bloom smiled O rocks at two windows of the Ballast Office. She's right after all. Only big words for ordinary things on account of the sound. She's not exactly witty. Can be rude too. Blurt out what I was thinking. Still, I don't know. She used to say Ben Dollard had a base barreltone voice. He has legs like barrels and you'd think he was singing into a barrel. Now, isn't that wit? They used to call him Big Ben. Not half as witty as calling him base barreltone. Appetite like an albatross. Get outside of a baron of beef. Powerful man he was at stowing[7] away number one Bass. Barrel of Bass. See? It all works out.

A procession of white-smocked sandwich[8] men marched slowly towards him along the gutter, scarlet sashes across their boards. Bargains. Like that priest they are this morning: we have sinned: we have suffered. He read the scarlet letters on their five tall white hats: H.E.L.Y.'S. Wisdom Hely's. Y lagging behind drew a chunk of bread from under his foreboard, crammed it into his mouth and munched as he walked. Our staple food. Three bob a day, walking along the gutters, street after street. Just keep skin and bone together, bread and skilly. They are not Boyl: no: M'Glade's men. Doesn't bring in any business either. I suggested to him about a transparent showcart with two smart girls sitting inside writing letters: copybooks, envelopes, blotting paper. I bet that would have caught on. Smart girl writing something catch the eye at once. Everyone dying to know what she's writing. Get twenty of them round you if you stare at nothing. Have a finger in the pie. Women too. Curiosity. Pillar of salt. Wouldn't have it of course because he didn't think of it himself first. Or the inkbottle I suggested with a false stain of black celluloid. His ideas for ads like Plumtree's Potted under the obituaries, cold meat department. You can't lick 'em. What? Our envelopes. Hello, Jones, where are you going? Can't stop, Robinson, I am hastening to purchase the only reliable ink eraser, Kansell, sold by Hely's Ltd., 27-30[9] Dame Street. Well out of that ruck I am. Devil of a job it was collecting accounts of those convents. Tranquilla Convent. That was a nice nun there, really sweet face. Wimple suited her small head. Sister? Sister? I am sure she was crossed in love by her eyes. Very hard to bargain with that sort of woman.

---

Page 344:

Edy Boardman was noticing it too because she was squinting at Gerty, half smiling, with her specs, like an old maid, pretending to nurse the baby. Irritable little gnat she was and always would be and that was why no one could get on with her, poking her nose into what was no concern of hers. And she said to Gerty:

– A penny for your thoughts.

– What? replied Gerty with a smile reinforced by the whitest of teeth. I was only wondering was it late.

Because she wished to goodness they'd take the snotty-nosed twins and the babby[10] home to the mischief out of that so that was why she just gave a gentle hint about it being late. And when Cissy came up Edy asked her the time and Miss Cissy, as glib as you like, said it was half past kissing time, time to kiss again. But Edy wanted to know because they were told to be in early.

– Wait, said Cissy, I'll ask my uncle Peter over there what's the time by his conundrum.

So over she went and when he saw her coming she could see him take his hand out of his pocket, getting nervous, and begin to play with his watchchain, looking up[11] at the church. Passionate nature though he was, Gerty could see that he had enormous control over himself. One moment he had been there, fascinated by a loveliness that made him gaze, the passion seething in his veins[12], and the next moment it was the quiet grave-faced gentleman, self-control expressed in every line of his distinguished-looking figure.

Cissy said to excuse her would he mind please[13] telling her what was the right time and Gerty could see him taking out his watch, listening to it and looking up and clearing his throat, and he said he was very sorry his watch was stopped but he thought it must be after eight because the sun was set. His voice had a cultured ring in it and though he spoke in measured accents there was a suspicion of a quiver in the mellow tones. Cissy said thanks and came back with her tongue out and said uncle said his waterworks were out of order.

Then they sang the second verse of the *Tantum ergo* and Canon O'Hanlon got up again and censed the Blessed

Sacrament and knelt down and _told Father Conroy that one of the candles was just going to set fire to the flowers and Father Conroy got up and settled it all right and she could see the gentleman winding his watch and listening to the works and she swung her leg more in and out in time.

_____

Page 487:

It claims to afford a noiseless, inoffensive vent. (*He sighs.*) 'Twas ever thus. Frailty, thy name is marriage.

**The Nymph** (*her fingers in her ears*) – And words. They are not in my dictionary.

**Bloom** – You understood them?

**The Yews** – Ssh!

**The Nymph** (*covers her face with her hands*[14]) – What have I not seen in that chamber? What must my eyes look down on?

**Bloom** (*apologetically*) – I know. Soiled personal linen, wrong side up with care. The quoits are loose. From Gibraltar by long sea long ago.

