# EXHIBIT R

Dockets.Justia.com

Sunday Independent ◆ Sunday, January 16, 2000

# Bloomsday blues as writs fly over Ulysses on Internet

THE James Joyce Estate is taking a High Court action over the global reading of Joyce's classic Ulysses on the Internet on Bloomsday two years ago against the sponsors, Irish Distillers and the *Irish Times* which published it.

Both sponsors and the publishers have entered a defence in the High Court after the action taken by the James Joyce Estate over the reading of Ulysses on the web in 18 locations around the world in 1998.

The reading began in Melbourne and continued around the world to Tokyo, South Africa, South America, Canada and ended with the last chapter being read in Los Angeles.

Bob Joyce of the James Joyce Centre said it had linked a lot of established Bloomsday events with Dublin and had been planned when Joyce's works were out of copyright.

When the Joyce Estate saw a photograph of the Taoiseach announcing the event published in the *Irish Independent* their legal advisers wrote to the Joyce Centre and to Irish Distillers pointing out that no permission had been received from the Joyce Estate.

Mr Joyce said the Joyce Centre's own legal advice was that they did not need the permission of the Joyce Estate and they went ahead. Subsequently High Court action was instituted by the Joyce Estate against the *Irish Times* and Irish Distillers.

"We are at a complete loss to know why this action has been taken. We know that the Estate has taken action like this in the past," he pointed out.

The event did not make a profit, in fact it was loss-making and was run by the centre in accordance with its aims to promote an interest in the life and works of James Joyce.

He added that the promotion of Bloomsday creates an interest in Joyce around the world and the people who gained were the Joyce Estate.

Mr Joyce added: "We are determined to go ahead with the readings in future years. It seems likely that we will not have the current sponsor because of what has happened, but the centre itself is not a commercial organisation and does not operate for profit.

"It needs to raise funds abroad to help with the running of the centre, and high on the priorities is an education programme for students and we also also want to help with Dublin's illiteracy problem."

# Bloomsday

## In recent years Dublin's celebration of *Ulysses* has become a major annual event. So why is James Joyce's estate trying to ban it on the Internet? By **Peter Carty**

One of the highlights of Dublin's calendar is Bloomsday, a celebration of James Joyce's most famous work, *Ulysses*. The book's events are set on 16 June 1904 in Dublin, and on the same date each year, groups of Joyceans, often in period costume, visit scenes of the book's action. As befits the 20th century's most important novel, no other literary work boasts such a large public festival.

Events now sprawl either side of Bloomsday over a whole week, including bus tours, theatre shows, a breakfast with a menu drawn from the book, lectures, walking tours and, of course, readings from the book. But some of the celebrations have now led to a bitter legal battle behind the scenes, which has so far lasted more than 18 months, and whose details have only emerged as a result of investigations by *The Independent*.

Controversy over *Ulysses* is not new. Written in poverty, the book had a tortuous journey into print and was viciously censored for its supposed obscenity in several countries for many years. The celebration of Bloomsday began in 1954, when a group of writers, including Patrick Kavanagh and Flann O'Brien, retraced the day-long journey across Dublin taken by Leopold Bloom, the novel's central character. Their horse-drawn carriage journey from Sandycove to the city centre ended in a drunken stupor. The intention had been to celebrate Joyce and protest at the novel's ban in Ireland.

Today the book is recognised as a national asset, with Bloomsday attracting large numbers of tourists, literary and non-literary, to Dublin. Celebrations are no longer confined to Dublin, and it has been an attempt to link these across the globe that has led to the current row.

Ironically, the pre-eminent modernist text has fallen foul of the Internet, the most modern medium of all. In 1998, in an ambitious undertaking sponsored by Jameson, the Irish whiskey brand owned by Irish Distillers and favourably referred to by Joyce in several works, audio-broadcast readings from *Ulysses*' 18 chapters on the World Wide Web connected Bloomsday events in 18 cities around the world. Jameson sponsored the event to the tune of £20,000, and the webcast was named, "Global Jameson Bloomsday".

Readings began early in the midday, before ending in Los Angeles with Molly Bloom's soliloquy, *Ulysses*' final chapter. The Joyce Centre in Dublin, a registered charity which co-ordinates Bloomsday events, paid *The Irish Times* to organise the webcast through its website, which is widely respected and attracts large numbers of international readers.

