# EXHIBIT B

# THE NEW YORKER
## FACT

**THE INJUSTICE COLLECTOR**
by D. T. MAX
Is James Joyce's grandson suppressing scholarship?
Issue of 2006-06-19
Posted 2006-06-12

June 16th marks the hundred-and-second anniversary of Bloomsday, the date on which the events in James Joyce's "Ulysses" take place. There will be the customary commemorative celebrations surrounding Leopold Bloom's famous walk through Dublin: public readings and festivals in cities around the world, including Dublin, New York, Berlin, Paris, St. Petersburg, and Melbourne. In Budapest, two hundred or so academics will convene a Joyce symposium—the twentieth to be held on Bloomsday.

There is a chance that Joyce's grandson, Stephen Joyce, will go to Budapest. He lives in the French town of La Flotte, on the Île de Ré, off the Atlantic Coast. He loves the island, which is the Martha's Vineyard of France, but he has sometimes been willing to leave it when academics have invited him to attend Joyce commemorations and symposia. The scholars' courtesy is, in part, tactical: Stephen is Joyce's only living descendant, and since the mid-nineteen-eighties he has effectively controlled the Joyce estate. Scholars must ask his permission to quote sizable passages or to reproduce manuscript pages from those works of Joyce's that remain under copyright—including "Ulysses" and "Finnegans Wake"—as well as from more than three thousand letters and several dozen unpublished manuscript fragments.

Sometimes, Stephen has declined an invitation to a gathering but then appeared anyway; more than once, he has insisted that the assembled scholars make room for him on their program. The aim of his presentations has been to question the value of academic criticism. "If my grandfather was here, he would have died laughing," he likes to say. At a 1986 gathering of Joyceans in Copenhagen, he explained that "Dubliners" and "A Portrait of the Artist as a Young Man" can be "picked up, read, and enjoyed by virtually anybody without scholarly guides, theories, and intricate explanations, as can 'Ulysses,' if you forget about all the hue and cry."

Stephen is a handsome man of seventy-four, with a gray beard, sloping forehead, and deep-blue eyes– he looks the way Joyce might have looked if he had not smoked and drunk himself to death, at fifty-eight, in 1941. Stephen sometimes walks with an ashplant, just as his grandfather did. At academic conferences, he is combative and sardonic. "I am a Joyce, not a Joycean, and there is more than a nuance to that fact," he often says. And he insists on being addressed as Stephen James Joyce, his full given name.

His audacity and his pique have amused some Joyceans, and at times the Joyceans have provoked him. "Should you care to observe some of our proceedings or interfere with them, you would be welcome to join us at any stage—and naturally, the usual conference fee would be waived," an invitation to a 1996 Zurich Bloomsday symposium read. Stephen wrote back, "When you and your colleagues disagree, have opposing views, or engage in unseemly scholarly brawls this constitutes dialogue, exchange of views, differences of opinion. When I express my opinions orally or in writing this is labeled 'interference'—most instructive and interesting."

Over the years, the relationship between Stephen Joyce and the Joyceans has gone from awkwardly symbiotic to plainly dysfunctional. In 1988, he took offense at the epilogue to Brenda Maddox's

"Nora," a biography of Joyce's wife, which described the decades that Joyce's schizophrenic daughter, Lucia, spent in a mental asylum. Although the book had already been printed in galleys, Maddox, fearing a legal battle, offered to delete the section; the agreement she signed with Stephen also enjoined her descendants from publishing the material. Shortly afterward, at a Bloomsday symposium in Venice, Stephen announced that he had destroyed all the letters that his aunt Lucia had written to him and his wife. He added that he had done the same with postcards and a telegram sent to Lucia by Samuel Beckett, with whom she had pursued a relationship in the late nineteen-twenties.

"I have not destroyed any papers or letters in my grandfather's hand, yet," Stephen wrote at the time. But in the early nineties he persuaded the National Library of Ireland to give him some Joyce family correspondence that was scheduled to be unsealed. Scholars worry that these documents, too, have been destroyed. He has blocked or discouraged countless public readings of "Ulysses," and once tried unsuccessfully to halt a Web audiocast of the book. In 1997, he sued the Irish scholar Danis Rose, who was trying to publish a newly edited version of "Ulysses," calling it "one of the literary hoaxes of the century." (Around the same time, Stephen expressed his intention to obstruct a proposed new edition by the American scholar John Kidd; he told the chairman of Kidd's publisher, W. W. Norton, that he was "implacably opposed" to the project, which was never completed.) According to Hans E. Jahnke, Stephen's stepbrother, who once had a stake in the Joyce estate, the suit against Rose, which lasted five years, cost the estate roughly a hundred thousand dollars. The estate won the case. In 2004, the centenary of Bloomsday, Stephen threatened the Irish government with a lawsuit if it staged any Bloomsday readings; the readings were cancelled. He warned the National Library of Ireland that a planned display of his grandfather's manuscripts violated his copyright. (The Irish Senate passed an emergency amendment to thwart him.) His antagonism led the Abbey Theatre to cancel a production of Joyce's play "Exiles," and he told Adam Harvey, a performance artist who had simply memorized a portion of "Finnegans Wake" in expectation of reciting it onstage, that he had likely "already infringed" on the estate's copyright. Harvey later discovered that, under British law, Joyce did not have the right to stop his performance.