**The Nymph** (*bends her head*) – Worse, worse!

**Bloom** (*reflects precautiously*) – That antiquated commode. It wasn't her weight. She scaled just eleven stone nine. She put on nine pounds after weaning. It was a crack and want of glue. Eh? And that absurd orange-keyed utensil which has only one handle.

The sound of a waterfall is heard in bright cascade.

**The Waterfall**

– *Poulaphouca Poulaphouca*

*Poulaphouca Poulaphouca.*

**The Yews** (*mingling their boughs*) – Listen. Whisper. She is right, our sister. We grew by Poulaphouca waterfall. We gave shade on languorous summer days.

In the background, John Wyse Nolan, in Irish National Forester's uniform, doffs his plumed hat.

**John Wyse Nolan** – Prosper! Give shade on languorous days, trees of Ireland!

**The Yews** (*murmuring*) – Who came to Poulaphouca with the High School excursion? Who left his nut-questing classmates to seek our shade?

**Bloom** (*scared*) – High School of Poula? Mnemo? Not in full possession of faculties. Concussion. Run over by tram.

**The Echo** – Sham![15]

**Bloom** (*pigeon-breasted, bottle-shouldered, padded, in nondescript juvenile grey and black striped suit, too small for him, white tennis shoes, bordered stockings with turnover tops and a red school cap with badge*) – I

_____

Page 541:

– We come up this morning eleven o'clock. The three-master *Rosevean* from Bridgwater with bricks. I shipped to get over. Paid off this afternoon. There's my discharge. See? D. B. Murphy, A.B.S.

In confirmation of which statement he extricated from an inside pocket and handed to his neighbour a not very clean-looking folded document.

– You must have seen a fair share of the world, the keeper remarked, leaning on the counter.

– Why, the sailor answered upon reflection upon it, I've circumnavigated a bit since I first joined on. I was in the Red Sea. I was in China and North America and South America. We was chased by pirates one voyage.[16] I seen icebergs plenty, growlers. I was in Stockholm and the Black Sea, the Dardanelles under Captain Dalton, the best bloody man that ever scuttled a ship. I seen Russia. *Gospodi pomilyou*. That's how the Russians prays.

– You seen queer sights, don't be talking, put in a jarvey.

– Why, the sailor said, shifting his partially chewed plug, I seen queer things too, ups and downs. I seen a crocodile bite the fluke of an anchor same as I chew that quid.

He took out of his mouth the pulpy quid and, lodging it between his teeth, bit ferociously:

– Khaan! like that. And I seen man-eaters in Peru that eats corpses and the livers of horses. Look here. Here they are. A friend of mine sent me.

He fumbled out a picture postcard from his inside pocket, which seemed to be in its way a species of repository, and pushed it along the table. The printed matter on it stated: *Choza de Indios. Beni, Bolivia.*

All focussed their attention at the scene exhibited, at[17] a group of savage women in striped loincloths, squatted, blinking, suckling, frowning, sleeping, amid a swarm of infants (there must have been quite a score of them) outside some primitive shanties of osier.

– Chews coca all day long, the communicative tarpaulin added. Stomachs like bread graters. Cuts off their diddies when they can't bear no more children. See them sitting[18] there stark ballock-naked eating a dead horse's liver raw.

His postcard proved a centre of attraction for Messrs the greenhorns for several minutes if not more.

– Know how to keep them off? he inquired generally[19].

Nobody volunteering a statement, he winked, saying:

– Glass. That boggles 'em. Glass.

Mr Bloom, without evincing surprise, unostentatiously turned over

Page 670

to the Flats that Sunday morning with Captain Rubio's[20] that was dead spyglass like the sentry had he said he'd have one or two from on board I wore that frock from the B Marché Paris and the coral necklace the Straits shining I could see over to Morocco almost the Bay of Tangier white and the Atlas Mountain with snow on it and the Straits like a river so clear Harry Molly darling I was thinking of him on the sea all the time after at mass when my petticoat began to slip down at the elevation weeks and weeks I kept the handkerchief under my pillow for the smell of him there was no decent perfume to be got in that Gibraltar only that cheap *peau d'Espagne* that faded and left a stink on you more than anything else I wanted to give him a memento he gave me that clumsy Claddagh ring for luck that I gave Gardner going to South Africa where those Boers killed him with their war and fever but they were well beaten all the same as if it brought its bad luck with it like an opal or pearl still it[21] must have been pure 18-carrot [22] gold because it was very heavy but what could you get in a place like that the sand-frog shower from Africa and that derelict ship that came up to the harbour *Marie* the *Marie* whatyoucallit no he hadn't a moustache that was Gardner yes[23] I can see his face clean shaven frseeeeeeeeeeeeeeeeeeeeeeeeefrong that train again weeping tone