Prior to the event, Irish Distillers and *The Irish Times* received letters from the Joyce estate's solicitors pointing out that the Joyce Centre had not obtained the estate's permission for the webcast. "To our dismay and to our astonishment, the Joyce estate tried to stop the readings," says Bob Joyce, a director of the centre and a great-nephew of James Joyce. The centre's legal

> 'We're still perplexed as to what the Joyce estate is trying to achieve. Bloomsday surely creates an interest around the world and makes people buy the books'

advice was that it did not need the estate's permission to proceed, and the webcast duly took place. It was extremely successful, with Irish Prime Minister Bertie Ahern, President Mary McAleese and other leading politicians and celebrities in attendance in Dublin.

Following 1998's event, High Court proceedings were initiated by the Joyce Estate against Irish Distillers and *The Irish Times*. Both companies filed defences, but last year's webcast did not proceed because, given the litigation, Jameson was reluctant to continue with its sponsorship. This dampened the 1999 celebrations.

"There was an expectation from a lot of people that we would continue this global reading. We were connecting a lot of the global events to Dublin for the day. We had requests from other locations around the world to say, 'Why weren't they included in 1998? Could they be in included in 1999?'," says Bob Joyce. "The Joyce estate have put a span-

family feud, because the Joyce estate belongs to Stephen Joyce, James Joyce's grandson and a wealthy septuagenarian based in Paris. He is now the sole owner after buying out the beneficiaries of smaller portions. Stephen Joyce and other Joyce estate trustees were unavailable for comment, but it is possible that the estate takes the view that Bloomsday's webcast devalues Joyce's masterpiece. "We're still perplexed as to what exactly the Joyce estate is trying to achieve," says Bob Joyce. "The promotion of Bloomsday and readings from *Ulysses* – it surely creates an interest in Joyce around the world and makes people buy the books, and the people who gain monetarily are the Joyce estate."

The estate's lawyers have zealously protected what it sees as its rights in *Ulysses* several times, but it is unclear whether it will take High Court action. "We are aware that the Joyce estate in the past have actually instigated legal action, have gone as far as threatening legal action – but haven't actually gone ahead," says Bob Joyce.

Previously, recipients of the estate's solicitors' letters have backed down for fear of lengthy litigation. This time, the estate might have gone too far, because Irish Distillers intends to fight vigorously. "We consider it a serious case and we'll be defending our aspect of it robustly," says Eily Kilgannon, Distillers' international PR manager.

Whether the Joyce estate's action is winnable is a moot point. Its ownership of the copyright to *Ulysses* is far from clear, as the legal position is complex. The book's copyright lapsed in 1991, 50 years after Joyce's death. However, European copyright law was harmonised in 1995, with an EU directive extending copyright periods to 70 years. The directive was also retrospective, and stipulated that works whose copyright had lapsed because 50 years had passed, but for which 70 years had not gone by, which includes *Ulysses*, could have their copyright "revived".

On the face of it, copyright reverted back to the Joyce estate, but the directive also stated that EU members' statutes should uphold the rights of individuals who did not originally own rights in a literary estate but had planned exploitations following lapses of copyright after the 50-year period. Such individuals are defined as those persons who



**James Joyce:** 'Ulysses' had a tortuous journey into print and was viciously censored for its alleged obscenity          *AP*

a work following a copyright lapse.

Unfortunately, "substantial" was left undefined, and its meaning can only be determined through court ruling. Nonetheless, readings from certain editions of *Ulysses*, published or prepared in the period between 1991 and 1995, could fall outside the Joyce Estate's control. This might include preparations for the readings carried out on *Ulysses* by the Joyce Centre itself. "We did extensive work while it was out of copyright," says Bob Joyce.

the notion of "fair dealing" under which the courts might support a reading that can be shown to be for the common good. "To read *Ulysses* on Bloomsday to a group of people in celebration – that comes under the 'fair dealing' legal provision," asserts Bob Joyce. Then there is the thorny legal question of whether copyright extends to the Internet at all: versions of *Ulysses* are already available on the web.

Meanwhile, Jameson has stated that it will not fund this year's

seek another sponsor. "We are determined to go ahead with the world reading," he says. As well as raising the profile of Bloomsday worldwide, and integrating the global celebrations, the readings assist in promotion of the Joyce Centre. "It was helping the centre to get funds for a lot of the things that we wanted to do," he says, such as setting up education programmes to combat illiteracy in inner-city Dublin.