Stephen has also attempted to impede the publication of dozens of scholarly works on James Joyce. He rejects nearly every request to quote from unpublished letters. Last year, he told a prominent Joyce scholar that he was no longer granting permissions to quote from any of Joyce's writings. (The scholar, fearing retribution, declined to be named in this article.) Stephen's primary motive has been to put a halt to work that, in his view, either violates his family's privacy or exceeds the bounds of reputable scholarship. The two-decade-long effort has also been an exercise in power—an attempt to establish his own centrality in regard to anything involving his grandfather. If you want to write about James Joyce and plan to quote more than a few short passages, you need Stephen's consent. He has said, "We have proven that we are willing to take any necessary action to back and enforce what we legitimately believe in." Or, as he put it to me during two phone calls that he recently made to me from La Flotte, "What other literary estate stands up the way I do? It's a whole way of looking at things and looking at life."

The first time that Stephen called me, he seemed to be in a good mood. He said that he and his wife, Solange, had just returned to La Flotte from a trip. He noted that a letter I had sent requesting an interview had pleased him, but added, "I am not ashamed of my middle name. It's Stephen *James* Joyce." (The second call was less cordial, and he declined my request to visit him in France.)

In our conversations, Stephen spoke proudly about his fights with scholars. "I am not only protecting and preserving the purity of my grandfather's work but also what remains of the much abused privacy of the Joyce family," he said. He added, "Every artist's born right is to have their work . . . reproduced as they want it to be reproduced." This was particularly important in the

case of Joyce, whom he calls Nonno—the Italian word for grandfather. Stephen said that Joyce's genius could be found in his several books. (His own library of Joyceana, he once told *Le Monde,* "is less than a metre wide.") He did not see what the two hundred and sixty-one works of criticism in the catalogue of the Library of Congress, say, could add to this legacy. Academics, he said at one point, are "people who want to brand this great work with their mark. I don't accept that."

He depicted himself as an average reader who wanted other average readers to share in the pleasure of what he had discovered only later in life. In school, he once said, English was his worst subject; for many years, he had been intimidated by his grandfather's writing, and had not read it. Eventually, he said, he read "Dubliners," then moved on to "A Portrait of the Artist" and "Ulysses." (He did not mention "Finnegans Wake.") He had found the books not only readable but appealingly human. "As I got older, I realized Joyce is *not* the difficult writer they say he is," he said. "When they say, 'We've done so much for him,' I think, What about the thousands, not to say millions, of readers they scared off? All this *crap* they write—that's good old American slang!"

To him, the three books form a single *Bildungsroman* closely based on James Joyce's own experiences. "The sixteenth of June is 'Ulysses' Day," he said. "Bloom is not mentioned until the third chapter. Why is so much more, then, written about Leopold Bloom?" His relationship with the characters was the reverse, he implied: "Stephen Dedalus is, in a very important sense, Nonno's character."

Stephen discussed some of his ground rules for dealing with scholars. He looked askance at academics whose requests contained typographical errors; such slips promised sloppy scholarship. More important, he added, the Joyces' private life was "no one's fucking business." (This claim, it can be argued, clashes with his notion that Joyce's work is essentially autobiographical.) And then there were the Irish. If he ever had the energy, he said, he would write a book on "the shitty treatment my grandmother and grandfather got from their country of origin." Nora had contemplated reburying Joyce's body on native soil—he had been buried in Zurich during the Second World War—but Irish officials rebuffed the idea. Worse, when Joyce died, Ireland did not send a representative to his funeral. Stephen had been almost nine, and he saw the family's dismay. "I will *never* forgive that," he said.

Stephen was funny and playful on the phone, although a subtext of anger was often evident. Acknowledging his pugnacity, he said, "It is better to be pissed off than pissed on." He said that he didn't much like the work of Vladimir Nabokov, though perhaps he had just "read the wrong book"; he admired William Styron's "Tidewater Tales"; and he thought "the only worthwhile book published in the past twenty years" was a novel by the Irish writer John McGahern. He also admired the poet Patrick Kavanagh, who had written the first anti-Joyce-industry poem, in 1951: "What weapon was used / To slay mighty Ulysses? / The weapon that was used / Was a Harvard thesis."