*once in the dear deaead days beyondre call* close my eyes breath my lips forward kiss sad look eyes open piano *ere o'er the world the mists began* I hate that istsbeg *comes love's sweet sooooooooooong* I'll let that out full when I get in front of the footlights again Kathleen Kearney and her lot of squealers Miss This Miss That Miss Theother lot of sparrowfarts skitting around talking about politics they know as much about as my backside anything in the world to make themselves someway interesting Irish homemade beauties soldier's daughter am I ay and whose are you bootmakers' and publicans' I beg your pardon coach I thought you were a wheelbarrow they'd die down dead off their feet if ever they got a chance of walking down the Alameda on an officer's arm like me on the band night my eyes flashing my bust that they haven't passion God help their poor head I knew more about men and life when I was fifteen than they'll all know at fifty they don't know how to sing a song like that Gardner said no man could look at my mouth and teeth smiling like that and not think of it I was afraid he mightn't like my accent first he so English all father left me in spite of his stamps I've my mother's eyes and figure anyhow he always said they're so snotty about themselves some of those cads he wasn't a bit like that he was dead gone on my lips let them get a husband first that's fit to be looked at and a daughter like mine or see if they can excite

Note 1   1922 has "a". The Rosenbach manuscript is not easy to read; the word looks more like "the" but was typed as "a".   [Back]

Note 2   Correction from "Torry" by Mr Rose, based on reference to newspapers of the time: see judgment paragraph 20.   [Back]

Note 3   Correction by Mr Rose from "lobbing", which is in the Rosenbach manuscript and 1922. He considers that "lobbing" is inept in the context and was probably miscopied (or at least written in an ambiguous way which lent itself to being misread) from "lolling" by Joyce when preparing the Rosenbach manuscript by copying from his previous draft.   [Back]

Note 4   1922 has "Live on fishy flesh they have to, all sea birds"; "fish" is in the Rosenbach manuscript and the typescript; it was omitted on the placard and "have" was changed to "have to" by correction at that stage.   [Back]

Note 5   The Rosenbach manuscript has "Didn't cost him a cent. Got fellows [etc.]" The typescript has "Didn't cost him a red. Got fellows [etc.]" The passage about Maginni was added at the third proof stage. 1922 has "Didn't cost him a red like Maginni [etc.]"   [Back]

Note 6   "idea" is in the Rosenbach manuscript but was omitted in typing.   [Back]

Note 7   The Rosenbach manuscript has "stowing" as does the typescript. The placard has "storring" which was corrected to "storing" at that stage, and it so appears in 1922.   [Back]

Note 8   "sandwich" is in Little Review, and nowhere else: see judgment paragraph 18.   [Back]

Note 9   The passage, "I am hastening … Dame Street", is part of a longer passage introduced by manuscript amendment of the typescript. There and in all versions up to and including 1922 the address appears as "85 Dame Street". The change is by Mr Rose; see judgment paragraph 21.   [Back]

Note 10   1922 has "their baby"; the Rosenbach manuscript has "the babby", typed as "their baby".   [Back]

Note 11   "up" is in the Rosenbach manuscript, but was omitted at typescript stage.   [Back]

Note 12   These six words are in the Rosenbach manuscript but were omitted in typing.   [Back]

Note 13   In the Rosenbach manuscript but omitted in typing.   [Back]

Note 14   1922 has "hand", but the Rosenbach manuscript and another manuscript both have the plural form, rendered as singular in the typescript.   [Back]

Note 15   This passage is in the Rosenbach manuscript and in another manuscript source but was omitted in typing.   [Back]

Note 16   This sentence is in the Rosenbach manuscript but was omitted in typing.   [Back]

Note 17   1922 has "at" here, omitted by Mr Rose: see paragraph 28 of the judgment for the development of this passage.   [Back]

Note 18   This word is in the Rosenbach manuscript. The passage "Stomachs … raw" was omitted in typing and reinserted in manuscript on the typescript, but without the word "sitting".   [Back]

Note 19   1922 has "genially", the result of a mistyping of "generally" from the Rosenbach manuscript.   [Back]

Note 20   All apostrophes on this page (as in the whole Penelope episode) are inserted by Mr Rose. They appear in the Rosenbach manuscript but were deleted at the proof stage. See paragraph 30 of the judgment.   [Back]

Note 21   "still it" is in the Rosenbach manuscript but not in 1922 having been omitted in typing.   [Back]

Note 22   1922 has "16-carat"; the incorrect number is the result of mistyping from the Rosenbach manuscript which has "18-carrot".   [Back]

Note 23   This passage is in the Rosenbach manuscript, in two parts, but was omitted from the typescript and is therefore not in 1922.   [Back]

© 2001 Crown Copyright

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback
URL: *http://www.bailii.org/ew/cases/EWHC/Ch/2001/460.html*