The litigation might have further adverse consequences for the Joyce

expand its sponsorship to become an ongoing donor to the centre. Ms Kilgannon says that this is under review.

Yet the row could prove to be beneficial after all. If the High Court action takes place and the Joyce estate loses the case, the benefits could go well beyond webcasts. The estate's iron grip on *Ulysses* could finally be broken, with benefits to scholars planning new editions and to artists planning performances based on it – and, as result to us all,

# Ulysses internet reading

### Jan Battles

THE James Joyce Centre in Dublin is planning a global reading of Ulysses on the internet, despite legal action from the author's estate.

Stephen Joyce, the writer's grandson and owner of his estate, has been seeking to ban the internet broadcast which is part of the centre's annual Bloomsday celebrations.

Although the Joyce estate has previously started court cases against people using the writer's works, this is the first time it has tried to stop an event organised by Joyce's relatives.

"We are planning to go ahead, continuing what we did in 1998," Bob Joyce, chief executive of the centre, and a grand-nephew of the writer, said last week. "We had many calls, letters and e-mails from other Bloomsday events wanting to participate in the webcast. The plan is to increase the number of locations and eventually read the whole of the book around the world."

A webcast, a transmission using the internet, planned last year did not take place because a sponsor was unwilling to take part after litigation was launched by the estate 18 months ago. "It is the first time that legal action has been threatened against something that was organised by the James Joyce Centre. I think it is a shame," said Bob Joyce. "We are perplexed as to what it is trying to achieve."

On June 16, 1998, the centre added to its normal celebrations by holding the Global Jameson Bloomsday, a series of readings from Ulysses around the world linked by the internet. Irish Distillers provided £20,000 sponsorship and The Irish Times hosted the webcast on its internet site.

Solicitors for the Joyce estate wrote to Irish Distillers, The Irish Times and the James Joyce Centre early in June 1998, before the webcast. The letter said the estate was the owner of the copyright and that no permission had been sought to use the work in the reading. The centre obtained legal advice that no permission was needed and it was not infringing copyright. The internet audio broadcast started in Melbourne at 8am and spanned the globe, finishing in Los Angeles at 9pm, Irish time. Among those reading extracts from Ulysses were President Mary McAleese, Frank McCourt



Novel argument: the work of James Joyce, left, is at the centre of row involving his grandson Stephen Joyce, who is taking legal action over a global webcast of Ulysses



"One of the wonders of the world"

"The biggest ghost show on earth"

Joyce, the event cost more than the sponsorship received.

The estate then began High Court proceedings against Irish Distillers and The Irish Times. "We agreed with the James Joyce Centre that the case was a spurious one which we would defend robustly," said Eily Kilgannon, Irish Distillers' international public relations manager. Solicitors for both sides have been meeting regularly.

Some observers believe the action may be part of a family feud because the estate, which has reaped huge financial rewards from holding Joyce's copyright, does not seem to be seeking royalties for the webcast. The estate's relationship with the centre has been cold at best. "Stephen doesn't approve of the estate," said Ken Monaghan, a nephew of James Joyce and a director of the centre. "He certainly doesn't correspond with us except to write rather unfriendly letters occasionally."

Stephen Joyce, a retired civil servant who lives in Paris, has turned down invitations to take part in Bloomsday celebrations at the centre. He has become well known for guarding his grandfather's legacy, regularly issuing writs and denouncing unofficial Joycean ventures.

The legitimacy of the copyright the estate holds has been challenged several times. All of Joyce's works came out of copyright at the end of 1991, 50 years after his death. However, in 1995 the European Union enacted legislation which extended the period of protection to 70 years after death. Under certain conditions Ulysses and Joyce's other works may have had their copyright "revived" until 2011.

There was also a provision in the legislation which gave rights to anybody who had exploited or made substantial preparations to exploit copyright while they were out of copyright. Several people had begun or completed editions of Joyce's work between 1992 and 1995. In 1997, Danis Rose, a Dublin author, published a revised edition of Ulysses without the consent of the Joyce estate. The estate issued a writ against Picador, the British publishers, claiming infringement of copyright but the High Court case did not go ahead.

The centre planned its internet reading while Joyce's works were out of copyright. It had also planned to computerise all his works and put them on the internet.