Stephen's parents, Giorgio Joyce and Helen Kastor Joyce, had lived in the New York City area during part of the nineteen-thirties, and Stephen's English was infused with the slang of that era. He talked about opening his "yap" and "getting a fair shake." He also displayed many of his grandfather's traits: the passion, the certainty, and the sense of aggrievement. (Leon Edel, the biographer of Henry James, memorably called Joyce "the Injustice Collector.") Stephen had a melancholy side to him as well. "I have no children," he said. "The line dies with me." He wondered if his focus on the estate had "ruined" his wife's life. And he told me, "Stephen James Joyce is weary with hunting and fain would lie down"—quoting the ballad "Lord Randall." Moments later, however, he'd be swearing once again to defend the estate. Academics, he declared, were like "rats and lice—they should be exterminated!"

Stephen Joyce is hardly the first executor of a literary estate to resist the agenda of scholars. T. S. Eliot's widow, Valerie, has opposed all biographies of her husband in the forty years since his death, and has withheld the balance of his letters—a first volume appeared in 1988—for almost two decades. A former assistant, writing in an English newspaper last year, recalled Valerie's distaste for members of the "Ph.D. industry" and her "dry, formal, excessively polite notes giving them the least help possible." Marianne Craig Moore, the niece of Marianne Moore, has been unusually strict with permissions; in 1989, she demanded that a biographer remove all quotations from the poet's unpublished letters. Ted Hughes destroyed Sylvia Plath's journal of their last months together. "I did not want her children to have to read it," he said.

Stephen has made his presence felt on a much broader front. Most prickly literary estates are interested in suppressing unflattering or intrusive information, but no one combines tolltaker, brand enforcer, and arbiter of taste as relentlessly as Stephen does, and certainly not in such a personal way. In 2003, Eloise Knowlton, a Joycean and a novelist, asked permission to publish a fictional version of "Sweets of Sin," the risqué novel that Bloom picks up for his wife, Molly. ("Ulysses" offers only a glimpse of its contents.) Stephen wrote back, "Neither I nor the others who manage this Estate will touch your hare-brained scheme with a barge pole in any manner, shape or form." When turning down a request for permission from an academic whose work was going to be published by Purdue, he said that he objected to the name for the university's sports teams: the Boilermakers. (He considered it vulgar.) Michael Groden, a scholar at the University of Western Ontario, spent seven years creating a multimedia version of "Ulysses," only to have Stephen block the project, in 2003, with a demand for a permissions fee of one and a half million dollars. (Before Stephen controlled the Joyce estate, such fees were nominal.) Groden's sin was to have praised Danis Rose's edition of "Ulysses" as "confident and controversial," in a reader's report for Rose's publisher; he had also helped the National Library of Ireland to evaluate some Joyce drafts prior to acquiring them. "You should consider a new career as a garbage collector in New York City, because you'll never quote a Joyce text again," Stephen told Groden.

Stephen's hostility toward scholarship is striking, considering the intricate and allusive nature of his grandfather's work. Interpreters were there at the beginning—Stuart Gilbert's guide to "Ulysses" appeared in 1930, only eight years after the book's European publication. And it is hard to imagine Joyce's books without all the books that have been written about them. As Joyce told one of his translators, "I've put in so many enigmas and puzzles that it will keep the professors busy for centuries arguing over what I meant, and that's the only way of insuring one's immortality."

It is also not easy for scholars to decode Joyce's puzzles without addressing his personal life. Joyce frequently said that he drew his events from the newspapers and his observations from his life. "I'm like a man who stumbles," he once said. "My foot strikes something, I look down, and there is exactly what I'm in need of." In "Finnegans Wake," Joyce describes a character whose work is written "over every square inch of the only foolscap available, his own body."

More than a dozen Joyce scholars told me that what was once an area of exploration and discovery now resembles an embattled outpost of copyright law. Robert Spoo, who used to edit the *James Joyce Quarterly*, which is published by the University of Tulsa, quit the job to become a copyright lawyer. "New biographies, digital representations of Joyce's work, analyses of Joyce's manuscripts, and, to a lesser extent, criticism—they hardly exist," he said. "People either despaired of doing them . . . or the demands were so high that they just didn't feel it was worth continuing the discussions." Although more than fifteen hundred letters and dozens of manuscript drafts have been discovered since Stephen gained control of the estate, scholars told me that no new biographies of Joyce or his family are under way. The estate has not licensed online versions

of "Ulysses" and "Finnegans Wake," seminal works for hypertext theory. Anyone who plans to study Joyce today has to wonder whether it will be worth the strain. In 2003, Thomas Staley, the director of special collections at the University of Texas, in Austin, folded the *Joyce Studies Annual* after twelve years, in part to avoid dealing with Stephen. "He is an almost impossible person," Staley told me. (Buck Mulligan to Dedalus: "O, an impossible person!")

Once, the death of a major literary figure marked the moment when scholars could interpret his work with genuine freedom. After Proust died, for example, academics began excavating the connections between his homosexuality and his art. Yet when Stephen Joyce succeeded in muffling a whole field of study with a combination of litigation and bravado, others took notice. Paul Zukofsky, the son of the poet Louis Zukofsky, said of Stephen's efforts, "What I've heard sounds very, very good. He is a staunch defender of rights." The Samuel Beckett estate sues theatre companies that mount unorthodox productions of the plays. A year after Stephen announced his suit against Danis Rose's "Ulysses," the Nabokov estate fought an unsuccessful battle to prevent the publication in English of "Lo's Diary," an Italian novel based on "Lolita."

Joyceans find it especially galling that the estate representing one of the most censored writers of his day—"Ulysses" was banned in America until 1934—has itself become a censor. A few have been outspoken in their anger. Michael Groden, the Western Ontario professor, recently gave a talk at Cornell about the Joyce estate, during which he projected images from a book called "Take the Bully by the Horns: Stop Unethical, Uncoöperative, or Unpleasant People from Running and Ruining Your Life." Others have tried to befriend Stephen, even knowing that such ententes usually end badly. Sam Slote, the co-editor of the forthcoming book "How Joyce Wrote 'Finnegans Wake,' " who enjoyed Stephen's patronage for a time, joked, "It's sort of like the moment of death. You know it's coming. You just don't know when and you don't know why." Some scholars plan to wait until Joyce's unpublished writings enter the public domain, in 2012.

This is a risky strategy, however, because copyright law has proved to be highly elastic. Copyright has its origins in eighteenth-century English law. In America, the idea that authors and inventors, for a time, should exclusively collect profits from their work was embraced by Congress, which initially provided for copyright to extend for a maximum of twenty-eight years after a work's creation. But over time the copyrights for recordings and Hollywood films proved extremely valuable, and American corporations persuaded Congress to lengthen the term of protection again and again. (Writers and their estates were the accidental beneficiaries of this process.) Most recently, in 1998, Congress added twenty years to the term of copyright. As a result, any work created by an individual is now protected for at least seventy years after the creator's death. Had the bill not passed, the burst of American creativity in the nineteen-twenties and thirties—everything from Bugs Bunny to "Rhapsody in Blue"—would have soon passed into the public domain. Disney, for instance, would have lost the rights to Mickey Mouse in 2003. (Critics call the 1998 extension, which Disney lobbied for heavily, the Mickey Mouse Protection Act.)

There is an element in American copyright law that allows people to make "fair use" of protected work: a scholar, critic, journalist, or parodist may reproduce a modest portion without permission. But "fair use" has proved extremely hard to define. How many words can be quoted? From how many works? What about unpublished texts? Moreover, European law does not explicitly recognize "fair use." As a result, Joyceans are often unsure if they are violating the law, and when the estate objects they usually give in.

Yet, for the first time, a Joycean is fighting to free herself from Stephen's control. In 2002, Stephen learned that Carol Loeb Shloss, an English professor at Stanford, was about to publish "Lucia Joyce: To Dance in the Wake," a life of his mentally ill aunt. Stephen wrote to Shloss, implying that he might sue if she quoted from copyrighted material. He pressured her publisher,

Farrar, Straus & Giroux, which asked Shloss to cut many quotations. An expurgated version of the book was published in December, 2003.

In the midst of her fight with Stephen, Shloss met Lawrence Lessig, a law professor at Stanford, who was willing to take on her case pro bono. Lessig had just argued before the Supreme Court against Congress's 1998 extension of copyright. He had lost the case, but he was eager to find another way to show that distended copyright laws were not in the public interest. Shloss gave him the correspondence that Stephen had sent her over the years, and he was excited by what he read. "The letters were extreme," he recalled.

This week, to coincide with Bloomsday celebrations, Lessig plans to file a suit against Stephen Joyce in United States District Court. He believes that it is the first to accuse a literary estate of "copyright misuse"; the charge is usually levelled against corporations in patent disputes. Lessig is a capable lawyer, and at Stanford he has considerable resources; four attorneys work on his staff, and he has free help from law students. "It's in the DNA of lawyers not to be intimidated," he said. In other words, Lessig intends to fight on and on, just as Stephen Joyce does.

For all the enmity Stephen Joyce has aroused, it can be argued that he has succeeded in fulfilling his grandfather's wish to have his life and work treated with respect. As Richard Ellmann's splendid 1959 biography points out, James Joyce was a strict guardian of his own image. In "Finnegans Wake," he coined the word "biografiends" to describe nosy academics. He fought Herbert Gorman, his authorized biographer, whenever Gorman's idea of Joyce's work diverged from his own. And he demanded that Gorman "obliterate" a passage revealing that Joyce and Nora had not married before leaving Ireland, in 1904, meaning that Lucia and her brother Giorgio were illegitimate. A half-dozen times in his life, Joyce threatened or filed lawsuits. The publication of "Dubliners," in 1914, required seven solicitors, in part because he refused to remove pointed references to actual people and places. Some of the lawsuits were justified—he sued an American publisher who pirated "Ulysses"—but others were misguided attempts to protect his dignity. He charged an actor with slander after the actor told others that Joyce owed him a hundred and fifty francs. He eventually withdrew the suit, an episode that is amusingly revisited in Tom Stoppard's play "Travesties."

Upon Joyce's death, however, a different set of hands began to shape his image. His will gave control of his literary estate to Harriet Shaw Weaver, his patron. (Nora Joyce, his wife, received all the royalties but did not have an active role in the estate.) Weaver's stance, and that of the trustees who succeeded her, was that Joyce should be made accessible to the world. Revelations followed: Joyce's 1919 affair with Marthe Fleischmann, in Zurich; his brazenly erotic 1909 letters to Nora (in one, he calls her a "darling brown-arsed fuckbird"). In 1951, Nora died, and her children, Giorgio and Lucia, became the beneficiaries of the estate. They were not in a position to mount a vigorous opposition to scholars: Lucia was institutionalized, and Giorgio had a severe drinking problem. According to Hans Jahnke, who is Giorgio's stepson from his second marriage, Giorgio was mostly interested in the money that the estate generated, and he left the details to others.

But Stephen, by then in his thirties, was angered by the way that academics were circumventing the wishes of the estate. For instance, when the estate registered its desire to keep Joyce's erotic letters to Nora private, Ellmann maneuvered around it. His 1959 biography alluded to the correspondence; his 1966 volume of Joyce's letters contained expurgated versions of the letters; and his 1975 "Selected Letters" contained every word. In 1909, Joyce had implored Nora to "be careful to keep my letters secret." Stephen viewed the letters' publication as a transgression against his family.

Stephen Joyce was born in February, 1932, during a chaotic month for his grandfather. "Ulysses," published in France in 1922, had finally found an American publisher who would challenge its purported obscenity in court. Fragments of "Finnegans Wake" were appearing in print, and friends and patrons—even the usually docile Harriet Weaver—were expressing grave doubts about the book's merits. And Giorgio had just taken Lucia to a psychiatric clinic, following an outburst on Joyce's birthday.

The birth of Stephen came soon after the death of Joyce's father, whom Joyce had romanticized as the source of his talent. Joyce commemorated these events in the poem "Ecce Puer," which begins, "Of the dark past / A boy is born; / With joy and grief / My heart is torn." Stephen—German Jewish on his mother's side, Irish on his father's—was a beautiful baby. His mother, Helen, in an unpublished memoir that is housed in the archives of the University of Tulsa, describes him as "a handsome lively, wavy haired blonde, with bright blue eyes not as dark as his fathers and rosy cheeks and a bright smile (my smile, I think)." Joyce put the boy on his lap and told him stories. In 1936, he wrote Stephen a children's story, "The Cat and the Devil." Helen, in her memoir, captures their growing rapport: "As Stevie grew older I loved to watch him crawling onto his grandfather's knee and asking him grave little questions. His serious childish face was charming to see as he listened to the slow and painstaking answers that [his grandfather] gave him in his slow careful Dublin drawl. [Joyce] was infinitely patient with him and was always willing to stop and talk to him or to answer as he grew older his incessant 'whys.' The answers needless to say were always wonderful ones."

The marriage of Stephen's parents rapidly dissolved. Giorgio, deciding that he and Helen were incompatible, largely abandoned the family, and when Stephen was six, Helen, suffering from depression, checked herself into a Swiss clinic. Stephen spent more and more time with his grandparents. He and Joyce took regular walks along the Zürichsee. Joyce bought him a box of toy soldiers. Helen recalls in her memoir, "I do not think that Stephen will ever forget his famous grandfather and their relationship was a deep and lovely one." Even now, when Stephen has to make important decisions about the estate, he sometimes goes to Joyce's grave to consult with him.

After the Second World War, Helen's family sent Stephen to Andover, where, in 1948, he wrote an essay about his grandfather, titled "The Man Whom I Loved and Respected Most in This World." Yet being related to a genius was also a burden. When Stephen was at Andover, this magazine wrote about him in The Talk of the Town. After Stephen recalled of Joyce, "He used to drop in before breakfast to talk to me about Greek mythology," he was asked if he remembered who Daedalus was. He responded, "Wasn't he a Greek in a big battle with somebody?" Some members of Joyce's retinue found Stephen a disappointment. In 1955, Maria Jolas, a friend of the Joyces, wrote a letter to Harriet Weaver, saying that Stephen had been "invited to leave Harvard because he wouldn't study." Jolas added, "I find his idle, intellectually mediocre existence deplorable," and suggested that Stephen had an "unjustified arrogance."

Stephen graduated from Harvard after eight years, in 1958. A year later, he became an aid official for the Organization for Economic Coöperation and Development, specializing in French sub-Saharan Africa. He stayed for more than thirty years, travelling frequently to Africa; his last position, according to the agency, was as a "mid-level manager." In 1991, he retired, and, as he wrote in a Harvard alumni publication, he began devoting himself to "the intricate and complicated job of running my grandfather James Joyce's literary estate." Until the mid-nineteen-eighties, he received no money from the estate.

According to the French scholar Jacques Aubert, during Stephen's years with the O.E.C.D. he often told Joyceans that "there are some things more important than going to literary conferences." But he had never stopped caring about his grandfather and the Joyce estate. In

1959, while living in Paris, he wrote to Ellmann, who had just sent him a copy of his Joyce biography. Ellmann's comprehensive interviews and persuasive reading of the life had been widely praised, but Stephen saw things differently: "Reading parts of your book did something to me deep down inside. I can best describe the feeling as one of hurt, sadness, disgust and in the end even anger. . . . All our inner secrets are bared for all to see, read about, and gloat over if they so desire." Ellmann wrote back, "There is no doubt that biographies are hard for the survivors, yet . . . this is the price of greatness."

In 1982, Lucia Joyce died; Stephen was one of her heirs. After negotiations with family members, Stephen acquired a fifty-per-cent stake in the Joyce estate. Eleven years later, Giorgio's second wife, Asta, died, and half of Giorgio's stake in the estate devolved to Stephen, giving him seventy-five-per-cent control. (Hans Jahnke and his sister Evelyn held the rest.) Before long, Stephen launched his expensive suit against Danis Rose's edition of "Ulysses." In 2000, Jahnke, who had to pay some of the legal fees, offered to sell Stephen his family's share in the estate. Jahnke, a professor of international development who lives in Berlin, recalled, "There was too much anger, too much work, and too many lawyers." The change was fine with Stephen: he preferred to stand alone.

In 1988, Carol Shloss began investigating the story of Lucia Joyce. Shloss didn't see Lucia as schizophrenic; rather, she saw her as a frustrated genius. James Joyce might well have supported this notion, for he had never accepted that his daughter was mentally ill. "Whatever spark or gift I possess has been transmitted to Lucia, and has kindled a fire in her brain," he said in 1935.

Shloss was particularly interested in Lucia's possible influence on "Finnegans Wake." Joyce had almost invited this reading. In a letter to Harriet Weaver, he wrote, "She is a fantastic being, speaking a curious abbreviated language of her own. I understand it or most of it." Lucia had schizophrenic symptoms—her sense of time and relationships was abnormal—and she was a dancer. "Finnegans Wake," as Shloss saw it, was characterized by word dissociation and informed by a dancer's sense of movement. "Something creative, compelling, and possibly dangerous had been going on between two extraordinary people," she later wrote. Over time, what began as a study in artistic influence became a biographical portrait.

One thing that had drawn Shloss to writing about Lucia was her absence from previous accounts of the Joyce family. Ellmann had accepted the traditional account of the relationship, calling Joyce "foolish fond like Lear" for investing so much time in trying to prevent Lucia's institutionalization. Maddox's epilogue on Lucia's later years had been suppressed. Contemporary accounts belittled her. Of the thousand letters that Shloss estimates Lucia wrote, only a dozen were in the archives; the rest had disappeared. Shloss suspected that Stephen had pulled documents relating to Lucia from the National Library of Ireland when he had obtained permission to remove papers from its archive. Yet when Shloss visited the library, she found something that had perhaps been overlooked: Lucia's medical bills. She made copies, and spent a year placing them against the doctors' published writings, reconstructing Lucia's treatment. Shloss speculated that either Joyce or Giorgio might have engaged in incest with Lucia, but there was no documentation to prove it. (This theory, which most Joyceans do not share, was based partly on "Finnegans Wake": Joyce implies that Issy, who is somewhat modelled on Lucia, has been violated by her father and her brothers.) As Shloss saw it, patriarchal suppression was forcing her book to become "an incredible act of circumlocution."

In 1994, Stephen Joyce learned of Shloss's project, and was displeased. Many of Lucia's extant papers reside at SUNY-Buffalo. Robert Bertholf, the archive's director at the time, said that Stephen delivered an indirect "warning" to him from intermediaries "in Europe," communicating his wish that Shloss be prevented from using its archives. (Stephen denied this.) Bertholf, who

had secured a valuable arrangement to publish Joyce's detailed notebooks for "Finnegans Wake," was wary of angering Stephen, but he quietly allowed Shloss access. According to Shloss, during the time that she was consulting the archive, Bertholf picked her up in his car each morning and escorted her into the library before it opened. She added that he never officially signed in, to hide the fact that she had visited the library. (Bertholf said that this protocol was not unusual.)

Although Shloss was aware of Stephen's opposition to her project, she wrote him a letter in 1996, asking for his "blessing." She thought that Stephen might appreciate her view that Lucia was misunderstood, not mentally ill. He answered, "My response regarding helping and working with you on a book about Lucia is straightforward and unequivocal: it is a definitive NO. Our experience with Brenda Maddox has taught us not to work with anybody doing a book about, or on, any member of the immediate Joyce family. We have learned our lesson well!"

Shloss was shaken, but she didn't abandon the project. For one thing, she concluded that, despite Stephen's assertions, he did not control the copyright to Lucia's work: the nephew of her last caregiver did, and he gave his approval. (David Monro, a lawyer for the Joyce family, said that an agreement made after Lucia's death gave Stephen the copyright to her papers.) Moreover, American copyright law at that time provided that unpublished work was protected for only fifty years after an author's death. Considering that Joyce had died in 1941, Stephen was not in a position to stop her.

In 1998, Congress passed the bill extending copyright protection to seventy years after a creator's death. James Joyce's unpublished writing was now under Stephen's control until 2012. Nevertheless, Shloss finished her manuscript and sold it to Farrar, Straus & Giroux in 2000. Shortly afterward, Stephen sent her a letter, warning her that he would not give her permission to quote from any document that was under his control. When an attorney for the publisher wrote Stephen to say that the book would limit its quotations to seven thousand words, following the provisions of "fair use," Stephen responded that "this sounds like a bad joke." Copyright, he wrote, was meant "to protect the author's rights as well as those who inherited them, which is my case with respect to James Joyce." He noted, "You should be aware of the fact that over the past decade the James Joyce Estate's 'record,' in legal terms, is crystal clear and we have proven on a number of occasions that we are prepared to put our money where our mouth is."

Shloss had half expected Stephen to challenge her, but she was saddened by the response of other Joyceans. A number of them told her that she should have known better than to write about Lucia. She attributed this reaction to the "climate of fear Stephen causes." Some Joyceans told me that their critiques were more principled. Luca Crispi, a research fellow at the National Library of Ireland, said that Shloss's project was filled with "innuendos" and was "not worthy of its subject." Nevertheless, he agreed with Shloss's point about Joyce's grandson: "Stephen's ruined what was otherwise a wonderful working community."

In June, 2003, Shloss attended a Joyce conference in Tulsa. Sam Slote, who was then working at SUNY-Buffalo, let Shloss know that Stephen expected him to report back on a presentation she was giving on Lucia. Slote, who was uncomfortable in such a role, told me he informed Stephen that he didn't go to the lecture because "everyone suspects me of being a spy."

Meanwhile, Farrar, Straus & Giroux was determined to publish Shloss's book, but it was wary of provoking a lawsuit; Shloss and her editor, Elisabeth Sifton, began making extensive cuts. For example, Shloss had originally quoted a statement that Joyce made to Michael Healy, Nora's uncle, describing Lucia's "form of mental or nervous malady." Joyce argued, "The real trouble is not violence or incendiarism or hysterics or simulated suicide. These are hard to deal with but they prove that the person is still alive. The real danger is torpor [and] losing more and more contact with the outer world." All but the last sentence was excised.

In an e-mail, Sifton reassured Shloss that the cuts had not compromised her book: "I honestly don't think it was a better book when you quoted ten thousand words of Joyce than when you quote only six thousand." Shloss, however, has said that "the process of deleting things that had taken years to find out was just excruciating." She had tried to get Stanford to indemnify her from a lawsuit. But lawyers at the university said that it did not offer protection for a professor's books. An individual risk policy cost fifteen thousand dollars, more than she felt she could afford. So Shloss began searching for another way out of the "mousetrap" that Stephen Joyce had sprung on her.

I met with Lawrence Lessig one afternoon last month, in the garden of the Stanford Law School, in Palo Alto. Lessig is the co-founder of Creative Commons, a popular online copyright-licensing project. That effort, combined with his fight against the 1998 Copyright Term Extension Act, has made him a leading authority on intellectual-property issues. In the 2003 Supreme Court case Eldred v. Ashcroft, Lessig argued that the Founding Fathers did not intend copyright to become a creative straitjacket. He quoted the Constitution to the Justices: "Congress shall have power to . . . promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings." Lessig had clerked for Justice Antonin Scalia, and he expected him and the conservatives on the Court to respond to reasoning based on the original words of the framers. "But the conservatives sat silent," he said. "It was, in some ways, the dying moments of a naïve law professor."

Lessig thinks that Shloss's case is more likely to succeed. "Have you seen her?" he said of Shloss. "She's the quintessential academic—quiet, soft-spoken, modest. The idea that copyright law is going to descend on her and turn her life into hell shows that the law has lost touch with its purpose."

In March, 2005, Lessig had suggested that Shloss prepare to post on a Web site material she had deleted from "To Dance in the Wake." He then wrote to Stephen's lawyers, explaining that the purpose of the Web site would be "to aid scholars and researchers," and that, even though Farrar, Straus had asked Shloss to delete the material, the quotes fell under the doctrine of "fair use." On April 8th, Joyce's solicitors replied, expressing displeasure that Shloss was revisiting the subject of Lucia. Two weeks later, Lessig's office reiterated that the Web site would eventually be going online. (The site has not yet been made accessible to the public.) That May, the estate's lawyers wrote back that "Mr. and Mrs. Joyce have requested we convey their 'astonishment' " at "an unwarranted infringement of the Estate's copyright" and hinted at legal consequences. Lessig— with the help of Robert Spoo, the scholar-turned-lawyer, and David Olson, a Stanford associate— then prepared the suit.

Of the two dozen people I had talked to, Lessig was one of the few who weren't angry at Stephen Joyce. "I don't really blame people who exercise the rights the law appears to give them," Lessig said. "Stephen Joyce is using whatever power he has." But he added that Stephen had strengthened Shloss's case with the threatening letters, the calls to her publisher, the alleged spying and attempts to block her research. As Lessig saw it, the case was simple: Shloss was not trying to profit in an unseemly way off the Joyce legacy; she was an academic who was trying to make a literary argument. It was not at all important whether her argument was correct—only that it was a legitimate effort. To make her case, she needed supporting documents, and Stephen's obstructionism had, perhaps, adversely affected the reception of the book. The *Times*, for example, had described it as "more like an exercise in wish fulfillment than a biography."

"If a copyright holder misbehaves, we want people to know it's not costless," Lessig added. "It's not just the tone of Stephen's letters. It's who the letters were sent to: researchers, archivists, and

librarians, people playing by the rules. It ought to be possible for people to be good."

Around this time, Stephen called me again from La Flotte. He didn't want to discuss Shloss's book. The first time we spoke, he had called it "the biggest pile of horse and cow manure. You'd want to mix it up and put it in a great big bucket." This time, he said simply, "It's so full of nonsense it's not even funny. There is, of course, the freedom of scholars."

Since his fight with Shloss, he had found a new source of resentment. In 2004, the International James Joyce Foundation, a group of scholars, had formed a fact-finding commission to collect stories about the Joyce estate's behavior. (Shloss and Spoo were members of the commission.) The foundation had written to Stephen to say that its goal was not to indict him; it simply wanted to clarify the rights of scholars. But Stephen considered the letter a hostile act. He said, "I am not the Italian Mafia. I am not the Russian Mafia." He went on, "I have to be very careful what I say. Too much is at stake for me. Are these boys the C.I.A., the F.B.I.?" He said of the commission, "So far, I've been handling it by ignoring it. But I'm getting prepared to lower the boom." He did not yet know about Shloss's impending suit.

A person with knowledge of the Joyce estate's finances said that it generates three to four hundred thousand dollars annually. Stephen therefore has money at his disposal for a protracted legal fight. He does not have a bad case, either: over the decades, judges have consistently confirmed the right of estates to exercise a firm hand. F. Scott Kieff, an intellectual-property specialist at Washington University, in St. Louis, said, "It would be really bad if Shloss won. If all I need to do to get access to your property is to say that the restrictions that you are using are unfair—and by unfair I only mean unpopular—then anyone who is unpopular loses their property rights."

The victor in a lawsuit is sometimes determined by stamina. And, as Stephen reminded me several times during our conversations, when it came to stamina he was without peer. He recalled that he had successfully fought to recover two Joyce keepsakes that had remained in the SUNY-Buffalo collection for forty years: a charm engraved with the words "Finnegans Wake" and a pen that Joyce had used to sign copies of that book. "How many people will fight on and on for something they believe in?" he asked me. "It is a typical Stephen James Joyce story." ♦